UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

In re:

VISTA BELLA, INC.,                                    Case No.: 11-00149-MAM-7

      Debtor.


LYNN HARWELL ANDREWS,

      Trustee,

v.                                                    Adv. Proc. No.: 12-00060-MAM

RBL, L.L.C., ROBERT W. SHALLOW,
SUSAN SHALLOW, and RONALD H. CARR,

      Defendants.


**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS
FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING
IN PART THE TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

       William M. Lyon, Jr., Attorney for the Trustee, Mobile, Alabama
       Lynn Harwell Andrews, Chapter 7 Trustee, Mobile, Alabama
       Mark H. Taupeka and Max Cassady, Attorneys for Defendants

       This case is before the court on the Defendants' motions for partial summary judgment

and the Trustee's motion for partial summary judgment. The court has jurisdiction to hear these

matters pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court.

The court has the authority to enter final orders pursuant to 28 U.S.C. § 157(b)(2). For the

reasons indicated below, the Defendants' motions for partial summary judgment and the

Trustee's motion for partial summary judgment are GRANTED IN PART and DENIED IN

PART.

FACTS

The debtor in this matter is Vista Bella, Inc. ("Debtor" or "Vista Bella"). In 2005, the Debtor established a fifty-unit high-rise residential condominium development in Orange Beach, Alabama. At its inception, Curtis Wilson Jr. was the sole officer, director, and shareholder of the Debtor. On October 27, 2005, Vista Bella purchased the unimproved property that would become the condominium development by vendor's lien deed from Island Investments II, LLC ("Island Investments"), another entity owned by Curtis Wilson. Island Investments agreed in the vendor's lien deed to subordinate its vendor's lien to a subsequently obtained construction loan. Prior to that transaction, Island Investments purchased the Vista Bella development property from C. Thurmon Bell ("Mr. Bell"). On October 27, 2005, in connection with the Vista Bella property purchase, Island Investments executed a collateral assignment of its vendor's lien in the Vista Bella property to Mr. Bell.

Around the same time, Curtis Wilson, through Island Investments, owned another condominium development on the Gulf Coast called Emerald Tower. Regions Bank held a mortgage on that property and Curtis Wilson personally guaranteed the debt. Mr. Wilson testified that he was unable to continue making payments on the mortgage and Regions foreclosed on Emerald Tower in February of 2008, resulting in a deficiency. After the foreclosure, Regions sued Curtis Wilson for the deficiency and obtained a judgment. Mr. Wilson testified that the judgment was entered three to four months following the foreclosure.

On October 27, 2005, the Debtor borrowed $36,400,000 from AmSouth Bank to purchase and develop the Vista Bella property and in exchange the Debtor executed a note and mortgage with AmSouth (the "Debtor's mortgage"). The Debtor's mortgage secured all of the Debtor's assets. Curtis Wilson and his wife signed personal guarantees for the debt as well. Pursuant to the

2

vendor's lien deed, Mr. Bell's lien fell behind the Debtor's mortgage in priority. On May 15, 2007, Mr. Wilson executed a Declaration of Condominium for the Vista Bella development. Among other things, the Declaration identified 8 garages and 28 boat slips as limited common elements ("LCEs") and described the LCEs as appurtenant to Vista Bella Unit PH-1 ("Unit PH-1"), a penthouse condominium unit at the Vista Bella development. The Declaration was recorded in Baldwin County, Alabama on May 21, 2007. The Declaration was specifically made subject to the provisions of the Alabama Uniform Condominium Act, Ala. Code § 35-8A-101, et. seq.

The Defendants in this action are RBL, LLC ("RBL"), Robert Shallow, Susan Shallow, and Ronald Carr ("Ronnie Carr"). RBL is a limited liability company and Robert Shallow is its sole manager. Ronnie Carr is the majority owner of RBL. Robert Shallow testified that Mr. Carr owns around 95% of the company. He also owns Vista Bella Unit 1001, which he purchased at an unknown time. Robert Shallow is, and has been, the attorney in fact for Ronnie Carr for years, including with regard to certain transfers of Vista Bella property.

Robert Shallow is also a broker at Ocean Shores, Inc. d/b/a RE/MAX Paradise ("RE/MAX Paradise"), a licensed real estate company in Orange Beach, Alabama. He and his wife, Susan Shallow (collectively, the "Shallows"), own 100% of the shares of RE/MAX Paradise. In 2009, RE/MAX Paradise was taxed as a Subchapter S corporation. Mr. Shallow is an experienced real estate broker and has enjoyed success as a broker in the Gulf Shores/Orange Beach area for years. He has acted as the real estate agent for Vista Bella since its inception. In that capacity, he has procured contracts for the purchase, sale, and transfer of various condominium units originally owned by the Debtor and comprising the Vista Bella development.

3

On July 18, 2007, Unit PH-1 was conveyed to Robert and Susan Shallow by vendor's lien deed. Curtis Wilson executed the vendor's lien deed on behalf of Vista Bella. The description of the property transferred in the vendor's lien stated: "Unit PHW-1 of Vista Bella Condominium . . . according to that certain Declaration of Condominium of Vista Bella . . . Together with appropriate undivided interest in the common area and facilities declared in said declaration to be appurtenant to the above described unit." The vendor's lien recited consideration of $1,350,000 on its face. The vendor's lien deed was recorded and specifically subjected the conveyance to the Debtor's mortgage lien with AmSouth Bank. In late 2006, AmSouth and Regions Bank merged and Regions Bank acquired the Debtor's mortgage and promissory note pursuant to the merger. The Debtor owed $14,485,111.73 to Regions Bank on July 18, 2007.

As consideration for the purchase of Unit PH-1, Robert Shallow testified that he gave Curtis Wilson a $1,000,000 check and signed a $350,000 promissory note which was secured by the vendor's lien. The $1,000,000 check was dated June 2, 2006 and was made payable to Curtis Wilson, not Vista Bella. Robert Shallow testified that Curtis Wilson insisted that the check be made to him personally, rather than to the Debtor. Curtis Wilson testified in his deposition that the $1,000,000 was a loan from the Shallows to him personally and that the money was never deposited into the Debtor's corporate account. The Debtor credited the $1,000,000 payment against the $1,350,000 purchase price of Unit PH-1.

Robert Shallow testified that his intention on July 18, 2007 was to purchase Unit PH-1 with two garages and one boat slip. All of the LCEs that had not been previously reallocated to other units were appurtenant to Unit PH-1 at the time of the conveyance. The Trustee's Second Amended Complaint at paragraph 18 alleges that the additional LCEs were "held by agreement

4

with the Debtor in constructive trust by the Shallows, to be reallocated at the sole and exclusive direction of and for the benefit of the Debtor." Robert Shallow testified on several instances that the LCEs were assets of the Debtor. However, he also testified that, in accordance with the Declaration of Condominium, the legal/record title to the LCEs was in him and his wife, as owners of Unit PH-1, and that the equitable title was in the mortgagee, AmSouth.

Tony Lewis, a licensed real estate appraiser for the Trustee, opined that Unit PH-1 was worth $2,850,000 on July 18, 2007. Mr. Lewis included the value of the LCEs appurtenant to Unit PH-1 in his valuation. Claud Clark III, a licensed real estate appraiser for the Defendants, testified that $1,350,000 was fair consideration on July 18, 2007 "considering the state of the Alabama Gulf Coast condominium market at the time." Mr. Clark elaborated that Hurricane Katrina in 2005 and the economic recession that began in 2007 depressed the condominium market. He did not include the LCEs in his opinion of Unit PH-1's value. In addition to the condominium itself, Mr. Clark only included the two garages and one boat slip that the Shallow's intended to purchase in his consideration of value.

The loan documents associated with the Debtor's mortgage required the Debtor to pay a release price to the lender if it sold any of the Vista Bella units. The release price was to be "equal to the *greater* of (i) ninety-three and one-half (93.5%) of the gross sales proceeds from the sale of a unit or (ii) the minimum sales price applicable to the unit to be sold." Moreover, the release price paid was to be "applied to reduction of the principal balance of the" promissory note that the Debtor originally executed in favor of AmSouth. According to the loan documents, the minimum release price for Unit PH-1 was $1,820,000. The evidence does not indicate that a payment was made to the lender on account of the sale of Unit PH-1 or that any debt reduction

for the sale of Unit PH-1 ever took place. Under the loan documents, the sale of Unit PH-1 without payment of the release price constituted an event of default.

The Lemoine Company of Alabama, LLC ("The Lemoine Company") was a contractor on the Vista Bella development. It filed a verified claim of lien in October of 2007 against the Vista Bella property for unpaid labor and materials and, in December of 2007, it obtained a default judgment against the Debtor in Baldwin County Circuit Court.

Between July of 2008 and March of 2009, some of the LCEs were reallocated from Unit PH-1 to other Vista Bella units as part of sales of those units to third parties.[1] Robert Shallow testified that when a particular unit was sold, he and his wife Susan would sign an amendment to the Declaration of Condominium to acknowledge the reallocation of any LCEs to that unit. He testified that, other than the two garages and boat slips he purchased in 2007, the remaining LCEs were still the property of Vista Bella and it was necessary for him to amend the Declaration in order to transfer the LCEs to other units for sale. The Trustee's Second Amended Complaint concedes that the "Debtor, not the Shallows, received the consideration and benefit of the aforesaid transfers of limited common elements."

On January 22, 2009, the Debtor released Unit PH-1 from its $350,000 vendor's lien. Curtis Wilson executed the release. Several un-reallocated LCEs were still appurtenant to Unit PH-1 at the time. The Trustee argues that the outstanding balance on the vendor's lien, due to accrued interest, was $371,000 on January 22, 2009. Robert Shallow and Curtis Wilson testified that the release was in exchange for Robert Shallow's forgiveness of over $350,000 in real estate commissions owed to him. Robert Shallow testified that he and Curtis Wilson had conducted business together for many years and, in that time, he had earned commissions for his work. Mr.

---

[1] A list of the transactions is alleged in the Trustee's Second Amended Complaint at paragraph 18.

Case 12-00060    Doc 113    Filed 06/04/13    Entered 06/04/13 13:51:46    Desc Main
Document      Page 6 of 55

Shallow testified that he and Curtis Wilson had an understanding, predating the Vista Bella project, which entitled him to a 6% commission on all real estate transactions in which both and he and Curtis Wilson were involved. He explained that he and Curtis Wilson met regarding the $350,000 vendor's lien and "both agreed . . . just to call it even." Curtis Wilson acknowledged that the release was appropriate based on Robert Shallow's forgiveness of the commissions.

A May 10, 2005 agreement between Vista Bella and RE/MAX Paradise provided RE/MAX Paradise a 6% commission on the gross amount of any sales it made on behalf of, and with the consent of, the Debtor. Curtis Wilson signed the agreement on behalf of the Debtor. Robert Shallow, personally, was not a party to the agreement. However, Robert Shallow is noted as the listing agent on the agreement and signed for RE/MAX Paradise as the listing agent. The agreement expired on May 30, 2007. Robert Shallow testified that "23 closings of Vista Bella units in May, June and July 2007 were originally contracted prior to the AmSouth loan closing in October 2005" and that "[a]ll but two of the preconstruction contracts were signed by their purchasers in May and June 2005." Mr. Shallow did not cite evidence in the record to support those statements. The Defendants cite the following transactions as entitling Robert Shallow to commissions:

1. $156,959.42 in commissions derived from 6% of forfeited earnest money deposits from 14 purchasers who did not close purchases of Vista Bella condominium units. Robert Shallow acted as escrow agent for the Debtor;

2. $81,000 in commissions equal to 6% of the $1,350,000 gross purchase price of Unit PH-1 to the Shallows;

3. $45,000 in commissions from his brokering the purchase of the Vista Bella development property from Island Investments II, LLC.; and

4. $97,155.32 in commissions for brokering a transaction between Stewart Title Guarantee Company which resulted in Stewart Title

7

releasing a second real estate mortgage against the Debtor's
property in exchange for Vista Bella Unit 303 in February of 2009.

The Trustee disputes the basis of those commissions beyond the $81,000 for Unit PH-1. Robert

Shallow did not report income for the forgiveness of the $350,000 debt on his 2009 individual

tax return, nor did he report $350,000 in real estate commission income. RE/MAX Paradise did

not report the receipt of $350,000 or more in real estate commissions for tax purposes either.

RE/MAX Paradise also did not pay a 1% franchise fee for the asserted real estate commissions.

On January 23, 2009, RBL purchased the Debtor's mortgage, loan agreement, and

promissory note from Regions Bank. Robert Shallow, acting as manager for RBL, effectuated

the transfer. In addition to the loan documents, RBL also acquired the previously executed

personal guarantees of Curtis Wilson and his wife. Curtis Wilson testified by deposition that his

"position after RBL paid the note was [sic] I was out is kind of what my position was . . . [s]o I

didn't direct [RBL or Ronnie Carr] to do anything but I didn't direct them not to do anything."

He also stated that after RBL purchased the note and mortgage from Regions he "didn't have any

involvement after that, none whatsoever."

On or about January 26, 2009, Robert Shallow, again acting on behalf of RBL, executed

a written release of Unit PH-1 from RBL's newly acquired mortgage lien. Robert Shallow

testified that RBL only intended to release Unit PH-1 and 1 boat slip and two garages from the

lien. The release stated, in pertinent part:

> RBL, LLC does hereby release . . . free from the lien, operation
> and effect of the above referenced Security Documents . . . Unit
> PH-1 of Vista Bella Condominium located in Baldwin County,
> Alabama, according to that certain Declaration of Condominium . .
> . [t]ogether with appropriate undivided interest in the common area
> and facilities declared in said declaration to be appurtenant to the
> above described unit.

8

The promissory note, formerly owned by AmSouth/Regions, permitted RBL to release any collateral at any time, without notice, and without affecting or releasing the liability of any party. Further, in the promissory note, the Debtor agreed to "remain bound for the payment of principal, interest, and all other sums payable hereunder or under any of the Loan Documents . . . notwithstanding any change or changes by way of addition, release, surrender, exchange or substitution of any security for this Note." Curtis Wilson, on behalf of the Debtor, did not object to the release. The release of Unit PH-1 left fifteen condominium units as collateral for the Debtor's mortgage. The Debtor's loan balance was not credited for the value of Unit PH-1 following Unit PH-1's release from the lien. Similarly, no value was credited to the loan balance for the LCEs that were appurtenant to Unit PH-1 at the time of the release.

The Lemoine Company and C. Thurmon Bell also released Unit PH-1 from their liens. Mr. Bell's release was executed on July 23, 2007 and was "given for the purpose of enabling VISTA BELLA, INC., an Alabama Corporation, to make a valid conveyance of [Unit PH-1] free and clear of [his] lien." The Baldwin County Circuit Court determined on January 12, 2010 in an order in Case No. CV-2009-900861.00 that Mr. Bell's release could not be reformed or rescinded. The Lemoine Company's release occurred on May 18, 2009 to "accommodate the sale and transfer of [Unit PH-1] to purchasers."

In early May of 2009, Robert Shallow sold Unit PH-1 to Corey and Theresa Callais, determined by the Circuit Court of Baldwin County to be bona fide purchasers for value, for $912,840.05. Vista Bella did not receive any debt reduction or the benefit of the proceeds from the sale of Unit PH-1. On or around May 19, 2009, the un-reallocated LCEs appurtenant to Unit PH-1 were transferred by Robert Shallow to Vista Bella Unit 1001, which was owned by defendant Ronnie Carr at the time. Robert Shallow testified that the transfer of the LCEs which

9

were appurtenant to Unit PH-1 was necessary because Unit PH-1 had been sold. The Debtor did not object to RBL, Robert Shallow, and/or Ronnie Carr's disposition of the LCEs. In fact, Curtis Wilson testified that he consented to the reallocation of the LCEs to Mr. Carr's Unit 1001.

In Robert Shallow's response to the Trustee's third amended notice of deposition duces tecum, he explained that he erroneously included $350,000 in his basis in Unit PH-1 when reporting a loss on his sale of Unit PH-1. According to Mr. Shallow, he has since instructed his tax preparer to amend his 2009 tax returns to reduce his basis by $350,000.

On June 1, 2009, pursuant to the power of sale contained in the Debtor's mortgage, RBL foreclosed on the Debtor's remaining fifteen condominium units. The power of sale in the mortgage allowed RBL, as the Lender, to offer the mortgaged property for sale in whole or in part, or "in any other manner the Lender may elect." Robert Shallow authorized the foreclosure sale on behalf of RBL. Daniel G. Blackburn acted as auctioneer. Notice of the sale was given by publication in *The Islander*, a Baldwin County, Alabama periodical, for three consecutive weeks in May of 2009. No objections were raised by Vista Bella or any of its creditors prior to the sale. The sale was conducted by auction on the front steps of the Baldwin County courthouse in Bay Minnette, Alabama between 11:00 a.m. and 4:00 p.m. The condominium units were offered for sale individually, rather than en masse. Gary Malin, co-owner of Vista Bella Unit 504, was present at the sale and placed competitive bids for a few of the units. Ultimately, RBL was the winner at the foreclosure sale. RBL bid-in the total amount of its mortgage debt, calculated at $4,935,370.39, plus $138,578, a surplus created by the competitive bidder, Gary Malin. The Debtor was completely released from further liability on the RBL mortgage debt.

No deficiency was created at the foreclosure sale and RBL did not proceed against Curtis Wilson or his wife on the personal guarantees. Mr. Wilson testified that Robert Shallow told him

10

prior to the sale that RBL had to foreclose on the Vista Bella mortgage, but that he "wasn't going to come after the guaranty." Mr. Wilson also testified that the release of the $350,000 vendor's lien was not in exchange for RBL's release of his personal guaranty on the Vista Bella debt.

Curtis Wilson testified that the debt owed to RBL at the time of foreclosure was approximately $5,000,000. The Defendants assert that the exact amount was $4,935,370.39, calculated based on the following information. According to a Sale and Assignment Agreement between Regions Bank and Charter Landing, Inc., the balance of the debt was $4,810,294.66 on December 23, 2008. Also according to Regions, that amount was reduced by a forfeited deposit of $129,281.82 for Vista Bella Unit 1004 on January 22, 2009 and by $457,135.03 from the sale of Vista Bella Unit 602 on January 26, 2009, leaving $4,348,953.54 owed after those transactions. The debt was further reduced by the sale of Vista Bella Unit 504, which sold for $549,691.54 on February 3, 2009, and Unit 802, which sold for $423,548.96 on March 20, 2009. Also included in the total debt were interest, expenses, and other charges. Regions conveyed the mortgage, note, and loan agreement to RBL with $3,750 in charges, $329,763.39 in expenses, and $1,171,998.73 in interest through January 26, 2009. RBL also included interest charges from January 26, 2009 through June 1, 2009.

The Debtor owed a substantial amount of debt which was subordinate to RBL's mortgage at the time of foreclosure. Curtis Wilson testified that the Debtor's other obligations were in excess of $12,000,000, which included, in part, the then-secured debt of The Lemoine Company and C. Thurmon Bell. Mr. Bell filed an unsecured claim in the Debtor's bankruptcy case for $6,679,436.56, which has a fixed interest rate of 6%. The Lemoine Company filed an unsecured claim in the Debtor's bankruptcy case in the amount of $2,118,906, which carried a 12% interest rate. The parties agree that the Debtor was insolvent on the date of the foreclosure and that it had

11

been insolvent since at least 2008. Curtis Wilson testified that he was notified that the AmSouth/Regions mortgage loan was in default in late 2007. Mr. Wilson also explained that, as early as July of 2007, he knew that Vista Bella did not have sufficient assets to retire its debts. Robert Shallow was aware of the Debtor's financial condition, including its insolvency.

No LCEs were offered at the foreclosure sale. None of the fifteen units offered for sale had appurtenant LCEs. All of the unallocated LCEs were appurtenant to Vista Bella Unit 1001, which was owned by defendant Ronnie Carr at the time. Harry T. Haas, a co-owner of Vista Bella Unit 1004 and former President of the Vista Bella Condominium Owners Association, executed an affidavit discussing the demand for LCEs among Vista Bella condominium owners. Mr. Haas explained that he and his wife tried unsuccessfully to purchase a garage. He testified that other Vista Bella condominium owners desiring LCEs had similar difficulties. He also stated that if the LCEs had been included in the foreclosure sale, he would have bid up to $50,000 for a garage unit and speculated that other owners would have had interest in bidding as well.

Gary Malin executed an affidavit that echoed Mr. Haas' testimony regarding LCEs completely. Mr. Malin added that he attended the foreclosure sale and bid on several units, but was outbid by RBL. He stated that he would have bid up to $80,000 for a large boat slip or $50,000 for a garage unit if the LCEs had been made available for purchase at the foreclosure sale. Robert Shallow testified by affidavit that he did not receive any inquiries about the availability of any LCEs from Harry Haas, Gary Malin, or anyone else during the four weeks prior to the date of the foreclosure.

Based in part on Mr. Malin and Mr. Haas' statements of demand for LCEs and estimations of what they would have paid for certain LCEs, the Trustee submitted an LCE valuation analysis as of the date of the foreclosure sale. It estimates that the LCEs held by

Ronnie Carr on the date of the foreclosure, including thirteen boat slips and two garages, were worth between $600,000 and $880,000. Claud Clark III, the defendant's appraisal expert, disagreed with the Trustee's valuation. Mr. Clark emphasized that if the LCEs had been included in the foreclosure, then their value would have been reduced by the nature of the foreclosure sale as a distressed sale. Based upon values placed on boat slips from the foreclosure of Sunset Bay at Bon Secour Island Villas, a condominium development, he concluded that the LCEs would have had an aggregate value of $60,000 if included at the foreclosure sale.

Tony Lewis, a licensed real estate appraiser for the Trustee, testified that the prices received for the foreclosed condominium units ranged between 41.02% and 76.98%—an average of roughly 58%—of their individual fair market values, which he calculated at $8,658,730. Mr. Lewis took into account sales of Vista Bella units within the five months prior to the foreclosure when doing his appraisals. Claud Clark III, the Defendants real estate appraiser, testified by affidavit that the prices paid by RBL at the foreclosure sale were fair. He testified in his deposition that Mr. Lewis' starting point of $8,658,730 was reasonable, but that it needed to be discounted to account for the less than ideal circumstances attendant to a distressed sale. To determine whether the price paid by RBL at the sale was fair, he explained that it was necessary to take into account that the sales occurred at a foreclosure, a single-day, cash only sale of a distressed property, and that the foreclosed properties were encumbered by the one year statutory right of redemption. To find the appropriate discount level, Mr. Clark cited bulk sales of four similarly situated and distressed condominium developments on the Gulf Coast, including one in foreclosure. Those sales netted 45%, 53%, 58%, and 67% of their fair market value. Mr. Clark concluded that the 58% paid by RBL in light of the circumstances was fair consideration.

13

The Trustee offered the affidavit of Ferrell S. Anders. Mr. Anders has been an attorney in Mobile, Alabama for over 30 years. His law practice has focused on real estate, title insurance, mortgage banking and foreclosures. In his opinion, the foreclosure sale was not properly conducted under Alabama law, which damaged the Debtor and parties entitled to redeem. Mr. Anders explained that RBL should have offered all of the Debtor's collateral, including the LCEs, at the foreclosure sale because, in his opinion, failing to do so artificially increased the loan balance that RBL bid-in and reduced the surplus that the Debtor was entitled to from the sale. He stated that "the process of sale was flawed and the debtor did not receive the pool of bidders or the spirited competition expected from an absolute auction of limited common elements where the bidder with the highest bid was assured of purchase." He asserted that the prices bid by RBL on the individual units did not represent reasonably equivalent value and that Vista Bella failed to acquire pre-foreclosure appraisals for the units. He argued that RBL simply purchased the condominium units at the foreclosure sale with an eye toward realizing a profit on their purchase of the Debtor's mortgage.

The Defendants deposed Mr. Anders. He conceded in his deposition that if Unit PH-1 were totally encumbered by the AmSouth/Regions mortgage lien at the time of its transfer to the Shallow's, then its transfer was not fraudulent. Mr. Anders also concluded that foreclosure sales, as forced sales, do not typically garner fair market value. He stated that at one time in Alabama 75% of fair market value paid at a foreclosure was considered a proper price; however, he explained that now, when foreclosure sales are conducted properly, the prices received at the sale are conclusively reasonable. He explained that it was uncommon for attorneys to advise their creditor clients to bid more than the amount of their outstanding debt at a foreclosure sale when such a bid would be sufficient to secure the foreclosed property.

14

In response to Mr. Anders' testimony, the Defendants offered the affidavit of David Hudgens, a longtime foreclosure attorney in Mobile, Alabama. In Mr. Hudgens opinion, the foreclosure sale was properly conducted and was not collusive or fraudulent. He testified that the Defendants' notice of foreclosure was sufficient and that the sale was conducted at the proper location, the Bay Minette courthouse, and at the proper time. Mr. Hudgens testified that RBL met its duty of fairness and good faith because it did not receive such a low price as to shock the conscience. After discussing Alabama case law on the issue, Mr. Hudgens concluded that a price received that equaled 58% of the fair market value of the units would not shock the judicial conscience. He also found it significant that no party, including the Debtor, objected to the sale.

Following the foreclosure, RBL filed an interpleader action in Baldwin County Circuit Court and deposited the surplus money with the court. The Debtor and creditors C. Thurmon Bell, The Lemoine Company, and William P. Condon, among others, were named in the Circuit Court complaint. Mr. Bell accepted the surplus pursuant to a granted motion for partial summary judgment because of the priority of his debt. Even so, Mr. Bell filed a counterclaim in the state court action against RBL disputing $138,578 as the proper surplus amount.

On July 27, 2010, Ronnie Carr reallocated the LCEs appurtenant to his Unit 1001 to Vista Bella Unit 204, owned by RBL by virtue of the foreclosure sale. Robert Shallow acted as Ronnie Carr's attorney in fact in those transactions. Sometime thereafter, RBL reallocated the LCEs among the fifteen condominium units it purchased at the foreclosure sale. RBL then sold the fifteen condominium units, including the LCEs, to third party purchasers. RBL retained the proceeds from the sales. Curtis Wilson did not object, on behalf of the Debtor, to RBL's reallocation of the LCEs or retention of the proceeds from the sales. RBL sold the fifteen condominium units acquired at the foreclosure sale to third party purchasers at a profit over its

basis that exceeded $2.2 million. Those sales occurred over a year after the foreclosure sale. Robert Shallow received a $335,700 commission on those sales.

RBL purchased all of the outstanding stock of Vista Bella from the Trustee of Curtis Wilson's individual bankruptcy estate on October 12, 2010. Robert Shallow is now the sole director and officer of the Debtor. At no point prior to that purchase were Robert Shallow, Susan Shallow, or Ronald Carr officers, directors, or shareholders of the Debtor. RBL, Robert Shallow, Susan Shallow, and Ronald Carr were not creditors of the Debtor within one year of the filing of the involuntary petition.

On January 14, 2011, Vista Bella was the subject of an involuntary bankruptcy petition that was later converted to a Chapter 7 case. The three creditors who filed the involuntary petition were C. Thurmon Bell, The Lemoine Company, and William P. Condon. The Trustee filed this adversary proceeding on June 4, 2012 seeking to avoid many of the transfers discussed above as fraudulent or preferential. The Trustee's complaint has been amended twice. The Trustee's Second Amended Complaint asserts four causes of action: (1) avoidance of fraudulent transfers under federal law pursuant to 11 U.S.C. § 548 and 550, (2) avoidance of transfers under Alabama state law for constructive fraud pursuant to 11 U.S.C. § 544 and the Alabama Uniform Fraudulent Transfer Act § 8-9A-1, et. seq., (3) avoidance of transfers under Alabama state law for actual fraud pursuant to 11 U.S.C. § 544 and the Alabama Uniform Fraudulent Transfer Act § 8-9A-1, et. seq., and (4) avoidance of preferential transfers under 11 U.S.C. § 547.

The Defendants filed two motions for partial summary judgment with regard to certain transfers which the Trustee alleged were fraudulent and preferential in its complaint. The Trustee responded to those motions and countered with her own partial motion for summary judgment

with regard to the same transfers. The Trustee also filed a motion to strike certain portions of the affidavit of David Hudgens.

LAW

A motion for summary judgment is controlled by Rule 56 of the Federal Rules of Civil Procedure, which is applicable to bankruptcy proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure. A court shall grant summary judgment to a moving party when the movant shows that "there is no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056(c). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court found that a judge's function is not to determine the truth of the matter asserted or weight of the evidence presented, but to determine whether or not the factual disputes raise genuine issues for trial. *Anderson*, 477 U.S. at 249-50. In making this determination, the facts are to be looked upon in the light most favorable to the nonmoving party. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Allen v. Bd. Of Public Educ. for Bibb County*, 495 F.3d 1306 (11th Cir. 2007). The moving party bears the burden of proving that there is no issue as to any material fact and that judgment should be entered as a matter of law. Fed. R. Bankr. Pro. 7056.

Before analyzing the transfers at issue, it is necessary to dispense with a few preliminary matters. First, the Trustee conceded in her responses and partial motion for summary judgment that partial summary judgment should be granted in favor of the Defendants with regard to its fourth cause of action, which alleges preferential transfers. Therefore, the Defendants' partial motions for summary judgment are GRANTED as to the Trustee's fourth cause of action. Second, the Trustee filed a motion to strike certain portions of the affidavit of David Hudgens. The court did not rely on the portions of Mr. Hudgens affidavit cited by the Trustee and those

opinions are not reflected in the facts above. Therefore, the Trustee's motion to strike is GRANTED. Third, the parties stipulate that the Debtor was insolvent from at least the year 2008 through the present. That date includes all of the transfers at issue except for the July 18, 2007 conveyance of Unit PH-1. Therefore, the Debtor's insolvency as to all of the other transfers is established for purposes of this opinion.

The Trustee's remaining allegations concern fraudulent transfers. Fraudulent transfer issues are heavily fact dependent and generally come down to the credibility of witnesses. *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2d Cir. 1991). In line with that, courts generally hold that fraudulent transfer issues are inappropriate for summary judgment. *In re Canyon Systems Corp.*, 343 B.R. 615, 636 (Bankr. S.D. Ohio 2006); *In re Moss*, 2006 WL 6589913 (Bankr. N.D. Ga. Mar. 31, 2006). The Bankruptcy Code contains two different statutes under which fraudulent transfers may be avoided: 11 U.S.C. §§ 548 and 544(b). Under either § 548 or § 544(b), the party alleging a fraudulent conveyance bears the burden of proof by a preponderance of the evidence. *In re Fruehauf Trailer Corp.*, 44 F.3d 203, 211 (3rd Cir. 2006); *In re Earle*, 307 B.R. 276, 288 (Bankr. S.D. Ala. 2002) (explaining that the elements of the state law utilized under § 544(b) must be proven by a preponderance of the evidence). In pertinent part, § 548 allows a trustee to avoid "any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

    (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date such transfer was made . . ., indebted; or

    (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .

By its plain language, § 548 delineates two classes of fraudulent transfers. Subsection (A) avoids transfers based upon actual intent to defraud creditors and subsection (B) avoids transfers under circumstances where fraud is presumed—constructively fraudulent transfers. *See* 5 *Collier on Bankruptcy* ¶ 548.01 (16th Ed. 2012).

Section 544(b) gives a trustee the ability to avoid any transfer of an interest of the debtor in property that is voidable under applicable nonbankruptcy law by a creditor holding an unsecured claim that is allowable under the Bankruptcy Code. In this case, the Trustee invokes the Alabama Uniform Fraudulent Transfer Act ("AUFTA"), Ala. Code § 8-9A-1 et. seq., as her nonbankruptcy law of choice. The AUFTA is derived from the Uniform Fraudulent Transfer Act ("UFTA"), which has been adopted by 43 states and the District of Columbia. *See* 5 *Collier on Bankruptcy* ¶ 544.06[2] (16th Ed. 2012). Therefore, cases interpreting the UFTA are persuasive authority for the operation of the AUFTA where the language of the AUFTA mirrors that of the UFTA. *Horton v. Alexander*, 977 So. 2d 462, 465 (Ala. 2007). Like its federal counterpart, the AUFTA concerns both actual fraudulent transfers and constructive fraudulent transfers.

As to actual fraud, Ala. Code § 8-9A-4(a) section states that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." "Actual fraud denotes the actual mental operations of intending to defeat or delay the rights of the creditor." *In re Earle*, 307 B.R. at 291. Section 8-9A-4(b) provides an enumerated list of factors to consider when determining the requisite actual intent. Ala. Code § 8-9A-5(a) deems transfers constructively fraudulent. It states: "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the

transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer."

The court held a hearing on the motions for partial summary judgment on May 23, 2013 and took them under advisement. Following the hearing, several pleadings, mostly styled as responses, were filed. Some of those filings were made weeks after the court took the matter under advisement. There must be some finality to the information a court considers in deciding a matter; therefore, the court will not take the pleadings and exhibits filed after the May 23 hearing into consideration in deciding the underlying motions for partial summary judgment. For the most part, the parties organized their motions by the Trustee's alleged transfers, and for clarity and continuity, the court will do the same.

## ALLEGED TRANSFER 1

### July 18, 2007 Conveyance of Unit PH-1

The Trustee asserts that the Debtor's conveyance of Unit PH-1 to Robert and Susan Shallow on July 18, 2007 was actually and constructively fraudulent under § 548 and § 544(b) via the AUFTA.

**1.      § 548 actual and constructive fraud**

In response to the Defendants' request for admission and interrogatories, the Trustee conceded that 11 U.S.C. § 548 does not apply to the July 18, 2007 conveyance of Unit PH-1 because the transaction occurred more than two years prior to January 14, 2011, the date of the involuntary petition. Section 548 has a two year look back window for potentially offending transactions and the July 18, 2007 conveyance does not fall within it. Therefore, partial summary judgment in favor of the Defendants is GRANTED with regard to the Trustee's § 548 allegations as directed to the July 18, 2007 conveyance of Unit PH-1.

Case 12-00060   Doc 113   Filed 06/04/13   Entered 06/04/13 13:51:46   Desc Main
Document      Page 20 of 55

**2.**      **§ 544(b) and AUFTA actual and constructive fraud**

The Defendants argue that, under the AUFTA, the transfer of a fully encumbered piece of property is not a fraudulent transfer. This court agrees. The plain language of Ala. Code § 8-9A-4(a), § 8-9A-4(c), and § 8-9A-5(a) require the "transfer" of an "asset" to constitute a fraudulent transfer. Transfer is a defined term in the AUFTA: "Every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of *disposing of or parting with an __asset__ or an interest in an __asset__*, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Ala. Code § 8-9A-1(13) (emphasis added). An "asset" under the AUFTA is "Property of a debtor, but the term *does not* include . . . [p]roperty to the extent it is encumbered by a valid lien." Ala. Code § 8-9A-1(2) (emphasis added). A "valid lien" is "[a] lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." Ala. Code § 8-9A-1(14). A "lien" under the AUFTA is "[a] charge against or an interest in property to secure payment of a debt . . . and includes a security interest created by an agreement." Ala. Code § 8-9A-1(9).

The posture of the matter presently before the court is summary judgment. In that context, it is this court's job to determine if the undisputed material facts resolve the legal questions before the court. As to the July 18, 2007 conveyance of Unit PH-1, no material facts are in dispute. Unit PH-1 was conveyed to the Shallows by vendor's lien deed on July 18, 2007. The vendor's lien deed recited $1,350,000 consideration on its face and specifically subjected the conveyance to the Debtor's mortgage (then owned by Regions Bank). The outstanding balance of the Debtor's mortgage on July 18, 2007 was $14,485,111.73 and it encumbered all of the Debtor's property, including Unit PH-1, both before and after the conveyance. The Regions

Bank lien was a "valid lien" as it was good against a holder of judicial lien obtained after it. In fact, no lien of any sort could claim higher priority than the Regions lien.

Based on those undisputed facts, the July 18, 2007 conveyance of Unit PH-1 was not a transfer of an asset pursuant to the AUFTA because its value of $1,350,000 was completely encumbered by the $14,485,111.73 lien of Regions Bank—a valid lien under the AUFTA. Even assuming that the Trustee's appraiser, Tony Lewis, was correct about the $2,850,000 value of Unit PH-1, a value which took into account the LCEs that were appurtenant to Unit PH-1, the unit remained fully encumbered by $14,485,111.73 in debt. It makes sense that the conveyance of a completely encumbered piece of property would not amount to a fraudulent conveyance under the AUFTA when one considers its purpose: "The purpose of the Alabama Uniform Fraudulent Transfer Act is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach." *Folmar & Associates LLP v. Holberg*, 776 So. 2d 112, 117 (Ala. 2000) *overruled by White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5 (Ala. 2009).[2] In line with that, a completely encumbered piece of property contains no equity that creditors might reach. Therefore, under the AUFTA, its transfer does not defraud them.

As noted by the Defendants, no Alabama case discussing the AUFTA discusses this aspect of the AUFTA. However, pre-AUFTA Alabama case law long required "a conveyance of property out of which the creditor could have realized his claim or part of it" in order for a transfer to constitute a fraudulent transfer. *Foy v. Foy*, 447 So. 2d 158, 163 (Ala. 1984); *Roddam*

---

[2] The *Folmar* decision considered two controlling questions of law. The first question involved intentional interference with a business relationship. The second question considered the AUFTA. The *White Sands Group* court overruled the *Folmar* decision regarding its consideration of the first question of law involving intentional interference. The *White Sands Group* decision did not discuss the AUFTA.

22

*v. Martin*, 235 So. 2d 654, 657 (Ala. 1970); *Adkins v. Bynum*, 109 Ala. 281, 19 So. 400 (Ala. 1896). Moreover, courts in other jurisdictions adopting the UFTA have routinely held that "only equity in property in excess of the amount of encumbering liens thereon is an asset reachable by creditors under the Uniform Fraudulent Transfer Act." 37 C.J.S. *Fraudulent Conveyances* §§ 9 (2013) (noting case decisions holding likewise).

In addition, the AUFTA excludes from its definition of asset "property to the extent it is generally exempt under nonbankruptcy law." Ala. Code § 8-9A-1(2). This is so because "[a] sale or other disposition of property which is by law exempt from payment of debts cannot be impeached by creditors as fraudulent, since creditors cannot be deemed concerned with property not subject to their demands." *Flirt v. Kirkpatrick*, 175 So. 2d 755, 758 (1965). An early Alabama Supreme Court opinion called the power to transfer exempt assets "unlimited" because the property was not "subject to the demands of creditors." *May v. Strickland*, 235 Ala. 482, 180 So. 93 (Ala. 1938). While the nature of an exempt piece of property is distinct from a fully encumbered piece of property, the rationale of these cases is persuasive as to the issue before the court. Like with exempt property, fully encumbered property offers no equity to potentially benefit, or defraud, creditors. That truth is certainly evident under the plain language of the AUFTA.

The Trustee argues that the Debtor had equity in Unit PH-1, including the LCEs that were appurtenant to it, on July 18, 2007 because the lender was required to release the unit for the minimum release price of $1,820,000 in the loan agreement. This is not so. First, the Trustee cites no law or provision of the loan documents which restricts the allocation of the mortgage to only the release price of each condominium unit. Second, the vendor's lien made clear that Unit PH-1 remained subject to the Debtor's mortgage. Third, the loan agreement only required the

23

lender to release Unit PH-1 if the release price was actually paid to the lender (Regions Bank at the time). The evidence does not indicate that the release price was ever paid to Regions; therefore, Regions was never under any obligation to release Unit PH-1 and the Debtor's mortgage continued to encumber the unit.

Partial summary judgment is GRANTED in favor of the Defendants as to the Trustee's § 548 and § 544(b) allegations that regard the July 18, 2007 conveyance of Unit PH-1 to the Shallows. The Trustee's motion for partial summary judgment is, therefore, DENIED as to the July 18, 2007 conveyance.

### ALLEGED TRANSFER 2

### January 22, 2009 Release of the Debtor's $350,000 Vendor's Lien

The Trustee asserts that the Debtor's release of the $350,000 vendor's lien it held against the Shallow's Unit PH-1 was actually and constructively fraudulent under § 548 and § 544(b) via the AUFTA.

**1.     § 548 actual and constructive fraud**

The elements necessary to establish a fraudulent transfer for actual fraud under § 548(a)(1)(A) are: (1) a transfer (2) of an interest of the debtor in property (3) that occurred within 2 years prior to the filing of the petition, (4) where the debtor made the transfer with "actual intent to hinder, delay, or defraud" one of its creditors. Section 548(a)(1)(B), in pertinent part, shares the first three elements with subsection (A), but adds that (1) the Debtor received less than a reasonably equivalent value in exchange for the transfer and (2) the Debtor was insolvent on the date of the transfer. The existence of a disputed material fact regarding any of these essential elements will preclude summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Case 12-00060    Doc 113    Filed 06/04/13    Entered 06/04/13 13:51:46    Desc Main
                     Document        Page 24 of 55

It is undisputed that the release of the vendor's lien was a transfer because the Debtor parted with an interest in property. *See* 11 U.S.C. §§ 101(54)(D)(ii) and (37). It is also undisputed that the vendor's lien was an interest in property of the Debtor and that the transfer occurred on January 22, 2009, a date that is within two years of January 14, 2011, the petition date. Moreover, it is undisputed that the Debtor was insolvent on the date of the transfer. Therefore, the only questions that remain are (1) whether the Debtor released the vendor's lien with actual intent to hinder, delay or defraud its creditors, and/or (2) whether the Debtor received reasonably equivalent value.

### A.      Actual intent to hinder, delay, defraud

Actual intent to hinder, delay, or defraud creditors is ordinarily established by circumstantial evidence. *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998). That evidence is typically gathered by a court's consideration of certain badges of fraud. *Id.* In *XXZ Options*, the court cited the badges of fraud in Ala. Code § 8-9A-4(b):

1.  The transfer was to an insider;
2.  The debtor retained possession or control of the property transferred after the transfer;
3.  The transfer was disclosed or concealed;
4.  Before the transfer was made the debtor had been sued or threatened with suit;
5.  The transfer was of substantially all the debtor's assets;
6.  The debtor absconded;
7.  The debtor removed or concealed assets;
8.  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
9.  The debtor was insolvent or became insolvent shortly after the transfer was made;
10. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*XYZ Options*, 154 F.3d at 1272.

No specific combination of badges is necessary for a finding of actual intent and the presence of any of the badges of fraud does not compel such a finding. *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 10 n.13 (S.D.N.Y. 2007). The badges merely highlight circumstances that suggest that a transfer was made with fraudulent intent. *Id*. With that being said, it is clear that actual intent to hinder, delay, or defraud is a heavily fact-dependent question and, as such, summary judgment is rarely appropriate. *In re Canyon Systems Corp.*, 343 B.R. 615, 636 (Bankr. S.D. Ohio 2006). In line with that reasoning, the Eleventh Circuit in *XYZ Options* found genuine issues of material fact when considering whether the debtor in that case had actual intent to hinder, delay, or defraud its creditors.

Here, the result is the same as in *XYZ Options*. At the summary judgment stage, the court will not presume the existence or non-existence of an essential element of the Trustee's cause of action. The Trustee has failed to demonstrate *undisputed* evidence of the Debtor's intent to hinder, delay or defraud in executing the release of the vendor's lien. With a factual dispute, the court must see the witnesses and judge the credibility of their testimony. Therefore, the Trustee's partial motion for summary judgment with regard to the release of the vendor's lien is DENIED.

Similarly, the Defendants failed to demonstrate the absence of material fact issues with regard to the Debtor's intent because the Debtor's release highlights a few of the badges of fraud. Specifically, factual issues exist regarding whether the Debtor received reasonably equivalent value for the release of the lien. Moreover, it is undisputed that the Debtor was insolvent when the transfer was made. In addition, the Debtor's principal, Curtis Wilson, was arguably under threat of suit when he executed the release. Mr. Wilson had recently been sued on a personal guarantee on the Emerald Tower project and had a deficiency judgment entered against him. Mr. Wilson was liable for another personal guarantee in the Vista Bella project and the Trustee

argues that Mr. Wilson executed the release in exchange for Robert Shallow's assurance that RBL would not pursue Mr. Wilson on the guarantee. Again, viewing the witnesses will be necessary. While the Trustee's theory is far from established, it is sufficient to raise a genuine issue of material fact regarding the Debtor's intent in executing the release.

The Trustee also argues that the Debtor's release of the $350,000 vendor's lien was merely one step in a scheme to defraud creditors. She asserts that in January of 2009 that Robert Shallow was aware of the Debtor's financial problems and insolvency and orchestrated a string of transfers, including the Debtor's release of its $350,000 vendor's lien, which ultimately allowed the Defendants to profit from the Debtor's plight at the expense of its creditors. Instrumental in the Trustee's asserted scheme was Curtis Wilson's willingness to allow Robert Shallow and RBL to transfer the Debtor's property at will without any objection. Needless to say, the Trustee's allegations are disputed. However, those allegations do create factual issues that preclude summary judgment. It will be up to the Trustee to present evidence at trial demonstrating that the fraudulent scheme existed and showing how it imputes actual intent to hinder, delay, or defraud creditors on the Debtor. *See In re Lancelot Investors Fund, LP*, 451 B.R. 833 (Bankr. N.D. Ill. 2011) (finding in the context of a Ponzi scheme and pursuant to a motion to dismiss that "the Trustee must plead the requisite intent with respect to each transfer sought to be avoided and must connect the allegations against the Defendants to the Debtors' scheme to defraud creditors").

Consequently, the Defendants partial motion for summary judgment as to the Debtor's release of the $350,000 vendor's lien based on actual intent to defraud is DENIED.

**B.** **Reasonably equivalent value**

Case 12-00060   Doc 113   Filed 06/04/13   Entered 06/04/13 13:51:46   Desc Main
Document      Page 27 of 55

Reasonably equivalent value ("REV") is not specifically defined in the Bankruptcy Code. However, the purpose of the requirement is well known: "to protect creditors against the depletion of a bankrupt's estate." *In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir. 2012); *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990). Therefore, § 548(a)(1)(B) "does not authorize voiding a transfer which confers an economic benefit upon the debtor" because "the debtor's net worth will have been preserved, and the interests of the creditors will not have been injured by the transfer." *Rodriguez*, 895 F.2d at 727.

The pivotal question asks what value a debtor received from a transfer. The Bankruptcy Code defines "value" for § 548 purposes in § 548(d)(2)(A), to include "property, or satisfaction or securing of a present or antecedent debt of the debtor." The Bankruptcy Court for the Northern District of Georgia recently utilized the following three-part test for whether a debtor received REV: "(1) whether the debtor received value; (2) whether the value received was in exchange for the property transferred; and (3) whether the value was reasonably equivalent to the value of the property transferred." *In re Knight*, 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012). It is important to note that strict market equivalence of the transferred property and the received consideration is not required and that "the concept of reasonably equivalent value does not require a dollar-for-dollar transaction." *In re Advanced Telecomm. Network Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007); *see also In re Perry County Foods, Inc.*, 313 B.R. 875, 896 (Bankr. N.D. Ala. 2004) (finding that "paying less than what is the market value price does not demonstrate in isolation from other factors that one paid or received less than reasonably equivalent value for 11 U.S.C. § 548(a)(1)(B)(i)'s purposes"). For purposes of this opinion, it is clear that the court's inquiry into whether REV was received is largely factual and depends on the circumstances of

the case. *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593 (11th Cir. 1990); *TOUSA*, 680 F3d. at 1311.

Whether summary judgment is appropriate as to the Debtor's release of the $350,000 vendor's lien depends on whether the undisputed facts conclusively establish that the Debtor did or did not receive REV in exchange for the release. The Defendants argue that the Debtor owed over $350,000 in real estate commissions to Robert Shallow and RE/MAX Paradise and that the forgiveness of those outstanding commissions constituted REV to the Debtor. If over $350,000 in earned commissions were forgiven in exchange for satisfaction of the $350,000 lien, then it stands to reason that REV was received by the Debtor.

However, whether the commissions were actually owed is in dispute. The written agreement of May 10, 2005 expired on May 30, 2007 and most of the cited commissions occurred after the expiration. Even if the agreement were not expired, it is disputed whether the real estate commissions could be forgiven in order to satisfy the vendor's lien, a personal obligation of Robert and Susan Shallow, because the May 10, 2005 agreement was made between RE/MAX Paradise and the Debtor. Further, other than that document, no written agreement containing terms entitling Robert Shallow or RE/MAX Paradise to any real estate commissions is before the court. The primary evidence of the commissions is the testimony of Robert Shallow and Curtis Wilson. That testimony is far too vague at this stage to support entry of summary judgment. Its general import, which was largely obtained pursuant to leading questions asked during depositions, is that certain transactions occurred over the years and that Robert Shallow and Curtis Wilson had an arrangement where they would conduct their business and "settle up in the end." Moreover, it is significant that no tax implications were recorded with regard to the alleged earning and forgiveness of commissions. The Defendants will have an

29

opportunity at trial to establish that the agreement existed and that the commissions were earned and exchanged. Summary judgment is not the appropriate venue for that determination. The court must hear the witnesses and judge their credibility.

The Trustee argues that the vast majority of the commissions cited by Robert Shallow were void under the Alabama Statute of Frauds, Ala. Code § 8-9-2, because they were based on an oral agreement. In her view, if the oral agreement was void, then the commissions could not have been earned and, therefore, did not amount to REV as a matter of law. This is not so. While the Trustee is correct that any agreement warranting the commissions would have been oral after the expiration of the written contract, § 8-9-2 only applies to executory contracts. *Fowler v. Oliver*, 540 So. 2d 54, 55 (Ala. 1989). The facts, as alleged, indicate that Robert Shallow and Curtis Wilson had an oral agreement that Robert Shallow would receive a 6% commission on all real estate transactions in which he worked with Mr. Wilson. Until those commissions were forgiven, the agreement remained executory and potentially subject to the Statute of Frauds. However, the Defendants allege that the outstanding commissions were exchanged for the Debtor's forgiveness of the vendor's lien. At that point, the alleged oral agreement was no longer executory and not within the purview of the Alabama Statute of Frauds.

Therefore, both parties' motions for partial summary judgment are DENIED as to § 548 constructive fraud and the Debtor's release of the $ 350,000 vendor's lien.

## 2.    § 544(b) and AUFTA actual and constructive fraud

The next issue is whether the Debtor's release of the $350,000 vendor's lien was a "transfer" for purposes of the AUFTA. "The Alabama Uniform Fraudulent Transfer Act provides that 'certain transfers are void or voidable if they are made to the detriment of a creditor.'" *Folmar & Associates LLP v. Holberg*, 776 So. 2d at 117. To insure that a transfer is in fact made

Case 12-00060    Doc 113    Filed 06/04/13    Entered 06/04/13 13:51:46    Desc Main
Document      Page 30 of 55

to the detriment of a creditor, the AUFTA requires a "transfer" of an "asset" to constitute a fraudulent transfer. *See* Ala. Code §§ 8-9A-4(a), § 8-9A-4(c), and § 8-9A-5(a) (all requiring a "transfer"); Ala. Code § 8-9A-1(13) (defining "transfer" to require an "asset"). If a piece of property is encumbered by a "valid lien," then it is not an asset under the AUFTA. Ala. Code § 8-9A-1(2). A "valid lien" is a lien that is good against a subsequently obtained judicial lien. Ala. Code § 8-9A-1(14).

The undisputed facts show that Unit PH-1 was encumbered by the Debtor's mortgage on the date of release and, according to the records of Regions Bank, the value of the Debtor's mortgage exceeded $4,600,000 dollars. It is also undisputed that the Debtor's mortgage is a valid lien. The $350,000 vendor's lien was specifically subjected to the Debtor's mortgage and was recorded well-after the Debtor's mortgage. As such, it was inferior in priority to the Debtor's mortgage at its attachment to Unit PH-1. While the value of Unit PH-1 on January 22, 2009 is not specifically established by the facts, it is undisputed that Unit PH-1, even including a valuation of its appurtenant LCE's, was never worth as much or more than $4,600,000. Therefore, on January 22, 2009, no equity existed in Unit PH-1 for the $350,000 vendor's lien to realize any value for the Debtor—i.e., it was fully encumbered. *See generally In re SMTC Mfg. of Texas*, 421 B.R. 251, 282-283 (Bankr. W.D. Tex. 2009) (discussing equity and fully encumbered property under the Texas Uniform Fraudulent Transfer Act).

Like the Debtor's July 18, 2007 conveyance of Unit PH-1, the Debtor's release of the $350,000 vendor's lien was not a conveyance of an asset because it was fully encumbered by the Debtor's mortgage, a valid lien, and its transfer was not a detriment to other creditors under the AUFTA. Therefore, partial summary judgment is GRANTED as to the Trustee's § 544(b) allegations concerning the Debtor's January 22, 2009 release of the $350,000 vendor's lien.

**ALLEGED TRANSFER 3**

**January 26, 2009 Release of Unit PH-1**

The Trustee asserts that RBL's release of Unit PH-1 from the Debtor's mortgage was actually and constructively fraudulent under § 548 and § 544(b) via the AUFTA.

**1.      § 548(a)(1)(A) actual and § 548(a)(1)(B) constructive fraud**

It is undisputed that RBL's release of Unit PH-1 occurred within 2 years of the filing of the petition. The Debtor's insolvency on January 26, 2009 is also not in dispute. Beyond that, the parties disagree as to the elements of § 548(a)(1)(A) and (1)(B). At issue is whether the release of Unit PH-1 was (1) a transfer, (2) of an interest of the Debtor in property, and, if so, (3) whether the transfer was made with actual intent to hinder, delay, defraud creditors, or (4) whether the Debtor received less than reasonably equivalent value for its property interest. Genuine issues of material fact regarding any of the elements will preclude summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**A.      Transfer**

The first issue is whether RBL's release of Unit PH-1 from the Debtor's mortgage was a transfer for purposes of § 548. 11 U.S.C. § 101(54)(D) defines transfers very broadly to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." *See In re Bernard*, 96 F.3d 1279, 1282 (9th Cir. 1996) (citing legislative history and explaining that the Bankruptcy Code's definition of transfer is intentionally "as broad as possible").

The Defendants argue that RBL's release of Unit PH-1 was not a transfer "made by" the Debtor. The bankruptcy court in *Matter of Clover Donut of White Plains Corp.*, 14 B.R. 205, 210 (Bankr. S.D.N.Y. 1981), held that "the debtor must have made the proscribed transfer, either

directly or indirectly" under § 548. Similarly, the bankruptcy court in *In re FBN Food Services, Inc.*, 175 B.R. 671, 683 (Bankr. N.D. Ill. 1994) *aff'd by* 185 B.R. 265 (N.D. Ill. 1995), held that "a transfer does not have to be made directly by a debtor in order to fall within the ambit of the statute." In so holding, the court considered the breadth of the definition of transfer in the Bankruptcy Code and explained a bankruptcy court's duty, as a court of equity, to look beyond the form of a transaction to determine its substance. *Id.* at 682-83; *see also* 5 *Collier on Bankruptcy* ¶ 548.03[6] (16th Ed. 2012) (explaining that fraudulent transfer law has always considered substance over form to protect creditors from transactions that impair their rights).

On its face, the transfer at issue involves an action taken by RBL, the new mortgagee, releasing Unit PH-1, a piece of collateral owned by the Shallows, from its mortgage. Notably absent in that transaction, according to the Defendants, is the Debtor. Despite that, it is necessary to dig deeper into the transaction and look past its circuity in order to discern the transfer's effect on creditors. *In re Compton Corp.*, 831 F.2d 586, 591-595 (5th Cir. 1987). After all, "[f]raudulent transfers are avoidable because they diminish the assets of the debtor to the detriment of all creditors." *Chase & Sanborn Corp.*, 813 F.2d at 1181. The undisputed evidence shows that Curtis Wilson, on behalf of the Debtor, asserted no objection to RBL's release of Unit PH-1 from its mortgage lien. In fact, Curtis Wilson testified that once RBL purchased the Debtor's mortgage and note from Regions that he had no further involvement. Assuming that the release at issue did involve an interest of the Debtor in property, which will be discussed in the following section, Curtis Wilson's non-objection and lack of interest toward the transaction is significant. Considering the circumstances of the case and the breadth of the transfer definition, this court concludes that Curtis Wilson, on behalf of the Debtor, gave up a property interest of the Debtor

by failing to object to the transfer of that property interest. That action, or inaction, is sufficient to qualify as a transfer of the Debtor under § 548.

### B.    Interest of the Debtor in property

The next question is whether the release operated a transfer of an interest of the Debtor in property, another essential element of § 548(a). The Defendants argue that (1) the Debtor did not own any interest in Unit PH-1 on January 26, 2009 because it was sold to the Shallows in 2007 and (2) RBL, as the mortgage holder, had the unrestricted right under the loan documents to release the collateral without crediting the value of Unit PH-1 against the outstanding mortgage debt. Based upon those contentions, the Defendants argue that the release of Unit PH-1 was not a transfer of an interest of the Debtor in property. The Trustee takes exception with the Defendants' first contention. She argues that RBL's release of Unit PH-1 from the Debtor's mortgage with the consent of Curtis Wilson affected a transfer of the Debtor's equity of redemption and statutory right of redemption. The Trustee is partially correct.

The Debtor did not retain the equity of redemption, as argued by the Trustee, when it sold Unit PH-1. In Alabama, a title theory state, the equity of redemption is a property interest which allows a mortgagor to reacquire its legal title by paying off the entirety of the mortgaged debt. Ala. Code § 35-10-26; *Chess v. Burt*, 87 So. 3d 1201, 1207 (Ala. Civ. App. 2011). Therefore, if the Debtor still held the equity of redemption when Unit PH-1 was released, then a transfer of an interest of the Debtor in property would have occurred with the release. However, the Debtor did not own the equity of redemption when Unit PH-1 was released. In Alabama, when a piece of property is sold subject to a mortgage, its equity of redemption is passed to the purchaser of the property. *Trauner v. Lowrey*, 369 So. 2d 531, 534 (Ala. 1979). This is so because a mortgagor only has the equity of redemption to convey. *Id*. Therefore, after the Debtor sold Unit PH-1 to

Case 12-00060    Doc 113    Filed 06/04/13    Entered 06/04/13 13:51:46    Desc Main
Document      Page 34 of 55

the Shallows, and released its $350,000 vendor's lien forgoing any possibility of recovering the property through foreclosure of that lien, it lost its equity of redemption in Unit PH-1, including the appurtenant LCEs.

The same is not true of the statutory right of redemption. By operation of Alabama law, the Debtor retained the statutory right of redemption when it sold Unit PH-1. The statutory right of redemption arises under Ala. Code § 6-5-248 and allows "certain persons, including 'debtors,' to obtain title to foreclosed property within one year of the foreclosure by tendering the price paid at the sale plus interest and other lawful charges." *In re Poe*, 477 F.3d 1317, 1319 (11th Cir. 2007). The Debtor retained the statutory right under § 6-5-248(e) after the conveyance of Unit PH-1 to the Shallows because the Debtor remained liable for the debt on the mortgage to Regions Bank. *Id*. at 1321-1324. Section 6-5-248(e) states:

> When any debtor or mortgagor conveys his interest in property subject to a mortgage prior to sale wherein they are released from liability for the debt, his right of redemption under this article is terminated. . . . <u>However, where debtors or mortgagors have conveyed their interests in the property but remain liable on the debt and are debtors at the date of the foreclosure sale, the debtors and mortgagors retain their right of redemption under this article</u>.

(emphasis added). The Official Comment to Ala. Code § 6-5-248 reiterates that "[s]ubsection (e) clarifies that one could be a debtor without having any interest in the equity of redemption." The *Poe* court stated:

> [T]he language of subsection (e) provides that a person is a "debtor" under § 6–5–248(a)(1)—notwithstanding the fact that he sold the property prior to the foreclosure sale—if he previously owned the property subject to the mortgage that was foreclosed; retained the liability associated with the property after selling the property; and retained the liability associated with the property at the time of the foreclosure sale.

*Poe*, 477 F.3d at 1323. It is undisputed that the Debtor owned Unit PH-1 prior to its sale to the Shallows in 2007. Moreover, the sale of Unit PH-1 to the Shallows did not relieve the Debtor of

its obligation on the mortgage debt to Regions Bank. The release price in the loan documents was not paid to Regions Bank by the Debtor when Unit PH-1 was sold and the debt was not reduced. Finally, the Debtor remained liable on the debt at the date of foreclosure.

However, the fact that the Debtor retained the statutory right of redemption after the sale of Unit PH-1 does not fully answer the question of whether the statutory right of redemption is an interest in property for § 548(a) purposes. Many courts hold that "an interest of the debtor in property" in § 548 is equivalent to "property of the estate." *See* 5 *Collier on Bankruptcy* ¶ 548.03[2] (16th Ed. 2012) (citing cases). Interestingly, the statutory right of redemption is not property or a property right under Alabama law; rather, it is considered a personal privilege. Ala. Code § 6-5-250; *In re Greene*, 248 B.R. 583, 615 (Bankr. N.D. Ala. 2000); *In re McKinney*, 174 B.R. 330, 335 n.3 (Bankr. S.D. Ala. 1994). Despite that, in Alabama, a debtor's statutory right of redemption becomes property of the estate when a debtor files bankruptcy. *In re Smith*, 85 F.3d 1555, 1558 (11th Cir. 1996); *In re Bozeman*, 174 B.R. 328, 329 (Bankr. M.D. Ala. 1993). Therefore, as property of the estate, the Debtor's statutory right of redemption is an "interest in property of the debtor" for purposes of § 548.

Moreover, that interest was lost when RBL released Unit PH-1 from the Debtor's mortgage because Unit PH-1 could no longer be subject to foreclosure under the Debtor's mortgage. However, whether the Debtor's failure to object to the extinguishment of that interest through the release operated a fraud upon creditors is dependent on whether the Debtor did so with (1) actual intent to hinder, delay, or defraud creditors, or (2) did not receive reasonably equivalent value for the interest.

### C. Actual intent to hinder, delay, or defraud

Actual intent is a predominantly factual inquiry making summary judgment unlikely. *In re Canyon Systems Corp.*, 343 B.R. 615, 636 (Bankr. S.D. Ohio 2006). The issue is appropriately framed as whether Curtis Wilson, on behalf of the Debtor, had actual intent to hinder, delay, or defraud creditors when he failed to object to the release of Unit PH-1 from the Debtor's mortgage which had the effect of extinguishing the Debtor's statutory right of redemption.

This transfer was made while Vista Bella was insolvent and with questionable value received in return for the Debtor's property. However, those factors alone speak more to constructive fraud than actual fraud. The Trustee again invokes her argument regarding Robert Shallow's fraudulent scheme to attribute actual intent to defraud to this transaction. The Trustee will be given the opportunity at trial to present evidence to demonstrate how the Debtor's failure to object to RBL's release of Unit PH-1 from the Debtor's mortgage was done with actual intent to defraud pursuant to the alleged fraudulent scheme. Therefore, the Trustee's and the Defendants' motions for partial summary judgment are DENIED with regard to actual fraudulent intent and the January 26, 2009 release of Unit PH-1 because material factual issues exist.

**D.      Reasonably equivalent value**

As to the January 26, 2009 release of Unit PH-1, this court has concluded that the Debtor gave up its statutory right of redemption by failing to object to the release. The issue here is whether the Debtor received reasonably equivalent value ("REV") for what it gave up. Whether a debtor received REV is a three-part inquiry: "(1) whether the debtor received value; (2) whether the value received was in exchange for the property transferred; and (3) whether the value was reasonably equivalent to the value of the property transferred." *In re Knight*, 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012).

Case 12-00060    Doc 113    Filed 06/04/13    Entered 06/04/13 13:51:46    Desc Main
Document      Page 37 of 55

The undisputed facts do not show that the Debtor received anything in exchange for its statutory right of redemption. However, that does not end the inquiry because the value of the statutory right of redemption must be considered. After all, if the statutory right of redemption had no value, then the Debtor received exactly what it was worth—a reasonable value. In order to consider the value, some assumptions must be made. If the release is unwound, then the statutory right of redemption as to Unit PH-1 would not have been extinguished because Unit PH-1 would still be subject to the Debtor's mortgage. If that were the case, then Unit PH-1 would have presumably been part of the foreclosure sale. Considering those assumptions, the question becomes, at that point, what value does the statutory right of redemption of Unit PH-1 provide the Debtor? The undisputed facts do not answer that material question. Therefore, partial summary judgment is DENIED as to both the Trustee and the Defendants with regard to the January 26, 2009 release of Unit PH-1 based on lack of reasonably equivalent value.

2.      **§ 544(b) and AUFTA actual and constructive fraud**

The Defendants argue that the AUFTA does not apply to RBL's January 26, 2009 release of Unit PH-1 from the Debtor's mortgage because the transfer was not "made by" the Debtor. Alabama case law has made clear that an essential element of the AUFTA is that the challenged conveyance be made by the debtor. *Folmar & Associates LLP v. Holberg*, 776 So. 2d 112, 117 (Ala. 2000) *overruled by White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5 (Ala. 2009); *Hart v. Pugh*, 878 So. 2d 1150, 1157 (Ala. 2003); *George v. Raine*, 895 So. 2d 258, 264 (Ala. 2004); *Thompson Properties v. Birmingham Hide & Tallow Co., Inc.*, 839 So. 2d 629 (Ala. 2002); *Byrom v. Byrom*, 47 So. 3d 783, 789-790 (Ala. Civ. App. 2007); *S.J. Holding Company, Inc.*, 874 So. 2d 1036, 1045-46 (Ala. 2003); *Woodard v. Funderburk*, 846 So. 2d 363, 366-68 (Ala. Civ. App. 2002). However, Alabama case law also holds that a transfer is "made by a

debtor" where it is made by an alter ego of the debtor. *Thompson Properties v. Birmingham Hide & Tallow Co., Inc.*, 839 So. 2d at 633-34.

It is undisputed that the release of Unit PH-1 was executed by RBL, not the Debtor. It is also undisputed that Curtis Wilson did not object to the release. However, whether Curtis Wilson was merely an instrumentality or alter ego of Robert Shallow is in dispute. *See Ex Parte AmSouth Bank of America*, 669 So. 2d 154, 156-57 (Ala. 1995) (finding in the piercing the corporate veil context that "separate legal existence will not be recognized when a corporation is 'so organized and controlled and its business conducted in such a manner as to make it merely an instrumentality of another . . . or when it is the 'alter ego' of the person owning and controlling it'").

The following facts are evidence of a genuine issue of material fact regarding whether Curtis Wilson and the Debtor were mere instrumentalities or alter egos of Robert Shallow: (1) Robert Shallow's significant involvement with, and first-hand knowledge of, the Debtor since its inception, (2) Curtis Wilson's personal guarantee of debt which RBL eventually purchased (3) RBL's partial ownership by Robert Shallow, (4) Robert Shallow's promise not to collect on Curtis Wilson's guarantee, (5) Curtis Wilson's inactive stance as to all of the transfers of the Debtor's property, including the release of Unit PH-1, and (6) Robert Shallow's ultimate profit from acquiring the Debtor's property. On the other hand, the release of Unit PH-1 from the mortgage lien was accomplished by the Shallows and not the Debtor. Therefore, partial summary judgment as to this issue is DENIED as to both parties motions.

## ALLEGED TRANSFER 4

### Reallocation of LCEs

The Trustee alleges that the Defendants' various conveyances of the LCEs were fraudulent transfers under both 11 U.S.C. § 548(a) and § 544(b) through the AUFTA. The Debtor disagrees and moves for partial summary judgment on the basis that the reallocations were not made by the Debtor. These transactions are the most loosely defined "transfers" briefed by the parties. Based on a review of the facts, the following transactions encapsulate those involving the LCEs:

1. The LCEs were originally allocated to Unit PH-1 in the Declaration of Condominium on May 15, 2007.

2. On July 18, 2007, Unit PH-1, which included the appurtenant LCEs, was sold to Robert and Susan Shallow.

3. Between July of 2008 and March of 2009, some of the LCEs were reallocated to various condominium units as part of sales to third party purchasers. The Trustee concedes that the Debtor received the consideration and benefit of those transfers.

4. On May 19, 2009, the remaining un-reallocated LCEs still appurtenant to Unit PH-1 were transferred to Ronnie Carr's Unit 1001. The foreclosure occurred one month later.

5. On July 27, 2010, Ronnie Carr reallocated the LCEs to Vista Bella Unit 204, then owned by RBL by virtue of the foreclosure sale.

6. Sometime thereafter, RBL reallocated the LCEs among the fifteen condominium units it purchased at the foreclosure sale. RBL then sold the fifteen condominium units, including the LCEs, to third party purchasers. RBL retained the proceeds from the sales.

The Trustee does not question the first transaction as a fraudulent transfer. Section 548(a) does not apply to the second transaction because it occurred more than two years prior to the petition date. Likewise, the AUFTA does not apply to the second transaction because the LCEs appurtenant to Unit PH-1 were fully encumbered at the time. The Trustee does not dispute the third transaction as a fraudulent transfer. *See* Trustee's Second Amended Complaint at ¶ 18. Therefore, only the final three transactions are under consideration in this section discussing reallocation of the LCEs.

40

Case 12-00060   Doc 113   Filed 06/04/13   Entered 06/04/13 13:51:46   Desc Main
Document      Page 40 of 55

1. **§ 548 actual and constructive fraud**

It is undisputed that Vista Bella was insolvent when the LCEs were reallocated in 2009 and 2010. It is also undisputed that those reallocations occurred within two years of the filing of the involuntary petition. Beyond that, the parties dispute the application of the elements of § 548(a). Therefore, at issue is whether the reallocations from May 19, 2009 forward constitute (1) transfers made by the Debtor, (2) of an interest of the Debtor in property, and, if so, (2) whether those transfers were made with actual intent to hinder, delay, or defraud creditors and/or (3) whether the Debtor received less than reasonably equivalent value for the transfers.

A. **Transfer**

In order for a transfer to be subject to avoidance under § 548(a), it must be a transfer of an interest of the debtor in property. The Bankruptcy Code defines transfers very broadly to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). A transfer must be either directly or indirectly made by a Debtor in order to qualify for avoidance under § 548. *In re FBN Food Services, Inc.*, 175 B.R. 671, 683 (Bankr. N.D. Ill. 1994) *aff'd by* 185 B.R. 265 (N.D. Ill. 1995).

It is clear that the May 19, 2009 reallocation of the LCEs to Unit 1001 disposed of an interest in property. However, the Defendants argue that they are entitled to partial summary judgment because the reallocation of the LCEs on May 19, 2009, July 27, 2010, and the sales thereafter were not made by the Debtor. It is undisputed that the reallocations were effectuated pursuant to amendments to the Declaration and that those amendments were executed by Robert Shallow, Susan Shallow, and Ronnie Carr (by Robert Shallow as his attorney-in-fact). However,

it is also undisputed that Curtis Wilson, on behalf of the Debtor, consented to the May 19, 2009

reallocation of the un-reallocated LCEs to Ronnie Carr's Unit 1001.

In response to the Debtor's argument, the Trustee argues that the LCEs were the Debtor's

property and that the Defendants had no legal right to reallocate them without the Debtor's

direction or consent. The Defendants argue in response that following the January 26, 2009

release of Unit PH-1 from the Debtor's mortgage the LCEs were released along with the unit.

The Defendants are correct because a lien against a common element, like the LCEs, is void if

that lien is no longer attached to the unit to which the common element is allocated. Ala. Code §

35-8A-207(e) Commissioners' Commentary 6. It is also true that at the time of the release, the

un-reallocated LCEs were appurtenant to Unit PH-1 and that a limited common element must be

appurtenant to a unit. *Bank of America, N.A. v. Kinslow*, 2012 WL 6062577, at * 4 (Ala. Civ.

App. December 7, 2012). Based upon that, the Defendants argue that, upon release from the

mortgage lien, the Shallows were free to reallocate the LCEs as they saw fit.

The court agrees with the Defendants' legal analysis. The Shallows, as unit owners with

appurtenant limited common elements allocated to their unit, had the legal right to reallocate the

LCEs as long as those reallocations were in line with the Alabama Uniform Condominium Act

("AUCA"), Ala. Code § 35-8A-101 et. seq., and the Declaration of Condominium (the

"Declaration") executed by Curtis Wilson. Ala. Code § 35-8A-208 (a) and (b). However,

whether the Shallows had the legal right and ability to effectuate a reallocation does not speak to

whether the reallocation was an indirect transfer of the Debtor. A transfer under § 548 can be

directly or indirectly made by a debtor. *FBN Food Services, Inc.*, 175 B.R. at 683; *Matter of*

*Clover Donut of White Plains Corp.*, 14 B.R. at 210. Many fraudulent transfers are accomplished

through legal means but still qualify as fraudulent transfers. Just because the Shallow's could

42

transfer the LCE's does not mean that their transfer was conclusively not fraudulent—or, conclusively not an indirect transfer of the Debtor.

With that being said, it is this court's conclusion that, given the facts of this case and this court's duty to consider substance over form with fraudulent transfers, Curtis Wilson's consent to the reallocations of the LCEs on May 19, 2009 to Ronnie Carr's Unit 1001 qualifies as an indirect transfer of the Debtor under § 548.

There is no evidence of the Debtor's actions regarding the July 27, 2010 transfer or the sales made thereafter. At most, it is assumed that Curtis Wilson did not object to those transfers. Therefore, summary judgment is DENIED to both parties to the extent that the Trustee objects to those conveyances as fraudulent transfers because this court cannot conclude as a matter of law that those reallocations were transfers under § 548(a).

### B.       Interest of the Debtor in property

At the summary judgment stage, it is this court's duty to determine whether genuine issues of material fact exist. It is unclear to this court what interest, if any, the Debtor had in the LCEs on May 19, 2009. The Declaration at Article 4.08 initially allocated all of the LCEs to Unit PH-1. Robert Shallow owned Unit PH-1, and up until May of 2009, all of the LCEs that had not been reallocated to other units for sale to third parties remained appurtenant to Unit PH-1. The Trustee asserts that the LCEs were allocated to Unit PH-1 to be held in constructive trust by Robert Shallow so that he could allocate the LCEs to other units in connection with sales to third parties for the Debtor's benefit. That arrangement makes sense and Robert Shallow's deposition testimony indicates that his understanding was that he could only reallocate the LCEs at the direction of the Debtor because the LCEs were "assets of the [Debtor]."

Case 12-00060    Doc 113    Filed 06/04/13    Entered 06/04/13 13:51:46    Desc Main
Document        Page 43 of 55

However, the extent of the Debtor's interest in the LCEs on May 19, 2009, if any, is unclear. In their briefs, the parties argue that the Shallows held legal/record title to the LCEs pursuant to the Declaration of Condominium and that the mortgagee held equitable title. The court does not have sufficient information to contest the veracity of those arguments or to determine the status of the title of the LCEs. In order to determine, on summary judgment, the merits of the Trustee's § 548 claims regarding the reallocation of the LCEs, it must be undisputed that the Debtor had an interest in the LCEs. Based on the information before the court, including the parties' arguments which do not directly address this issue, a concrete determination of the Debtor's interest in the LCEs on May 19, 2009 cannot be made at this time. Therefore, the Defendants' motion for partial summary judgment regarding § 548(a) and the May 19, 2009 reallocation of the LCEs is DENIED because an interest of the Debtor in property is an essential element of § 548(a).

## 2.      § 544(b) and AUFTA actual and constructive fraud

Like with the release of Unit PH-1 detailed above, there is an issue of material fact regarding Robert Shallow's control of the Debtor through Curtis Wilson and whether the Debtor was, as a result, a mere alter ego or instrumentality of Robert Shallow. Although Alabama case law has made clear that an essential element of the AUFTA is that the challenged transfer be made by the debtor, *Hart v. Pugh*, 878 So. 2d 1150, 1157 (Ala. 2003), Alabama case law has also made clear that a conveyance made by the alter ego of the Debtor is a transfer made by the Debtor for purposes of the AUFTA, *Thompson Properties v. Birmingham Hide & Tallow Co., Inc.*, 839 So. 2d 629 (Ala. 2002). Therefore, for the reasons discussed in the section regarding the release of Unit PH-1 from the Debtor's mortgage as a fraudulent transfer under the AUFTA, a genuine issue of material fact exists as to whether the May 19, 2009 reallocation of the LCEs

was a transfer of the Debtor. Partial summary judgment is DENIED as to the both parties motions.

**ALLEGED TRANSFER 5**

**June 1, 2009 Foreclosure**

The Trustee alleges that the June 1, 2009 foreclosure sale of fifteen condominium units owned by the Debtor was actually and constructively fraudulent under both 11 U.S.C. § 548(a) and § 544(b) through the AUFTA. A mortgage foreclosure can qualify as a transfer for fraudulent transfer purposes. *In re Littleton*, 888 F.2d 90 (11th Cir. 1989). As to the June 1, 2009 sale, there is no dispute that the foreclosure sale was a transfer, made by the Debtor, of property owned by the Debtor. Moreover, the transfer occurred within two years of the involuntary petition. Therefore, under § 548 or the AUFTA, the only issues that remain as to whether the June 1, 2009 foreclosure sale was fraudulent are (1) whether the transfer was made with actual intent to hinder, delay, or defraud and/or (2) whether the Debtor received reasonably equivalent value for the foreclosed property.

**1.      Actual intent to hinder, delay, or defraud under § 548 and the AUFTA**

Actual intent to hinder, delay, or defraud creditors is ordinarily established by circumstantial evidence. *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998). That evidence is typically gathered by a court's consideration of certain badges of fraud. *Id.* In *XXZ Options*, the court cited the badges of fraud in Ala. Code § 8-9A-4(b):

1. The transfer was to an insider;

2. The debtor retained possession or control of the property transferred after the transfer;

3. The transfer was disclosed or concealed;

4. Before the transfer was made the debtor had been sued or threatened with suit;

5. The transfer was of substantially all the debtor's assets;

6. The debtor absconded;

45

7. The debtor removed or concealed assets;

8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

9. The debtor was insolvent or became insolvent shortly after the transfer was made;

10. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*XYZ Options*, 154 F.3d at 1272.

In discussing the actual intent requirement, this court in *In re Earle*, 307 B.R. 276, 291 (Bankr. S.D. Ala. 2002), stated that "[a]ctual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor." Therefore, the issue here is whether the Debtor, in conducting the foreclosure sale, acted with the requisite intent to defraud creditors.

The Defendants argue that the Trustee has failed to present any evidence of the Debtor's intent to defraud. This court agrees that the Trustee has failed to present any *undisputed* evidence of intent. Therefore, the Trustee's motion for partial summary judgment claiming actual fraudulent intent under § 548 and the AUFTA is DENIED.

However, the Trustee has created genuine issues of material fact regarding the Defendants' fraudulent intent. The Trustee alleges that all of the transfers, including the June 1, 2009 foreclosure sale, were part of a fraudulent scheme orchestrated by Robert Shallow to obtain the Debtor's assets at a discount and profit from its plight. To do so, the Trustee alleges that Robert Shallow asserted control over the Debtor's principal, Curtis Wilson, based on Curtis Wilson's personal guarantee on the mortgage debt. Moreover, the Trustee states that Robert Shallow was close enough to the situation to know the Debtor's finances inside and out, including its insolvency. Based on that knowledge, Robert Shallow was in a position, according

to the Trustee, to effectuate transfers of the Debtor's valuable assets to the benefit of the Defendants and at the expense of the Debtor and its creditors.

None of those allegations are undisputed and this court cannot make a determination as a matter of law. Therefore, the Trustee's motion for partial summary judgment is DENIED as to this issue. However, the deposition testimony and exhibits highlight circumstances regarding Robert Shallow's knowledge, potential control of Curtis Wilson, and the Defendants ultimate pecuniary gain in this matter. As such, partial summary judgment is DENIED to the Defendants as to the June 1, 2009 foreclosure sale and actual intent to defraud under § 548 and the AUFTA.

## 2.    Reasonably equivalent value under § 548 and the AUFTA

In the foreclosure context, the law regarding reasonably equivalent value ("REV") under § 548(a)(1)(B) and the AUFTA is very similar. With regard to § 548(a), the United States Supreme Court in *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 545 (1994), held that "a fair and proper price, or a 'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." In Ala. Code § 8-9A-3(b), the AUFTA echoes the rule in *BFP*: " For the purposes of subsection (c) of Section 8-9A-4 and subsection (a) of Section 8-9A-5, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement."

It is undisputed that the Debtor was insolvent on the date of the foreclosure, therefore, the only issue is whether the Debtor received REV. *BFP* and § 8-9A-3(b) teach us that the answer to that question is yes unless the foreclosure sale was improperly or collusively conducted under

Case 12-00060    Doc 113    Filed 06/04/13    Entered 06/04/13 13:51:46    Desc Main
Document    Page 47 of 55

Alabama state law. This court finds that the undisputed facts show that the sale was properly conducted and, as a result, that the Debtor received REV. In considering whether to set aside a foreclosure sale under Alabama law, the Eleventh Circuit held the following in *CS Assets, LLC v. West Beach, LLC*, 370 Fed. Appx. 45 (11th Cir. 2010):

> In the case at issue, the lender acquired the property for 20%, 30%, or 66% of its fair market value, depending on the appraisal used. But the choice of percentage is not as determinative in the end as the observation that no misconduct tainted the auction. The pleadings in the district court created no genuine issue as to the propriety of the sale or the adequacy of the notice. The investors concede they knew about the auction. (We also note that the investors declined to exercise their statutory right of redemption in the year following the sale.) In the absence of any issue of impropriety, this sale must stand. The trial court did not err in concluding the sale price did not shock the judicial conscience.

*Id.* at 46.

Similarly, in this case, RBL conducted a fair foreclosure sale. It is clear that the sale was properly noticed, was conducted at the proper location, and was conducted at the proper time. RBL bid-in its entire debt in accordance with its rights as the mortgagee. Moreover, the undisputed facts show that RBL's actions were consistent with securing its debt rather than creating a deficiency that would burden the Debtor following the sale. *See Jackson v. Wells Fargo Bank, N.A.*, 90 So. 3d 168, 172-73 (Ala. 2012) (finding that a wrongful foreclosure does not occur where the foreclosing party merely acts to secure its debt). A competitive bidder was present at the sale and entered bids that pushed the purchase price higher than RBL's debt amount. Despite that, RBL increased its bid and paid the surplus. Afterward, RBL properly interplead the surplus into the Circuit Court of Baldwin County to be disbursed to the Debtor's creditors in accordance with their priority. The surplus was accepted in the Circuit Court action. No objections were made by the Debtor or any of its creditors before or after the sale. No party attempted to redeem any of the foreclosed property within one year following the sale.

48

The Trustee argues that RBL breached its duty of good faith and fairness as a quasi-trustee in conducting the sale. It is true that Alabama law, in the context of a wrongful or bad faith foreclosure action,[3] imposes on a foreclosing party the duty to act in good faith and fairness in exercising the power of sale and in conducting the foreclosure sale. *Brabham v. American Nat. Bank of Union Springs*, 689 So. 2d 82 (Ala. Civ. App. 1996). An early Alabama case described the duty of good faith and fairness in this way:

> In a court of law a power of sale is merely part of a legal contract to be executed according to its terms. In a court of equity it is quickened with the elements of a trust, and the donee of the power is charged as a quasi trustee with the duty of fairness and good faith in its execution, to the end that the mortgagor's property may be disposed of to his pecuniary advantage in the satisfaction of his debt.

*Bank of New Brockton v. Dunnavant*, 204 Ala. 636, 638, 87 So. 105, 107 (1920). It is important to note that the duty does not impose upon a foreclosing party all of the duties of a general fiduciary. *Brabham*, 689 So. 2d at 88. Instead, in determining whether the duty has been violated, Alabama courts look, in part, to whether the price received at the sale was "so inadequate as to shock the conscience." *In re Sharpe*, 425 B.R. 620, 637-38 (Bankr. N.D. Ala. 2010). Courts have also held that "[w]hen property subject to a mortgage consists of distinct tracts, the mortgagee, as a quasi trustee, has a duty first to offer the property for sale as parcels rather than en masse." *Garris v. Fed. Land Bank of Jackson*, 584 So. 2d 791, 794 (Ala. 1991).

The price received in this case does not shock the conscience. According to a valuation by the Trustee's expert, the Debtor received roughly 58% of the fair market value of the fifteen condominiums. Such a value is reasonable given the circumstances of a forced sale. *See BFP*, 511 U.S. at 538 (explaining that "'fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale"). Moreover, RBL offered the

---

[3] The Trustee did not allege a wrongful foreclosure cause of action in this case.

units for sale individually, rather than en masse, which is thought to encourage the best possible price. *J. H. Morris, Inc. v. Indian Hills, Inc.*, 212 So. 2d 831, 843 (1968). In terms of fairness and good faith, it is also significant that the entirety of the Debtor's obligation on the debt was extinguished by the sale, creating no deficiency.

The Trustee argues that the foreclosure sale was improper because the debt amount bid-in by RBL was incorrect. The Trustee asserts that the debt that RBL bid-in was artificially inflated because no value for Unit PH-1 was deducted from the debt total on account of Unit PH-1's release from the Debtor's mortgage. She asserts that the debt should have at least been reduced by $912,000, which was the sale price of Unit PH-1 Robert Shallow received within two weeks of the foreclosure sale. Similarly, the Trustee asserts that the value of the un-reallocated LCEs should have been reduced from the debt total. The Trustee estimates that the LCEs were worth between $600,000 and $880,000, a disputed total. According to the Trustee, the effect of not reducing the debt to account for those assets was to inflate the amount of debt that RBL could bid-in to the sale, thus reducing the amount of surplus RBL would need to bid-in. Alternatively, the Trustee argues that RBL should have offered the LCEs for sale in the foreclosure sale because it could have garnered more bids, and a higher surplus, for the Debtor.

The Trustee's arguments assume too much. First, that in January of 2009, RBL was required to deduct the value of Unit PH-1 from the mortgage debt. The Trustee's assumption is incorrect because it is undisputed that the loan documents, acquired from Regions Bank, allowed RBL to release any collateral from the debt and did not require RBL to reduce the debt amount with the release. Moreover, the Trustee cites no law supporting his contention that the Debtor's failure to reduce the debt amount based upon Unit PH-1's release roughly six months earlier

50

made the foreclosure sale improper. The same is true of the value of the LCEs and their effect on the mortgage debt.

Second, the Trustee's argument regarding the LCEs presumes that the LCEs could have been included in the foreclosure sale on June 1, 2009. It is undisputed that the un-reallocated LCEs were appurtenant to Unit PH-1 when Unit PH-1 was released from the Debtor's mortgage. By operation of Alabama law, the Debtor's mortgage was void as against those LCEs on that day because when Unit PH-1 ceased to be encumbered by the Debtor's mortgage, the Debtor's mortgage became void as against the LCEs that were appurtenant to it. Ala. Code § 35-8A-207(e), Commissioners' Commentary 6. Further, on the date of foreclosure, no LCEs were appurtenant to any of the fifteen condominium units for sale because they were appurtenant to Unit 1001, owned by Ronnie Carr. At that point, RBL had no power to include them in the foreclosure sale.

The Trustee argues that the Debtor created this legal impossibility, and therefore, cannot cite it as a defense. The legal principle that the Trustee refers to is called supervening impracticability and it is a creature of contract law. *See Restatement (Second) of Contracts* § 261 (1981). For purposes of the Trustee's argument, the legal principle essentially says that a party to a contract cannot claim that their performance under the contract is impracticable if they are to blame for creating the impracticability. It is true that RBL created the circumstances that prevented the LCEs from being offered at the foreclosure sale. However, supervening impracticability would only require RBL to perform its obligations pursuant to the contract rather than standing behind the impracticability as a defense. The power of sale in the mortgage allowed RBL, as the Lender, to offer the mortgaged property for sale in whole or in part, or "in any other manner the Lender may elect." Even despite that, RBL's duty of fairness and good

faith with regard to that power of sale only required that it act to secure its debt while accepting a price that did not shock the conscience. RBL did that with or without inclusion of the LCEs.

Therefore, the Defendants' partial motion for summary judgment with regard to reasonably equivalent value under both § 548(a) and the AUFTA and the June 1, 2009 foreclosure sale is GRANTED because the foreclosure sale was properly conducted and the price received there was, as a result, presumptively reasonably equivalent value. The Trustee's partial motion regarding the same is DENIED.

## Good Faith Transfer

As to many of the transfers alleged by the Trustee in this case, the Defendants assert that they are entitled to a defense under § 548 and the AUFTA because, in their estimation, they took for value and in good faith. Both statutes contain such a defense. Under the Bankruptcy Code, 11 U.S.C. § 548(c), states:

> [A] transferee . . . that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Ala. Code § 8-9A-8(d), provides a similar defense:

> Notwithstanding voidability of a transfer under this chapter, a good-faith transferee is entitled, to the extent of the value given the debtor for the transfer or to another person as a consequence of the debtor's making such transfer, to
>
> (1) A lien on or a right to retain any interest in the asset transferred; or
>
> (2) A reduction in the amount of the liability on the judgment.

Under either statute, the good faith of the transferee must be shown. Both parties move for partial summary judgment regarding the applicability of the defenses to the Defendants as good-faith

transferees. Considering the undisputed facts, it is clear to this court that the Defendants did not receive any of the transfers in question with the requisite good faith.

Good faith is an objective inquiry. *In re Evergreen Sec., Ltd.*, 319 B.R. 245, 254 (Bankr. M.D. Fla. 2003). Under both § 548(c) and § 8-9A-8(d), courts considering the good faith question ask what a transferee knew or should have known which might have put him or her on notice of the Debtor's fraudulent purpose or the Debtor's precarious financial circumstances. *Id.* at 255 ("Circumstances putting the transferee on inquiry notice as to a debtor's insolvency, an underlying fraud, or the improper nature of a transaction, will preclude a transferee from asserting a good faith defense."); *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995) (finding good faith lacking where the transferees were on inquiry notice of the debtor's insolvency and the transfer did not carry the hallmarks of an arm-length bargain); *In re Dorsey*, 2011 WL 4914841, at *3 (Bankr. M.D. Ala. October 17, 2011) ("Good faith . . . requires not just a lack of actual knowledge of fraud, but also a lack of knowledge of circumstances requiring further investigation.").

Here, the Trustee argues that Robert Shallow's knowledge precludes good faith on behalf of the Defendants. The Trustee's argument is well-taken. Robert Shallow's knowledge and involvement with the Debtor precludes his good faith in the five transactions discussed in this opinion. Robert Shallow was involved with the Debtor since its inception. He knew of the Debtor's insolvency. He knew what debts the Debtor had and knew when and if they were paid. He knew the value of the Debtor's property. He had a long-standing business relationship with the Debtor's principal, Curtis Wilson. Moreover, Robert Shallow's knowledge can be imputed to RBL, since he was its manager. In the same way, his knowledge can be imputed to Ronnie Carr, his partner in RBL, for whom Mr. Shallow acted as attorney in fact. Likewise, his knowledge

can be imputed to his wife and business partner, Susan Shallow. It is clear that Robert Shallow acted on both sides with regard to the Debtor. On one hand, he worked for the Debtor as a real estate and escrow agent. On the other, he acted as a purchaser and transferor of the Debtor's property.

Under either § 548(c) or the AUFTA, it is clear that Robert Shallow knew of the Debtor's precarious financial circumstances and insolvency. His knowledge of the Debtor and his extensive participation in most, if not all, of the Debtor's transactions made those transactions, as to him, anything but arm's length. Therefore, partial summary judgment as to § 548(c) and § 8-9A-8(d) is GRANTED to the Trustee. Those provisions will not save the Debtor's fraudulent transfers, if any, in this case. The Defendants' motion for summary judgment regarding the same is DENIED.

THEREFORE IT IS ORDERED

1. The Defendants' motion for partial summary judgment is GRANTED as to the Trustee's fourth cause of action alleging preferential transfers.

2. The Trustee's motion to strike portions of the affidavit of David Hudgens is GRANTED.

3. The Defendants' motion for partial summary judgment is GRANTED as to the Trustee's § 548 claims as they pertain to the Debtor's July 18, 2007 transfer of Unit PH-1 to the Shallows.

4. The Defendants' motion for partial summary judgment is GRANTED as to the Trustee's § 544(b) claims via the AUFTA as they pertain to the Debtor's July 18, 2007 transfer of Unit PH-1 to the Shallows. The Trustee's cross motion regarding the same is DENIED.

5. The Defendants' motion for partial summary judgment is DENIED as to the Trustee's § 548 claims as they pertain to the Debtor's January 22, 2009 release of the Shallow's $350,000 vendor's lien. The Trustee's cross motion regarding the same is DENIED.

6. The Defendants' motion for partial summary judgment is GRANTED as to the Trustee's § 544(b) claims via the AUFTA as they pertain to the Debtor's January 22, 2009 release of the Shallow's $350,000 vendor's lien. The Trustee's cross motion regarding the same is DENIED.

7. The Defendants' motion for partial summary judgment is DENIED as to the Trustee's § 548 claims as they pertain to RBL's January 26, 2009 release of Unit PH-1 from the Debtor's mortgage. The Trustee's cross motion regarding the same is DENIED.

8. The Defendants' motion for partial summary judgment is DENIED as to the Trustee's § 544(b) claims via the AUFTA as they pertain to RBL's January 26, 2009 release of Unit PH-1 from the Debtor's mortgage. The Trustee's cross motion regarding the same is DENIED.

9. The Defendants' motion for partial summary judgment is DENIED as to the Trustee's § 548 claims as they pertain to reallocation of the LCEs. The Trustee's cross motion regarding the same is DENIED.

10. The Defendants' motion for partial summary judgment is DENIED as to the Trustee's § 544(b) claims via the AUFTA as they pertain to reallocation of the LCEs. The Trustee's cross motion regarding the same is DENIED.

11. The Defendants' motion for partial summary judgment is DENIED as to the Trustee's § 548 claims and § 544(b) claims based upon actual intent to hinder, delay, or defraud as they pertain to the June 1, 2009 foreclosure sale. The Trustee's cross motion regarding the same is DENIED.

12. The Defendants' motion for partial summary judgment is GRANTED as to the Trustee's § 548 claims and § 544(b) claims based upon lack of reasonably equivalent value as they pertain to the June 1, 2009 foreclosure sale. The Trustee's cross motion regarding the same is DENIED.

13. The Defendants' motion for partial summary judgment is DENIED as to their assertions that they are entitled to the good-faith transferee defenses codified in § 548(c) and Ala. Code § 8-9A-8(d). The Trustee's cross motion regarding the same is GRANTED.

14. This case is set for pre-trial on June 18, 2013 at 10:00 a.m. in Courtroom 1, U.S. Bankruptcy Court, 201 St. Louis Street, Mobile, Alabama 36602.

Dated: June 4, 2013

*Margaret A. Mahoney*
MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE