UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

In re:

VISTA BELLA, INC., Case No.: 11-00149-MAM-7

Debtor.

LYNN HARWELL ANDREWS,

Trustee,

v. Adv. Proc. No.: 12-00060-MAM

RBL, L.L.C., ROBERT W. SHALLOW,
SUSAN SHALLOW, and RONALD H. CARR,

Defendants.

**ORDER DENYING THE DEFENDANTS' MOTION TO RECONSIDER AND GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

William M. Lyon, Jr., Attorney for the Trustee, Mobile, Alabama
Lynn Harwell Andrews, Chapter 7 Trustee, Mobile, Alabama
Mark H. Taupeka and Max Cassady, Attorneys for the Defendants, Fairhope, Alabama

At issue are the Defendants' motions to reconsider and for partial summary judgment. The Trustee's opposes the relief requested in both motions. This court has jurisdiction to hear and finally decide these matters pursuant to 28 U.S.C. § 157 and 1334 and the Order of Reference of the District Court. For the reasons detailed below, the Defendants' motion to reconsider is GRANTED and the Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.

FACTS

On June 4, 2013, this court entered an opinion granting in part and denying in part cross-motions for partial summary judgment filed by the parties. *See In re Vista Bella*, 2013 WL

2422703 (Bankr. S.D. Ala. June 4, 2013); Doc. 114 and 115. In it, the court considered five fraudulent transfers alleged by the Trustee. The facts included in that opinion are incorporated here by reference.

The following facts are also relevant to the motions currently before the court. On October 27, 2005, the transactions which culminated in the creation of the Vista Bella condominium development took place. Among other documents, Vista Bella Inc. and AmSouth Bank executed a Loan Agreement; an Assignment of Leases, Rents, and Income; a Mortgage and Security Agreement; and an Assignment of Contract Rights and General Intangibles (collectively, the "Loan Documents"). The Loan Agreement contemplated the individual sale of the condominiums comprising the Vista Bella development and in section 3.14 assigned Vista Bella's "rights and privileges under any and all Purchase Agreements" to AmSouth as security for the loan. In pertinent part, section 3.14 stated:

> Assignment of Purchase Agreements. All of [Vista Bella's] rights and privileges under any and all Purchase Agreements . . . including but not limited to [Vista Bella's] rights with respect to any and all earnest money deposits . . . relating to the sale of any individual condominium unit, shall be, and hereby are, assigned to [AmSouth Bank] as additional collateral and security for the Loan. [Vista Bella] shall punctually perform, satisfy and comply with all conditions, covenants, terms and provisions to be performed, satisfied and/or complied with by [Vista Bella] . . . . Further, [Vista Bella] shall not make, suffer, permit or consent to any modification or termination of any such Purchase Agreement, nor enter into any future Purchase Agreement for the sale of any portion of the Premises, except for the sale of individual condominium units upon the form of Purchase Agreement approved by [AmSouth Bank] and for a purchase price at least equal to the applicable minimum purchase price set forth in Exhibit "C" attached hereto and incorporated by reference, without the prior written consent of [AmSouth Bank].

Section 3.20 of the Loan Agreement discusses Purchase Agreements. It explains that "[e]ach Purchase Agreement shall be upon the form of agreement approved by [AmSouth], without

alteration or amendment except as approved by [AmSouth] in writing, and shall have a purchase price equal to or greater than the minimum purchase price . . . unless [AmSouth] shall have approved in writing a lower purchase price." The applicable release price for Vista Bella Unit PH-1 contained in Exhibit C of the Loan Agreement was $1,820,000. There is no evidence that AmSouth ever approved, in writing or otherwise, the sale of Unit PH-1 at a price lower than the $1,820,000 minimum release price. Similarly, at section 3.16, the Loan Agreement details the circumstances in which AmSouth would execute a partial release of the individual condominiums in order to facilitate sales of those condominiums. That section reiterates that a release price would need to be paid to AmSouth in order for AmSouth to release a condominium.

The Mortgage and Security Agreement (the "Mortgage") granted AmSouth Bank a security interest, with an associated power of sale, in the Vista Bella development property and other related assets of the Debtor. The following "Rents and Accounts" were included as "Mortgaged Property":

> All rents, royalties, issues, profits, revenues, income, accounts, accounts receivable, contract rights, general and tangibles (sic), instruments, chattel paper and any and all rights of [Vista Bella] of any nature whatsoever to the payment of money, whether now existing or hereafter arising, by reason of or arising from or in connection with the use, occupancy or operation of the Mortgaged Property or any part thereof or the operation of any business enterprise thereon, together with all proceeds and products thereof, and further including without limitation all right title and interest of [Vista Bella], as seller, under any and all agreement for the sale of all or any portion of the Mortgaged Property now existing or hereafter entered into, including but not limited to any such contracts for the sale of condominium units hereafter constructed upon the Mortgaged Property, together with Mortgagor's rights and interest in the earnest money deposits made or to be made pursuant to such agreement.

All of AmSouth Bank's interests in the Mortgaged Property, including in the Rents and Accounts, would be extinguished after Vista Bella successfully satisfied the balance of the Note

and complied with the terms mandated by the Loan Documents. Section 1.07 of the Mortgage "creates a security interest in all that property (and the proceeds thereof) included in the Mortgaged Property which might otherwise be deemed 'personal property.'"

The Mortgage also included, at section 1.03, a provision entitled "Assignment of Rents, Accounts, Etc." It purported to "absolutely, presently, and unconditionally" assign the Rents and Accounts to AmSouth, but allowed Vista Bella to collect those Rents and Accounts so long as no Event of Default occurred. After an Event of Default, AmSouth was entitled to direct all "lessees, occupancy tenants, and account debtors of the Mortgaged Property" to pay to AmSouth "all amounts due [Vista Bella] pursuant to their respective leases, occupancy agreements, accounts or other agreements," provided that AmSouth sent written notice of the Event of Default to those persons. In that circumstance, "all persons [were] expressly relieved of any and all duty, liability or obligation to [Vista Bella] in respect of all payments so made." There is no evidence before the court that AmSouth ever sent the Shallows any written notice of default.

Section 1.04(C) of the Mortgage allowed Vista Bella to enter into contracts to sell condominium units for not less than the minimum approved sales price as detailed in the Loan Agreement and upon the terms of pre-approved Purchase Agreements. It is undisputed that an Event of Default occurred with regard to the sale of Unit PH-1 because it was sold for less than the minimum release price detailed in the Loan Agreement. The Debtor likewise did not remit the proceeds of the sale to AmSouth Bank. Section 1.09 of the Mortgage, entitled "No Secondary Financing," prohibited Vista Bella from creating or permitting a lien to encumber the Mortgaged Property without prior written consent of AmSouth Bank. It is undisputed that the Debtor did not obtain the written permission of AmSouth or its successors in interest to encumber Vista Bella Unit PH-1 with the vendor's lien.

The Assignment of Contract Rights and General Intangibles, executed on October 27, 2005 contemporaneously with the Loan Agreement and Mortgage, states:

> [Vista Bella] hereby grants a security interest in, transfers and assigns unto [AmSouth Bank], its successors and assigns, all of [Vista Bella's] rights, title, interests, privileges, and powers (whether now existing or hereafter arising) in, to, under and with respect to (1) all agreements and contracts between [Vista Bella] and the Escrow Agent pertaining in any way to the Vista Bella condominium development and (2) the Purchase Agreements and the monetary deposits made and to be made by purchasers under the Purchase Agreements as well as all of [Vista Bella's] right, title and interest with respect to any and all letters of credit . . . given and to be given by purchasers under said Purchase Agreements in lieu of monetary deposits, including without limitation [Vista Bella's] right to receive the proceeds from any Letter of Credit . . ., including without limitation [Vista Bella's] right to receive the Escrow Deposits and [Vista Bella's] right to require Escrow Agent to draw upon a letter of credit given in lieu of a monetary deposit upon a default by a purchaser under his or her Purchase Agreement . . . for the purpose of providing additional security . . . .

In addition to Vista Bella, Inc. and AmSouth Bank, the Assignment of Contract Rights and General Intangibles included Ocean Shores, Inc. d/b/a RE/MAX Paradise as a party to the agreement as "Escrow Agent." RE/MAX Paradise is owned and operated by Robert Shallow.

On June 2, 2006, Curtis Wilson, on behalf of the Vista Bella, executed a Preconstruction Purchase and Escrow Agreement with Robert Shallow for the purchase of Vista Bella Unit PH-1. It patently states that the Shallows paid $1,000,000 to the Debtor for Unit PH-1 as an earnest money cash deposit and that $350,000 remained due at closing. On July 18, 2007, Unit PH-1 was conveyed to Robert and Susan Shallow (collectively, the "Shallows"). As part of the conveyance, the Shallows executed a $350,000 promissory note in favor of Vista Bella and granted Vista Bella a vendor's lien in Unit PH-1 for $350,000. The promissory note was specifically secured by the vendor's lien and the vendor's lien was expressly subject to the Mortgage. The balance of the debt owed to AmSouth at the time was $14,485,111.73.

## LAW

A motion for summary judgment is controlled by Rule 56 of the Federal Rules of Civil Procedure, which is applicable to bankruptcy proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure. A court shall grant summary judgment to a moving party when the movant shows that "there is no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056(c). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986), the Supreme Court found that a judge's function is not to determine the truth of the matter asserted or weight of the evidence presented, but to determine whether or not the factual disputes raise genuine issues for trial. In making this determination, the facts are to be looked upon in the light most favorable to the nonmoving party. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Allen v. Bd. Of Public Educ. for Bibb County*, 495 F.3d 1306 (11th Cir. 2007). The moving party bears the burden of proving that there is no issue as to any material fact and that judgment should be entered as a matter of law. Fed. R. Bankr. P. 7056.

The parties make the same legal arguments regarding both the vendor's lien, which is the subject of the motion for reconsideration, and the promissory note, which is dealt with in the motion for partial summary judgment. For that reason, and because they share a common factual basis, the two motions will be considered concurrently.

This court concluded in its opinion that the Debtor's January 22, 2009 release of the $350,000 vendor's lien was not a transfer under the Alabama Uniform Fraudulent Transfer Act, Ala. Code § 8-9A-1 *et. seq.* ("AUFTA"), because the lien was fully encumbered, and thus, not an asset under the AUFTA's definitions. Based upon that conclusion, partial summary judgment was granted in favor of the Defendants. The Trustee also seeks to avoid the transfer pursuant to

11 U.S.C. § 548(a)(1) as actively and constructively fraudulent. This court denied the Defendants' request for partial summary judgment as to those claims, finding that genuine issues of material fact existed as to whether the release was accomplished with fraudulent intent and as to whether Vista Bella received reasonably equivalent value in exchange for the release. In doing so, this court necessarily determined that the vendor's lien was an interest in property of the Debtor. The Defendants take issue with that conclusion and insist that the promissory note was likewise not an interest in property of the Debtor.

Under § 548(a)(1), the subject of an offending fraudulent transfer must be "of an interest of the debtor in property." Courts interpret that phrase as the general equivalent of "property of the estate." 5 *Collier on Bankruptcy* ¶ 541.03[2][a] (16th Ed. 2012). Those courts do so primarily based upon the United States Supreme Court's opinion in *Begier v. IRS*, 496 U.S. 53, 59 (1990), where the Court held that "'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *See In re Cannon*, 277 F.3d 838, 849 (6th Cir. 2002) (applying the *Begier* rule to an 11 U.S.C. § 548 action); *In re Egidi*, 571 F.3d 1156, 1160 (11th Cir. 2009). Property of the estate under 11 U.S.C. § 541 is construed extremely broadly and sweeps in all sorts of interests, including interests which are contingent, speculative, non-possessory, intangible, or non-transferable. *See Segal v. Rochelle*, 382 U.S. 375 (1966); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205-06 (1983); *In re Prudential Lines Inc.*, 928 F.2d 565, 572 (2d Cir. 1991); *In re Neuton*, 922 F.2d 1379, 1382-83 (9th Cir. 1990); *In re Anderson*, 128 B.R. 850, 852-53 (D.R.I. 1991). Whether a debtor has an interest property, and to what extent, is determined according to state law. *Butner v. United States*, 440 U.S. 48, 54 (1979).

The Defendants argue that Vista Bella assigned all of its rights, title, and interest in the June 6, 2006 Presale Purchase Agreement for Unit PH-1, including the vendor's lien and promissory note which were a product of it, via the Loan Documents. Moreover, the Defendants argue that, pursuant to section 1.03 of the Mortgage, the Debtor absolutely assigned all Rents and Accounts, which in their estimation included the vendor's lien and promissory note, to AmSouth Bank and that after an Event of Default occurred the Debtor had no legal or equitable right to enforce the vendor's lien. The result of the assignment and the default, according to the Defendants, is that the Debtor did not have any property interest in the vendor's lien, an essential element of a § 548(a)(1) transfer, because it belonged to AmSouth Bank.

The Trustee disagrees. She argues that the documents relied upon by the Defendants demonstrate the parties' intention to apply a security interest in favor of AmSouth Bank (and its successors in interest) only in "bank approved, executory pre-sale purchase agreements (and escrow deposits)." Conversely, unapproved, or "rogue," purchase agreements which are not in line with the terms of the Loan Documents do not result in a security interest attaching to the purchase agreement or its proceeds. The Trustee agrees with the Defendants that the Debtor's entry into the purchase agreement for Unit PH-1 at a price less than the minimum approved price, without AmSouth's consent, constituted an Event of Default. Therefore, argues the Trustee, AmSouth never had a security interest in the purchase agreement for Unit PH-1, or its proceeds, which included the vendor's lien because the purchase agreement was "rogue." As a result, the vendor's lien belonged to the Debtor until its extinguishment—the transfer at issue.

The first issue raised by the parties is one of contract interpretation. In a nutshell, the question is whether the parties intended in the loan documents that a security interest should follow unapproved, "rogue" purchase agreements and their proceeds. In *N&L Enterprises, LLC*

*v. Lioce Properties, LLP*, 51 So. 3d 273, 279 (Ala. 2010), the Alabama Supreme Court had this to say regarding contract interpretation:

> "In construing a contract, this Court is guided by the principle that ' "[t]he intention of the parties controls ... and the intention of the parties is derived from the contract itself, where the language is plain and unambiguous." ' " *State ex rel. Riley v. Lorillard Tobacco Co.*, 1 So. 3d 1, 12 (Ala. 2008) (quoting *Dunes of GP, L.L.C. v. Bradford*, 966 So. 2d 924, 928 (Ala.2007), quoting in turn *Loerch v. National Bank of Commerce of Birmingham*, 624 So. 2d 552, 553 (Ala. 1993)). This Court has also stated: "[I]t is well settled that the words of a contract are to be given their ordinary meaning, and the intention of the parties is to be derived from the provisions of the contract itself." *Food Serv. Distribs., Inc. v. Barber*, 429 So. 2d 1025, 1028 (Ala. 1983).

Moreover, the *N&L Enterprises* court explained that in seeking to determine the meaning of a particular clause of a contract, a court must consider the contract as a whole and give effect to all of its parts, when possible. *Id*. at 280 (quoting *Gulf Coast Realty Co. v. Professional Real Estate Partners, Inc.*, 926 So. 2d 992, 1005 (Ala. 2005)). However, if a contract is "ambiguous or uncertain in any respect, determination of the true meaning of the contract is a question for the fact finder . . ." which takes into account "the surrounding circumstances, including the construction placed on the language by the parties . . . in order to ascertain the intention of the parties." *Mass Appraisal Services, Inc. v. Carmichael*, 404 So. 2d 666, 673 (Ala. 1981). "A contractual provision is ambiguous if it is reasonably susceptible of more than one meaning." *FabArc Steel Supply, Inc. v. Composite Const. Systems, Inc.*, 914 So. 2d 344, 357 (Ala. 2005). In analyzing this issue, the court is mindful of the present posture of the case—partial summary judgment. Therefore, an ambiguity in the contract that is unresolved by the undisputed facts will preclude summary judgment. *Alfa Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 684 So. 2d 1295, 1301 (Ala. 1996).

Here, no such ambiguity exists. In the Loan Agreement, the first sentence of section 3.14 makes clear that Vista Bella's rights and privileges under all present and future Purchase Agreements for condominium units were assigned to AmSouth as additional security for the loan AmSouth extended to Vista Bella. No language in section 3.14 limits that assignment to approved Purchase Agreements. The sentences following the first sentence detail Vista Bella's responsibilities with regard to the Purchase Agreements. None of those sentences directly limits the original collateral assignment. Therefore, pursuant to the Loan Agreement, all Purchase Agreements, including "rogue" purchase agreements, were assigned to AmSouth as collateral for the loan.

The Mortgage is similarly clear. At section 1.03 it unconditionally assigns all existing and future Rents and Accounts to AmSouth as security for AmSouth's loan. Rents and Accounts is defined as Mortgaged Property in section (F) to include "contract rights . . . together with all proceeds and products thereof," and specifically includes "any and all agreements for the sale of all or any portion of the Mortgaged Property . . . including, but not limited to any such contracts for the sale of condominium units . . . ." Like in the Loan Agreement, the assignment in the Mortgage is not limited to approved Purchase Agreements. Moreover, the Mortgage makes clear that the bank's assigned property, although given for security, extends to all proceeds and products of any purchase agreement for a condominium unit. That grant would surely include the vendor's lien and the promissory note. As to the promissory note specifically, section 1.07 of the Mortgage extends its coverage to property deemed "personal property." The promissory note is personal property.

The Trustee argues that the assignments in the loan documents only applied to pre-approved security agreements. It is true that the Loan Documents contain provisions requiring

the approval of purchase agreements or, at a minimum, the sale of condominiums at pre-approved prices. However, those provisions do not specifically limit the assignments at issue. Rather, failing to follow those provisions constitute Events of Default which entitle the holder of the Mortgage (AmSouth and its successors) to the remedies detailed in the Loan Documents. Moreover, Vista Bella's entry into a so-called "rogue" purchase agreement creates no obligation in the holder of the Mortgage to release the condominium conveyed pursuant to that rogue purchase agreement from the Mortgage. While holding a superior mortgage on a condominium unit which was sold outside the terms of the Loan Documents and additionally holding an assignment of the purchase agreement that led to that sale and its proceeds could be duplicative, both represent the security that AmSouth bargained for in the Loan Documents. The Loan Documents do not explain that one form of security necessarily precludes the other. Also, whether it would be advantageous for the Mortgage holder to enforce a "rogue" agreement does not rob AmSouth of that bargained-for option.

Moreover, the doctrine of merger does not apply to the 2006 purchase agreement. In *In re Heatherwood Holdings, LLC*, 454 B.R. 495, 535 (Bankr. N.D. Ala. 2011), the bankruptcy court discussed the doctrine of merger and cited with approval American Jurisprudence's explanation of the doctrine. *See* 77 Am. Jur. 2d Vendor and Purchaser § 244 (2013). There, the treatise states that "[t]he crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement." AmSouth, the beneficiary of the assignment at issue, was not a party to the "rogue" purchase agreement between Vista Bella and Robert Shallow. Therefore, AmSouth could not have intended that its rights pursuant to the collateral assignment be merged into any deed that resulted from the 2006 purchase agreement.

As such, it is clear that all purchase agreements, including "rogue" purchase agreements and their proceeds, which included the promissory note and vendor's lien, were assigned to AmSouth Bank as collateral for the loan. However, that conclusion does not dictate that the Debtor did not have a property interest in the promissory note and vendor's lien. In *In re McCombs*, 2011 WL 4458893, at *5 (Bankr. S.D. Ala. September 23, 2011), this court held that a pre-petition "absolute assignment" of rents pursuant a mortgage divested Mr. McCombs, and his bankruptcy estate, of a property interest in the rents. In doing so, this court expressed reservations about its holding based upon "the growing number of cases from other jurisdictions analyzing [the] question somewhat differently," *see In re Buttermilk Towne Center, LLC*, 442 B.R. 558 (B.A.P. 6th Cir. 2010), but felt compelled to follow Alabama law holding consistently on the issue. Since that time, this court has had occasion to revisit the *McCombs*' holding (in a few oral rulings) and has decided that the better result is that an "absolute assignment," which carries all of the hallmarks of being assigned for security purposes only, does not divest a debtor of all property interest in the absolutely assigned property.

Here, the assignments in the Loan Documents were patently included to give AmSouth Bank additional security for its loan. Those assignments did not rob the Debtor of all of its interest in the assigned property, including the 2006 purchase agreement for Unit PH-1 and its products, the promissory note and vendor's lien. In order for the Debtor to lose all property rights to those assigned property interests, the Mortgage holder would have had to take some action to foreclose on its interest or sequester the assigned property in partial satisfaction of its loan. In this case, at section 1.03, the Mortgage explains that upon an Event of Default, the holder of the Mortgage may collect the assigned Rents and Accounts and relieve the obligors of those Rents and Accounts from liability to the Debtor. However, in order to so, the Mortgage

holder would be required to send written notice of the default to those persons. There is no evidence that any such written notice was sent or that the Mortgage holder, AmSouth or otherwise, took any action with regard to any assigned property prior to the January 22, 2009 release of the vendor's lien and cancellation of the promissory note. As such, the Debtor retained a property interest in the vendor's lien and note through that date.

Therefore, the Defendants' motion to reconsider is DENIED. Likewise, the Defendants' motion for partial summary judgment is DENIED to the extent that it asks this court to grant partial summary judgment as to the Trustee's § 548(a) claims based on an alleged lack of any property interest of the Debtor in the promissory note.

The Defendants also argue in their motion for partial summary judgment that the Debtor's January 22, 2009 cancellation of the $350,000 promissory note was not a fraudulent transfer under the AUFTA via § 544(b)(1). The Defendants assert that the $350,000 promissory note was fully encumbered by the Debtor's mortgage. "The Alabama Uniform Fraudulent Transfer Act provides that 'certain transfers are void or voidable if they are made to the detriment of a creditor.'" *Folmar & Associates LLP v. Holberg*, 776 So. 2d at 117. To insure that a transfer is in fact made to the detriment of a creditor, the AUFTA requires a "transfer" of an "asset" to constitute a fraudulent transfer. *See* Ala. Code §§ 8-9A-4(a), § 8-9A-4(c), and § 8-9A-5(a) (all requiring a "transfer"); Ala. Code § 8-9A-1(13) (defining "transfer" to require an "asset"). If a piece of property is fully encumbered by a "valid lien," then it is not an asset under the AUFTA. Ala. Code § 8-9A-1(2). A "valid lien" is a lien that is good against a subsequently obtained judicial lien. Ala. Code § 8-9A-1(14).

It has already been determined that the promissory note was collateral under the Loan Documents as a product of the 2006 purchase agreement for Unit PH-1. At the time of its

cancellation, the Mortgage's value far exceeded the $350,000 promissory note. Therefore, as to the AUFTA, the promissory note was fully encumbered and not an "asset" capable of being fraudulently transferred. Partial summary judgment is appropriate in favor of the Defendants as to this finite issue.

THEREFORE IT IS ORDERED

1. The Defendants' motion for reconsideration is DENIED;
2. The Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.

Dated: August 9, 2013

Margaret A. Mahoney
MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE