UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

In re:

VISTA BELLA, INC.,                                         Case No.: 11-00149-MAM-7

    Debtor.


LYNN HARWELL ANDREWS,

    Trustee,

v.                                                        Adv. Proc. No.: 12-00060-MAM

RBL, L.L.C., ROBERT W. SHALLOW,
SUSAN SHALLOW, and RONALD H. CARR,

    Defendants.


## ORDER AWARDING JUDGMENT TO DEFENDANTS ON ALL COUNTS

William M. Lyon, Jr., Attorney for the Trustee, Mobile, Alabama
Lynn Harwell Andrews, Chapter 7 Trustee, Mobile, Alabama
Mark H. Taupeka, Attorney for Defendants

The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. The Court has the authority to enter a final order pursuant to 28 U.S.C. § 157(b)(2)(h). No party requested a jury trial. No party objected to the Court's jurisdiction. The Court has previously ruled on some issues in this suit in three summary judgment orders dated June 4, June 28, and August 9 of 2013. Those orders are incorporated by reference into this order. For the reasons indicated below, the Court is awarding judgment to the Defendants on all counts of the Complaint.

FACTS

I. The Parties

A. The Debtor

1

The Debtor in this matter is Vista Bella, Inc. ("Debtor" or "Vista Bella"). Vista Bella was incorporated on March 10, 2005 by Curtis "Bo" Wilson ("Bo Wilson" or "Wilson"). In 2005, the Debtor began developing a fifty-unit, high-rise residential condominium in Orange Beach, Alabama. The development, Vista Bella, contains twenty-eight boat slips and eight garages, termed Limited Common Elements ("LCEs") under the Alabama Uniform Condominium Act ("AUCA").

B. The Plaintiff

The Trustee, Lynn Harwell Andrews, brings this adversary proceeding on behalf of Vista Bella's unsecured creditors. Creditor C. Thurmon Bell held the largest debt after the Debtor's mortgage and he was second in line to be paid behind the mortgagee.

C. The Defendants

The Defendants in this action are RBL, L.L.C. ("RBL"), Robert W. Shallow ("Shallow" or "Bob Shallow"), Susan Shallow ("Susan Shallow" or "Mrs. Shallow"), and Ronald H. Carr ("Carr" or "Ronnie Carr"). RBL is a limited liability company. Ronnie Carr owns 95% of RBL and Bob Shallow owns the other 5%. Mr. Shallow is Carr's attorney-in-fact and the sole manager of RBL. Bob and Susan Shallow are married. They co-own RE/MAX Paradise and acted as the Debtor's exclusive real estate agents for the Vista Bella project. Additionally, they owned PH-1, a Vista Bella unit. Mr. Carr owned Vista Bella unit 1001 at some point. RBL bought the Debtor's mortgage in 2009 and foreclosed on the property a few months later. RBL then bought all of the shares of the Debtor from Bo Wilson's personal bankruptcy. Bob Shallow is now the sole director and manager of Vista Bella.

II. Background

A. Legacy and Legacy Key

Prior to developing Vista Bella, Wilson, its developer, had developed other projects on the Gulf Coast. Legacy, developed in 2000-2001, was a twelve-unit project. Wilson sold each unit and made a profit. Bob Shallow was the real estate agent for this project. Like Vista Bella, Legacy Key is a concrete high-rise with appurtenant LCEs. It consists of thirty-six units and twenty-four boat slips. Bob Shallow acted as Wilson's exclusive agent for this project as well. The Legacy Key development predated Vista Bella, and is located next to Vista Bella. Wilson testified that Bob Shallow "got the conversation going" about Legacy Key. The Court took this to mean that Shallow was instrumental in bringing Wilson and other key players together to develop the project. In determining what type of units to build, Wilson relied on Shallow's advice about what type of units would sell.

As he would do at Vista Bella, Bob Shallow purchased a penthouse and boat slip at Legacy Key. Wilson allocated all twenty-four boat slips to Shallow's unit, and then Shallow reallocated them to other units at Wilson's direction as they were sold; the development received all proceeds as a result of these LCE sales. Legacy Key was a successful project; all units were sold. Wilson made roughly $1,200,000 on the Legacy Key project.

B. Wilson's Financial Position

Around 2005, Bo Wilson, through Island Investments III, LLC, bought land for another condominium development on the Gulf Coast called Emerald Tower. Bob Shallow was a part-owner of the land purchased for the project and Shallow advised Wilson about what to build on the property. Regions Bank held a mortgage on the property. Wilson testified he was unable to continue making payments on the mortgage and Regions foreclosed on the property in February of 2008, resulting in a deficiency. Mr. Wilson had personally guaranteed the debt and after the

3

foreclosure Regions sued him for the deficiency and obtained a judgment. Mr. Wilson testified that the judgment was entered three to four months following the foreclosure.

### III. The Project: Vista Bella

A. Land Purchase

At its inception, Bo Wilson was the sole officer, director, and shareholder of the Debtor. On October 27, 2005, the Debtor purchased the unimproved property that would become the condominium development by vendor's lien deed from Island Investments II, LLC ("Island Investments"), another entity owned by Wilson. Island Investments agreed in the vendor's lien deed to subordinate its vendor's lien to a subsequently obtained construction loan. Prior to that transaction, Island Investments purchased the Vista Bella development property from C. Thurmon Bell ("Mr. Bell") for $3,750,000 on February 10, 2004. Wilson paid $1,000,000 in cash and financed $2,750,000 at the closing on February 10, 2004. Bob Shallow assisted with this purchase as a real estate agent and received a commission. The HUD statement lists $100,000 as the "Total Sales Brokers Commission," but Bo Wilson testified that he and Shallow had a business arrangement in which Shallow would receive a 6% commission. Six percent of $3,750,000 million is $225,000. Wilson said he was short of funds at the closing, so Shallow agreed to be paid the remainder of the commission at a later date. On October 27, 2005, Island Investments executed a collateral assignment of its vendor's lien in the Vista Bella property to Mr. Bell.

B. The Debtor's Mortgage

On October 27, 2005, the Debtor borrowed $36,400,000 from AmSouth Bank to purchase and develop the Vista Bella property. In exchange, the Debtor executed a note and mortgage with AmSouth (the "Debtor's mortgage"). Among other documents, Vista Bella and

4

AmSouth Bank executed a Loan Agreement; an Assignment of Leases, Rents, and Income; a Mortgage and Security Agreement; and an Assignment of Contract Rights and General Intangibles. The Loan Agreement contemplated the sale of the condominiums comprising the Vista Bella development, and, in section 3.14, assigned Vista Bella's "rights and privileges under any and all Purchase Agreements" to AmSouth as security for the loan. In pertinent part, section 3.14 stated:

> Assignment of Purchase Agreements. All of [Vista Bella's] rights and privileges under any and all Purchase Agreements . . . including but not limited to [Vista Bella's] rights with respect to any and all earnest money deposits . . . relating to the sale of any individual condominium unit, shall be, and hereby are, assigned to [AmSouth Bank] as additional collateral and security for the Loan. [Vista Bella] shall punctually perform, satisfy and comply with all conditions, covenants, terms and provisions to be performed, satisfied and/or complied with by [Vista Bella] . . . . Further, [Vista Bella] shall not make, suffer, permit or consent to any modification or termination of any such Purchase Agreement, nor enter into any future Purchase Agreement for the sale of any portion of the Premises, except for the sale of individual condominium units upon the form of Purchase Agreement approved by [AmSouth Bank] and for a purchase price at least equal to the applicable minimum purchase price set forth in Exhibit "C" attached hereto and incorporated by reference, without the prior written consent of [AmSouth Bank].

Section 3.20 of the Loan Agreement discusses Purchase Agreements. It explains that "[e]ach Purchase Agreement shall be upon the form of agreement approved by [AmSouth], without alteration or amendment except as approved by [AmSouth] in writing, and shall have a purchase price equal to or greater than the minimum purchase price . . . unless [AmSouth] shall have approved in writing a lower purchase price." The applicable release price for Vista Bella unit PH-1 contained in Exhibit C of the Loan Agreement was $1,820,000. Similarly, at section 3.16, the Loan Agreement details the circumstances in which AmSouth would execute a partial release of its collateral, chiefly the individual condominiums, in order to facilitate a sale of those

condominiums. That section reiterates that a release price would need to be paid to AmSouth in order for AmSouth to issue a release of a condominium from AmSouth's mortgage.

The Mortgage and Security Agreement (the "Mortgage) granted AmSouth Bank a security interest, with an associated power of sale, in the Vista Bella development property and other related assets of the Debtor. The following "Rents and Accounts" were included as "Mortgaged Property":

> All rents, royalties, issues, profits, revenues, income, accounts, accounts receivable, contract rights, general and tangibles, instruments, chattel paper and any and all rights of [Vista Bella] of any nature whatsoever to the payment of money, whether now existing or hereafter arising, by reason of or arising from or in connection with the use, occupancy or operation of the Mortgaged Property or any part thereof or the operation of any business enterprise thereon, together with all proceeds and products thereof, and further including without limitation all right title and interest of [Vista Bella], as seller, under any and all agreement for the sale of all or any portion of the Mortgaged Property now existing or hereafter entered into, including but not limited to any such contracts for the sale of condominium units hereafter constructed upon the Mortgaged Property, together with Mortgagor's rights and interest in the earnest money deposits made or to be made pursuant to such agreement.

All of AmSouth Bank's interest in the mortgaged property, including in the Rents and Accounts, would be extinguished after Vista Bella successfully satisfied the balance of the Note in compliance with the terms of the relevant loan documents.

The Mortgage also included, at section 1.03, a provision entitled "Assignment of Rents, Accounts, Etc." It purported to "absolutely, presently, and unconditionally" assign the Rents and Accounts to AmSouth, but allowed Vista Bella to collect those Rents and Accounts so long as no Event of Default had occurred. After an Event of Default, AmSouth was entitled to direct all "lessees, occupancy tenants, and account debtors of the Mortgaged Property" to pay to AmSouth "all amounts due [Vista Bella] pursuant to their respective leases, occupancy agreements,

6

accounts or other agreements," provided that AmSouth sent written notice of the Event of Default to those persons. In that circumstance, "all persons [were] expressly relieved of any and all duty, liability or obligation to [Vista Bella] in respect of all payments so made."

The Assignment of Contract Rights and General Intangibles, executed on October 27, 2005 along with the Loan Agreement and Mortgage, states:

> [Vista Bella] hereby grants a security interest in, transfers and assigns unto [AmSouth Bank], its successors and assigns, all of [Vista Bella's] rights, title, interests, privileges, and powers (whether now existing or hereafter arising) in, to, under and with respect to (1) all agreements and contracts between [Vista Bella] and the Escrow Agent pertaining in any way to the Vista Bella condominium development and (2) the Purchase Agreements and the monetary deposits made and to be made by purchasers under the Purchase Agreements as well as all of [Vista Bella's] right, title and interest with respect to any and all letters of credit . . . given and to be given by purchasers under said Purchase Agreements in lieu of monetary deposits, including without limitation [Vista Bella's] right to receive the proceeds from any Letter of Credit . . ., including without limitation [Vista Bella's] right to receive the Escrow Deposits and [Vista Bella's] right to require Escrow Agent to draw upon a letter of credit given in lieu of a monetary deposit upon a default by a purchaser under his or her Purchase Agreement . . . for the purpose of providing additional security . . . .

In addition to Vista Bella, Inc. and AmSouth Bank, the Assignment of Contract Rights and General Intangibles included Ocean Shores, Inc. d/b/a RE/MAX Paradise as a party to the agreement defined as "Escrow Agent."

The Debtor's mortgage encumbered all of its assets. In addition, Bo Wilson and his wife signed personal guarantees for the debt.

In late 2006, AmSouth Bank and Regions Bank merged and Regions Bank acquired the Debtor's mortgage and promissory note, as well as the Wilsons' personal guarantees pursuant to the merger.

C. The LCEs

On May 15, 2007, Mr. Wilson executed a Declaration of Condominium for the Vista Bella development. Among other things, the Declaration identified eight garages and twenty-eight boat slips as limited common elements ("LCEs") and described the LCEs as appurtenant to Vista Bella unit PH-1 ("unit PH-1" or "PH-1"), a penthouse condominium unit at the Vista Bella development. The Declaration was recorded in Baldwin County, Alabama on May 21, 2007. The Declaration was specifically made subject to the provisions of the Alabama Uniform Condominium Act ("AUCA"), Ala. Code § 35-8A-101, et seq.

D. RE/MAX

Bob Shallow is a broker at Ocean Shores, Inc. d/b/a RE/MAX Paradise ("RE/MAX Paradise" or "RE/MAX")), a licensed real estate company in Orange Beach, Alabama. An experienced real estate broker, he has enjoyed success in the Gulf Shores/Orange Beach area for years. He and his wife, Susan Shallow (collectively, the "Shallows"), own RE/MAX Paradise. Sunnie Haupt is Bob Shallow's Executive Assistant at RE/MAX Paradise. In 2009, RE/MAX Paradise was taxed as a Subchapter S corporation under the Internal Revenue Code, with items of income and expenses flowing through to the Shallows personally and reported on their joint individual income tax returns. Shallow has acted as the real estate agent for the Debtor since its inception. In that capacity, he has procured contracts for the purchase, sale, and transfer of various condominium units originally owned by the Debtor and comprising the Vista Bella development. Wilson testified that Shallow got very close to $50,000,000 in presale contracts for Vista Bella.

E. Other liens

Pursuant to the vendor's lien deed, Mr. Bell's lien fell behind the Debtor's mortgage in priority. Until February 3, 2009, Stewart Title held a second place lien. On February 3, 2009, the

Debtor conveyed unit 303 to Stewart Title. In exchange, Stewart Title released its second place mortgage on the Debtor's property.[1]

The Lemoine Company of Alabama, LLC ("The Lemoine Company" or "Lemoine") was a contractor on the Vista Bella development. It filed a verified claim of lien in October of 2007 against the Vista Bella property for unpaid labor and materials and, in December of 2007, it obtained a default judgment against the Debtor in Baldwin County Circuit Court. The Lemoine Company's lien fell behind Bell's in priority. HLH Constructors, Inc., Johnny Christopher Painting, and Ernest P. Breaux Electrical, Inc. also held subordinate liens on the property.

Mr. Bell filed an unsecured claim in the Debtor's bankruptcy case for $6,679,436.56 at a fixed interest rate of 6%. The Lemoine Company filed an unsecured claim in the Debtor's bankruptcy case in the amount of $2,118,906, which carries a 12% interest rate.

F. The Debtor's Default

Section 1.04(C) of the Mortgage allowed Vista Bella to enter into contracts to sell condominium units for not less than the minimum approved sales price as detailed in the Loan Agreement and upon the terms of pre-approved Purchase Agreements. It is undisputed that an Event of Default occurred with regard to the sale of unit PH-1 because it was sold for less than the minimum agreed upon price in the Loan Agreement. The Debtor likewise did not remit the proceeds of the sale to AmSouth Bank. Section 1.09 of the Mortgage, entitled "No Secondary Financing," prohibited Vista Bella from creating or permitting a lien to encumber the Mortgaged Property without prior written consent of AmSouth Bank. It is undisputed that the Debtor did not obtain the written permission of AmSouth or its successors in interest to encumber Vista Bella unit PH-1 with the vendor's lien. Likewise, there is no evidence that AmSouth ever approved, in

---

[1] There was evidence presented as to a commission Shallow believed he earned for this transaction. The facts show that the commissions earned by Shallow even without this transaction were sufficient to establish REV. Therefore, more specific facts about this deal are not included.

writing or otherwise, the sale of unit PH-1 at a price lower than the $1,820,000 minimum release price. Therefore, the Debtor was in default on the mortgage by July 18, 2007. However, there is also no evidence before the Court that AmSouth ever sent the Shallows any notice of default.

G. RBL Mortgage Purchase

By 2008, the Debtor was insolvent, the mortgage was in default, and the Vista Bella project was in trouble. Wilson testified that by the fall of 2008, he felt that foreclosure by Regions bank was imminent. Several interested parties considered buying the project. Ferrari Capital Partners entered a purchase agreement for the project on January 16, 2008. The deal never closed. Thurmon Bell executed a purchase agreement for the project on April 23, 2008 and began acting as the developer. To facilitate his purchase of the project, Bell and Wilson entered a standstill agreement on April 23, 2008. It purported to prohibit Regions bank from foreclosing on the encumbered assets, but specifically excluded PH-1 from this condition. Bell's purchase also failed to close.

The Vista Bella Condominium Owners Association (VBCOA) conducted meetings at which the members discussed the financial distress of the project. Harry T. Haas, a co-owner of Vista Bella unit 1004[2] and former President of the VBCOA, testified at trial. According to Mr. Haas, he attended a VBCOA meeting in early 2009 (before RBL bought the mortgage). Shallow was present at the meeting. According to Haas, Shallow represented to the association that another investor wanted to buy the mortgage and foreclose, thus devaluing all of the units in the project. Haas alleged that Bob Shallow discussed RBL's interest in buying the mortgage, and that Shallow specifically promised that if RBL bought the mortgage it would not foreclose, and it would pay the association dues Vista Bella had accrued. On cross, Mr. Haas admitted that Mr.

---

[2] Mr. Haas admitted that unit 1004 was titled solely in his wife's name until November 8, 2011. That is, at all relevant times, Mr. Haas was not, in fact, an owner or co-owner of any Vista Bella unit.

Shallow's promise not to foreclose was not made in exchange for anything—it was not part of a bargain.

Gary Malin—President of the VBCOA, Board member, and co-owner of unit 504—gave similar testimony. Mr. Malin said that he attended a VBCOA board meeting in early January of 2009 and that Bob Shallow was present at the meeting. According to Malin, at the meeting Shallow said someone else was trying to buy the mortgage and this potential bidder planned to foreclose, thereby lowering the value of all units. Further, Shallow said he was planning to buy the mortgage and that, if he did so, he would not foreclose and he would pay the back dues owed by Vista Bella to the VBCOA.

Shallow denied ever having promised not to foreclose. The minutes from the VBCOA meeting of January 31, 2009 show that Haas was present and that Shallow gave a report of the status of the unsold units. The minutes do not mention Mr. Malin and they do not evidence Shallow's alleged promise not to foreclose.[3]

RBL bought the mortgage on January 23, 2009. Shallow admitted that one motive for buying the mortgage was to release PH-1 from the mortgage, thereby protecting his investment. He denied that releasing the Wilsons from their personal guarantees was a motive.

1. Lien Releases

Because several creditors had filed liens against the project, the Debtor had to obtain lien releases in order to close a sale. Bob and Susan Shallow both testified that the Debtor had difficulty negotiating timely releases and that these difficulties were frustrating sales. They cited difficulty in obtaining lien releases as a primary motivation for foreclosing. To support their testimony, the Defendants introduced the following email correspondence.

---

[3] The testimony showed that there were several VBCOA meetings in the months leading up to and then following the foreclosure. The witnesses could not specify at which meeting Shallow's alleged promise was made.

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 11 of 88

1. On September 11, 2008, the Trustee's counsel, who represented Bell at the time, wrote to Lemoine's counsel,

> The original premise of [Mr. Bell] purchasing the units and then entering into resale contracts had to change due to the uncertainty of obtaining releases from the many lien claimants (this arose in part from the claims of HLH, etc.). Out of concern for resulting claims by the purchasers against [Mr. Bell] for damages due perhaps to the failure of obtaining a release, we felt it was wiser that the developer enter into the unit sale agreements with the purchasers.

2. On October 2, 2008 Kelli Flanagan of Southern Land Title, Inc. emailed Bo Wilson and Bell's counsel,

> I desperately need an update on the status of the lien releases ASAP. The purchasers of 1004 have been waiting since Tuesday to close. The purchasers of 901 have driven down here all day, with their furniture, from North Carolina and are due in my office at 4:00. We did not receive anything from Mr. Lemoine's office today, we need the amended release from Johnny Christopher, the release from [Mr. Bell] on 1004, and the releases from Breaux. Please let me know when we can expect these.

3. On October 2, 2008 Tammy Godbold (the Haases' buyer's agent) emailed Bob Shallow,

> Bob, my clients are deeply concerned since their contract called for closing on or before 9/30/08. Their cash was wired to the title company and all funds are in place. We do not understand the delay and vague explanations we are being given. Why can't these individuals provide not only the releases, but how and when they were sent. Sunnie told me today she didn't know who or how to contact. I cannot believe you have a listing under these circumstances. B.J. Lyons knows Mr. Haas and advised him to move in but could offer no time frame on closings.

4. On January 29, 2009, Kelli Jones (aka Kelli Flanagan) emailed Bo Wilson,

> I just spoke with Johnny Christopher to see if he could go by our Robertsdale office to sign the two releases needed to close units 504 and 303. He said he would not sign them because he had

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document      Page 12 of 88

not spoken with Bo on any new releases and he will not sign any new ones until he gets his money.[4]

Gary Malin, who purchased unit 504 on February 2, 2009, testified that the unit 504 transaction closed timely. He did not perceive any difficulties in obtaining lien releases.

The Court is convinced that difficulty in obtaining lien releases was frustrating the Debtor's ability to make sales at Vista Bella in the fall of 2008 and spring of 2009. While the Court believes Mr. Malin's testimony that his sale closed on time, this anecdotal evidence is not sufficient to undermine the Shallows' testimony and the many emails introduced to support the Court's finding.

### 2. Memo of Understanding

The Lemoine Company executed a release of PH-1 on May 18, 2009 to "accommodate the sale and transfer of [Unit PH-1] to purchasers." After RBL purchased the mortgage, but before Lemoine provided a release for PH-1, Bob Shallow discussed his intentions for the Vista Bella project with Lemoine. These discussions culminated in a Memo of Understanding drafted by Lemoine's counsel, signed by Shallow, and sent from Shallow to Lemoine on March 20, 2009. It reads:

> The following is a brief summary of my previous conversations with Lenny Lemoine and confirmation of my intentions regarding the disposition of units and mortgage debt at Vista Bella:
> 1. I have purchased the mortgage debt along with partners and my intention is to sell units until the mortgage debt is satisfied.
> 2. It is my belief that after satisfaction of mortgage debt that there will be funds remaining which will be shared by Thurman Bell who currently holds the second position behind the mortgage and The Lemoine Company, LLC who is immediately behind Bell.
> 3. In exchange for Lemoine and subcontractors releasing lien rights on individual units as they are sold, I am committed to

---

[4] The Defendants submitted more documentary evidence to corroborate their position that releases were frustrating sales. However, Court is able to make a finding on this point without considering further evidence from the Defendants.

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document   Page 13 of 88

update Lemoine and the subcontractors on sale prices of units prior to asking for lien releases as well as asking prices on all remaining units at any given point in time. I will also provide a quarterly statement indicating balance of debt and projected supply/inventory value net of debt.

Obviously, time will work against us as I am having to incur ongoing cost of interest, condominium dues, taxes, and insurance. So, my statement about funds remaining is under the assumption that all units can be sold within twelve (12) months.

Bob Shallow testified that Lemoine wanted Shallow to execute the Memo of Understanding in exchange for Lemoine's continued execution of lien releases as units were sold. Shallow testified that on March 20, 2009, he believed there was equity in the project and that there would be money for Bell and Lemoine after the mortgage debt was paid. Essentially, he affirmed that each statement in the Memo of Understanding was true at the time that it was made.

The Trustee presented evidence that Lemoine required Shallow to re-execute the Memo of Understanding on May 18, 2009 in exchange for his release of PH-1. Specifically, Lemoine's counsel emailed Shallow's counsel on May 18, 2009 requesting that the Memo of Understanding be signed and redated before Lemoine provided a release for PH-1. Shallow's counsel agreed by email and replied on May 18, 2009 with an attachment that included a signed copy of the Memo of Understanding. The attached copy of the Memo of Understanding was not redated. However, since the signed copy of the Memo was sent in response to Lemoine's request, the Court finds that Shallow re-executed the Memo on May 18, 2009. Shallow did not controvert this. Shallow denied that the main reason he wanted Lemoine's release of PH-1 was to get a release of the Debtor's LCEs which were appurtenant. Shallow has settled a state court suit with Lemoine regarding the Memo of Understanding.

H. Foreclosure

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document      Page 14 of 88

On June 1, 2009, pursuant to the power of sale contained in the Debtor's mortgage, RBL foreclosed on the Debtor's remaining fifteen condominium units. This Court has already found that the foreclosure sale was conducted properly. *In re Vista Bella, Inc.*, 2013 WL 2422703 *28 (Bankr. S.D. Ala. 2013) (stating "[I]n this case, RBL conducted a fair foreclosure sale. It is clear that the sale was properly noticed, was conducted at the proper location, and was conducted at the proper time."). Further, the Court has found that the price received for the foreclosed units was not so low as to shock the judicial conscience. *Id.* At *29. Therefore, the price constitutes reasonably equivalent value. This is so despite the fact that the LCEs were excluded from the sale, and regardless of the value placed on the LCEs. *Id.* at *29-30.

Bob and Susan Shallow both testified that because lien release difficulties were impeding sales, they thought foreclosure was the best option for the Vista Bella project on June 1, 2009. Susan Shallow testified that while a foreclosure has negative short-term effects on a project, the long-term effects can be beneficial. In particular, foreclosure alleviates lien release difficulties, allows a new party to start paying condominium owners association (COA) dues, and removes a project from the "no lend list." According to Mrs. Shallow, when a lender is considering loaning money for a condominium purchase, it sends a questionnaire to the COA. The COA must answer whether or not it is currently involved in litigation. If it is, then Fannie Mae and Freddie Mac will not loan the money; hence, the "no lend list."

The Shallows both testified that they did not receive any preforeclosure inquiries regarding the availability of LCEs or whether LCEs would be included in the foreclosure sale. No one asked the Shallows to reallocate the LCEs to units that would be foreclosed, to redraft the notice of foreclosure, or to postpone the foreclosure sale.

The power of sale in the mortgage allowed RBL, as the Lender, to offer the mortgaged property for sale in whole or in part, or "in any other manner the Lender may elect." Bob Shallow authorized the foreclosure sale on behalf of RBL. Notice of the sale was given by publication in *The Islander*, a Baldwin County, Alabama periodical, for three consecutive weeks on May 9th, May 16th, and May 23rd of 2009. No objections were raised by the Debtor or any of its creditors prior to the sale. Daniel G. Blackburn conducted the auction on the front steps of the Baldwin County courthouse in Bay Minette, Alabama between 11:00 a.m. and 4:00 p.m. Blackburn offered the condominium units for sale individually, rather than *en masse*. Gary Malin, co-owner of Vista Bella unit 504, was present at the sale and placed competitive bids for several units. Ultimately, RBL was the successful bidder at the foreclosure sale. RBL bid-in the total amount of its mortgage debt, calculated at $4,935,370.39, plus $138,578, a surplus created by the competitive bidder, Gary Malin. The Debtor was completely released from further liability on the RBL mortgage debt.

The foreclosure sale did not create a deficiency and RBL did not proceed against Bo Wilson or his wife on their personal guarantees. Bob Shallow testified that he intended to bid in the amount of the mortgage debt at the sale. He relied on counsel to determine the amount of the debt. His strategy was to divide the amount of the debt over the units that were being foreclosed and bid in that amount on each unit. Mr. Wilson testified that Shallow told him prior to the sale that RBL had to foreclose on the Vista Bella mortgage, but that he "wasn't going to come after the guaranty." Mr. Wilson's testimony does not support the allegation that Bob Shallow *promised* not to come after the guarantee *in exchange for* Mr. Wilson's release of the $350,000 vendor's lien. The fact that RBL bid the entire debt at the foreclosure sale made the guarantee superfluous.

Wilson also testified that the debt owed to RBL at the time of foreclosure was approximately $5,000,000. The Defendants assert that the exact amount was $4,935,370.39, calculated based on the following information. According to a Sale and Assignment Agreement between Regions Bank and Charter Landing, Inc., the balance of the debt was $4,810,294.66 on December 23, 2008. Also according to Regions, that amount was reduced by a forfeited deposit of $129,281.82 for Vista Bella unit 1004 on January 22, 2009 and by $457,135.03 from the sale of Vista Bella unit 602 on January 26, 2009, leaving $4,348,953.54 owed after those transactions. The debt was further reduced by the sale of Vista Bella unit 504, which sold for $549,691.54 on February 3, 2009, and unit 802, which sold for $423,548.96 on March 20, 2009. Also included in the total debt were interest, expenses, and other charges. Regions conveyed the mortgage, note, and loan agreement to RBL with $3,750 in charges, $329,763.39 in expenses, and $1,171,998.73 in interest through January 26, 2009. RBL also included interest charges from January 26, 2009 through June 1, 2009.[5]

The Debtor owed a substantial amount of debt which was subordinate to RBL's mortgage at the time of foreclosure. Wilson testified that the Debtor's other obligations were in excess of $12,000,000, which included, in part, the debts to The Lemoine Company and C. Thurmon Bell. Mr. Bell filed an unsecured claim in the Debtor's bankruptcy case for $6,679,436.56, at a fixed interest rate of 6%. The Lemoine Company filed an unsecured claim in the Debtor's bankruptcy case in the amount of $2,118,906, which carried a 12% interest rate. The parties agreed that the Debtor was insolvent on the date of the foreclosure and that it had been insolvent since at least 2008. Wilson was notified that the AmSouth/Regions mortgage loan was in default in late 2007. Mr. Wilson also explained that, as early as July of 2007, he knew that the Debtor did not have

---

[5] Bell believed that the debt owed to Regions Bank was improperly calculated, decreasing the overage amount paid to him. However, a state court judgment in Baldwin County finally determined the proper calculation to be as stated above.

sufficient assets to retire its debts. Bob Shallow was aware of the Debtor's financial condition, including its insolvency.

No LCEs were offered at the foreclosure sale. None of the fifteen units offered for sale had appurtenant LCEs. All of the unallocated LCEs were appurtenant to Vista Bella unit 1001, which was owned by Defendant Ronnie Carr at the time. Bob Shallow testified that had the LCEs been appurtenant to foreclosed units, his bidding strategy would have been the same: he would have bid the amount of the debt. There was no proof that, even if the LCEs were included in the foreclosure sale, any LCEs would have been offered except in conjunction with a condo unit.

Harry T. Haas explained that prior to the foreclosure he and his wife tried unsuccessfully to purchase a garage. According to him, other Vista Bella condominium owners desiring LCEs had similar difficulties. He further stated that if the LCEs had been included in the foreclosure sale, he would have bid up to $50,000 for a garage unit and speculated that other owners would have been interested in bidding as well. Mr. Haas admitted that he actually knew of the planned foreclosure sale before it occurred, and that he chose not to attend.

Gary Malin purchased unit 504 with a boat slip on or about February 2, 2009 (after RBL purchased the mortgage, but before foreclosure). The transaction closed in a timely and efficient manner. To Mr. Malin's knowledge, no lienholders impeded the sale by failing to timely provide lien releases. After learning of the foreclosure sale through the published notice, Mr. Malin attended the foreclosure sale and bid on several units, but was outbid by RBL. Based on the foreclosure notice, he assumed the LCEs would be offered for sale at the foreclosure. According to Malin, he was financially able and would have bid up to $80,000 for a large boat slip or $50,000 for a garage unit if the LCEs had been made available for purchase at the foreclosure

sale. The Trustee did not offer evidence to corroborate Mr. Malin's assertion that he was financially capable of making cash purchases at the foreclosure sale, but the Defendants did not controvert it. Bob Shallow testified that he did not receive any inquiries about the availability of any LCEs from Harry Haas, Gary Malin, or anyone else during the four weeks prior to the date of the foreclosure.

Mr. Malin did bid on units at the foreclosure sale. None had LCEs appurtenant to them. Mr. Malin testified that, at the sale, after the second or third bid, Bob Shallow's attorney, who was on the phone with Bob Shallow throughout the bidding, offered to sell a unit at a reduced price to Malin if Malin stopped bidding. Shallow denied making such an offer. Malin did not stop bidding.

Thurmon Bell, who held the second lien on the property, testified at trial. Bell said that he was not aware of the foreclosure sale until after the fact. However, in his 2011 deposition, when asked if he had had discussions about the pending foreclosure sale with his counsel he answered "I would think."[6] Also during his deposition, he was asked "You knew the foreclosure was happening, you testified to that the last time I was here, you knew the foreclosure was coming by RBL?" To this he replied, "That's right." Mr. Bell could not explain why he made these statements during his deposition, and he maintained that he had no knowledge of the foreclosure prior to its execution. During his deposition, Mr. Bell was also asked, "So you knew before RBL ever even bought the mortgage in your mind if there were going to be a foreclosure that it should include the boat slips and the garages?" To which he responded, "That's correct." Finally, during his deposition, Mr. Bell admitted that he took no steps, prior to the foreclosure, to investigate what was being foreclosed, to contact his attorney or anyone else to express

---

[6] Mr. Bell explained that he was in a coma for seven days in December of 2010 and that it affected his cognitive faculties for eighteen months following his hospitalization. His deposition was taken six months after the coma.

concerns, or to object to the sale. Mr. Bell also testified that while he did not personally have the money to bid at the foreclosure sale, he could have gotten the money from friends or other resources.

In addition, during Mr. Bell's deposition he could not point to any specific complaints or problems he may have had with Bob Shallow prior to the foreclosure. Further, while he acknowledged that the real estate market in south Alabama has plummeted since the Vista Bella project was commenced, he could not say whether his losses were attributable to misconduct by Bob Shallow or to market conditions. In fact, according to Mr. Bell, if the real estate market had continued to rise during the course of the project he would have made a lot of money.

I. Values/Experts

This Court has already found that the foreclosure sale was conducted properly. *In re Vista Bella, Inc.*, 2013 WL 2422703 at *28 (Bankr. S.D. Ala. 2013). However, the Court has not made findings about whether the foreclosure sale extinguished the Debtor's equitable interest in the LCEs, about the Defendants' purpose in excluding them from the sale, about whether the Trustee suffered damage as a result of the Defendants' failure to include the LCEs in the sale, or about what the appropriate measure of damages would be. The following facts are relevant to these issues.

Based in part on Mr. Malin's and Mr. Haas' statements of demand for LCEs and estimations of what they would have paid for certain LCEs, the Trustee submitted an LCE valuation analysis as of the date of the foreclosure sale. It estimates that the LCEs held by Ronnie Carr on the date of the foreclosure, including thirteen boat slips and two garages, were worth between $600,000 and $880,000. Claud Clark III, the Defendants' appraisal expert, disagreed with the Trustee's valuation. Mr. Clark emphasized that if the LCEs had been included

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document    Page 20 of 88

in the foreclosure, then their value would have been reduced by the nature of the foreclosure sale as a distressed sale. He used the price garnered through foreclosure of LCEs at Sunset Bay—a condominium development in the Gulf Shores area—as a comparable sale. He found Sunset Bay to be comparable to Vista Bella because they were both forced sales. Additionally, only unit owners were able to own LCEs, so for each project, the market for LCEs was limited to unit owners and potential owners. Based upon values placed on boat slips from the foreclosure of Sunset Bay at Bon Secour Island Villas, he concluded that the Vista Bella LCEs would have had an aggregate value of $60,000 or $4,000 each if included at the foreclosure sale.

Bob and Susan Shallow who have owned boat slips at both Vista Bella and Sunset Bay—a condominium development on Oyster Bay in the Gulf Shores area—testified that the fair market value of the boat slips at Sunset Bay is equal to if not higher than the fair market value of the Vista Bella slips. The Sunset Bay slips are larger and deeper (they can accommodate larger boats), more protected from the elements, and more substantially built. While the Vista Bella slips are located closer to the commercial center of Orange Beach, this is not attractive to all potential buyers.

The Trustee offered the expert testimony of Ferrell S. Anders. Mr. Anders has been an attorney in Mobile, Alabama for over thirty years. His law practice has focused on real estate, title insurance, mortgage banking and foreclosures. Mr. Anders explained that RBL, as the mortgagee, owed duties of good faith and fair dealing to the Debtor and that it breached these duties with respect to its disposition of the LCEs. He opined that RBL should have offered all of the Debtor's collateral, including the LCEs, at the foreclosure sale because, in his opinion, failing to do so diminished the amount that RBL bid-in and reduced the surplus to which the Debtor was entitled from the sale. In the alternative, he suggested that RBL should have either

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 21 of 88

credited the Debtor's account preforeclosure for the value of the LCEs which were to be withheld from the sale; or after foreclosure, the Debtor should have received the benefit of any LCE sales.

Mr. Anders also testified that foreclosure sales, as forced sales, do not typically garner fair market value. At one time in Alabama 75% of fair market value paid at a foreclosure was considered a proper price; however, now, when foreclosure sales are conducted properly, the prices received at the sale are conclusively reasonable. He explained that it is uncommon for attorneys to advise their creditor clients to bid more than the amount of their outstanding debt at a foreclosure sale when such a bid would be sufficient to secure the foreclosed property.

Further, Mr. Anders explained that when a mortgagee extinguishes a debt by foreclosing on part, but not all of the collateral, any collateral excluded from the sale should go back to the mortgagor. Mr. Anders concluded that Shallow's decision to move the LCEs from unit PH-1 to unit 1001 two weeks before foreclosure, revealed his intent to deprive the Debtor of any economic benefit from the sale of the LCEs. Finally, Mr. Anders stated that by not including the LCEs in the foreclosure, Shallow deprived any potential redemptioner of the ability to obtain the LCEs through redemption.

In response to Mr. Anders' testimony, the Defendants offered the testimony of David Hudgens, a longtime foreclosure attorney in Mobile, Alabama. In Mr. Hudgen's opinion, the Trustee was not harmed by the Defendants' failure to include the LCEs in the foreclosure sale. Mr. Hudgens opined that the Defendants could not foreclose on the LCEs because they had previously been released by the mortgagee. He did not find fault with their decision not to reallocate the LCEs to a unit to be foreclosed, because they bid in the entire debt with a surplus. Like Mr. Anders, he testified that he has never advised a lender to bid in more than the debt and

he has never seen it done. In other words, the mortgagee would have paid the same amount at the foreclosure sale even if the LCEs had been part of the sale. Further, he testified that the Defendants *could have* accepted conditional, parcel-by-parcel bids and then bid *en masse* at the end. However, it is undisputed that they did not do this. Mr. Hudgens also said that there was nothing improper about the Defendants' decision not to market the units during the redemption period. Finally, according to Hudgens, any potential redemptioner would have had to redeem the entire debt; partial redemption is not allowed. In other words, a redemptioner could not have decided to redeem just one unit or one boat slip.

### III. The Shallow Penthouse

A. Purchase

On June 2, 2006, Bo Wilson, for the Debtor, executed a Preconstruction Purchase and Escrow Agreement with Bob Shallow for the purchase of Vista Bella unit PH-1 with two garages and one boat slip appurtenant. The agreement states that the Shallows paid $1,000,000 to the Debtor for unit PH-1 as an earnest money cash deposit and that $350,000 remained due at closing. The parties stipulate that the Shallows actually paid $1,000,000 to Bo Wilson personally rather than paying this money to the Debtor. Bob Shallow and Wilson both testified that the $1,000,000 was a personal loan to Wilson, who needed cash at this stage in the project. This money was never deposited into Shallow's earnest money account. The Shallows both testified that they initially made a check out to "Vista Bella, Inc.," but that Bo told them to tear up the first check and asked them to make out a check to him personally instead. The Shallows could not produce the voided check, but a sequential check in their register was never cashed. Wilson testified that he does not think he told them to tear up the first check, but does not specifically

recall the interaction. The Debtor credited the $1,000,000 payment against the $1,350,000 purchase price of unit PH-1. The Court has already found that $1,350,000 was fair consideration for PH-1 on July 18, 2007. *In re Vista Bella, Inc.*, 2013 WL 2422703 at *3 (Bankr. S.D. Ala. 2013).

On July 18, 2007, PH-1 was conveyed to the Shallows. As part of the conveyance, the Shallows executed a $350,000 promissory note in favor of Vista Bella and granted Vista Bella a vendor's lien in unit PH-1 for $350,000. Bo Wilson executed the vendor's lien deed on behalf of the Debtor. The vendor's lien was expressly subject to the Debtor's mortgage, held by AmSouth Bank. The balance of the debt owed to AmSouth at the time was $14,485,111.73.

Bob Shallow testified that his intention on July 18, 2007 was to purchase unit PH-1 with two garages and one boat slip. The description of the property to be transferred in the vendor's lien is, "Unit PHW-1 of Vista Bella Condominium . . . according to that certain Declaration of Condominium of Vista Bella . . . Together with appropriate undivided interest in the common area and facilities declared in said declaration to be appurtenant to the above described unit." The conveyance included all of the LCEs that had not been previously reallocated to other units which were appurtenant to unit PH-1. Both Wilson and the Shallows testified that while the LCEs not purchased by the Shallows were appurtenant to PH-1, they belonged to the Debtor and would be reallocated at the direction of the Debtor as the parties had done with the Legacy Key project. Wilson and the Shallows characterize the arrangement as transferring legal title to the Shallows, but leaving the Debtor with an equitable interest in the un-reallocated LCEs. This is how the parties operated from July 18, 2007 until the foreclosure. The vendor's lien deed was recorded and specifically subjected the conveyance to the Debtor's mortgage lien.

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document      Page 24 of 88

The Debtor owed $14,485,111.73 to Regions Bank on July 18, 2007. The Debtor's mortgage encumbered all of the Debtor's assets including unit PH-1. The loan documents associated with the Debtor's mortgage required the Debtor to pay a release price to the lender if it sold any of the Vista Bella units. The release price was to be "equal to the *greater* of (i) ninety-three and one-half (93.5%) of the gross sales proceeds from the sale of a unit or (ii) the minimum sales price applicable to the unit to be sold." Moreover, the release price paid was to be "applied to reduction of the principal balance of the" promissory note that the Debtor originally executed in favor of AmSouth. According to the loan documents, the minimum release price for unit PH-1 was $1,820,000. The evidence does not indicate that a payment was made to the lender on account of the sale of unit PH-1 or that any debt reduction for the sale of unit PH-1 ever took place. Under the loan documents, the sale of unit PH-1 without payment of the release price constituted an event of default. By April 2008, creditors Regions and Bell were aware of this event of default. Neither creditor foreclosed. The Court has already determined that the July 18, 2007 sale was not fraudulent. *In re Vista Bella, Inc.*, 2013 WL 2422703 at *11-13 (Bankr. S.D. Ala. 2013).

B. Cancellation and Releases

On January 22, 2009, the day before RBL bought the Regions mortgage, the Debtor released unit PH-1 from its $350,000 vendor's lien. Bo Wilson executed the release, which included the un-reallocated LCEs. The Trustee argues that the outstanding balance on the vendor's lien, due to accrued interest, was $371,000 on January 22, 2009. Bob Shallow and Bo Wilson testified that the release was in exchange for Shallow's forgiveness of over $350,000 in real estate commissions owed to him. Shallow testified that he and Wilson had conducted business together for many years and, in that time, he had earned commissions for his work. Mr.

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 25 of 88

Shallow testified that he and Wilson had an understanding predating the Vista Bella project, which entitled him to a 6% commission on all real estate transactions in which both he and Wilson were involved. He explained that he and Wilson met regarding the $350,000 vendor's lien and "both agreed . . . just to call it even." Wilson also testified that he and Shallow had a longstanding 6% commission agreement, that some commissions went unpaid during the Vista Bella project, and that the release was given in exchange for Shallow's forgiveness of the unpaid commissions.

Shallow and Wilson's commission arrangement was formalized in several written, sometimes conflicting, agreements. A May 10, 2005 agreement between the Debtor and RE/MAX Paradise provided RE/MAX Paradise a 6% commission on the gross amount of any sales it made on behalf of, and with the consent of, the Debtor. Wilson signed the agreement on behalf of the Debtor. Shallow, personally, was not a party to the agreement. However, Shallow is noted as the listing agent on the agreement and signed for RE/MAX Paradise as the listing agent. The agreement expired on May 30, 2007. An October 24, 2007 extension of the listing agreement continued the arrangement. The extension expired on October 24, 2008. An April 22, 2008 exclusive listing agreement that expired in 2008 also listed the commission at 6%. However, there is another listing agreement dated April 22, 2008 that puts the commission at 5%. It also expired in 2008. Another extension agreement, dated October 21, 2008, extends the commission agreement to April 21, 2009. Further extension agreements are in evidence, but are not recited because they do not deal with the relevant time period—the time leading up to the January 22, 2009 release.

The Defendants cite the following transactions as entitling Bob Shallow to commissions:

1. $816,000.00 in commissions derived from 6% of the total amount of forfeited earnest money deposits;[7]
2. $81,000 in commissions equal to 6% of the $1,350,000 gross purchase price of Unit PH-1 to the Shallows;
3. $45,000 in commissions from his brokering the purchase of the Vista Bella development property from Island Investments II, LLC.; and
4. $105,899.30 in commissions for brokering a transaction between Stewart Title Guarantee Company which resulted in Stewart Title releasing a second real estate mortgage against the Debtor's property in exchange for Vista Bella Unit 303 in February of 2009.

Bob Shallow did not report income for the forgiveness of the $350,000 debt on his 2009 individual tax return, nor did he report $350,000 in real estate commission income. RE/MAX Paradise also did not pay a 1% franchise fee for the asserted real estate commissions. Shallow testified that commissions are only reported to RE/MAX if cash is received. Shallow also testified that he erroneously included $350,000 in his basis in PH-1 when reporting a loss on his sale of the unit. According to Mr. Shallow, he has since instructed his tax preparer to amend his 2009 tax return to reduce his basis by $350,000.

On January 23, 2009, the day after the Debtor released PH-1 from its vendor's lien, RBL purchased the Debtor's mortgage, loan agreement, and promissory note from Regions Bank. Bob Shallow, acting as manager for RBL, effectuated the transfer. In addition to the loan documents, RBL also acquired the previously executed personal guarantees of Bo Wilson and his wife on the debt. Wilson testified by deposition that his "position after RBL paid the note was [sic] I was out is kind of what my position was . . . [s]o I didn't direct [RBL or Ronnie Carr] to do anything but I didn't direct them not to do anything." He also stated that after RBL purchased the note and mortgage from Regions he "didn't have any involvement after that, none whatsoever." Shallow testified that protecting his investment in PH-1 was one motive for purchasing the mortgage. He

---

[7] Defendants originally calculated the figure at $156,959.42 or 6% of the total forfeited deposits. Upon reexamining the listing agreements, Defendants asserted that the Debtor actually owed Shallow the lesser of 6% of the total sales price or ½ of the deposit amount.

denied that controlling the Wilsons' personal guarantees was also a motive for purchasing the mortgage.

On or about January 26, 2009, Bob Shallow, again acting on behalf of RBL, executed a written release of unit PH-1 from RBL's newly acquired mortgage lien. Shallow testified that RBL only intended to release PH-1, one boat slip, and two garages from the lien. The release stated, in pertinent part:

> RBL, LLC does hereby release . . . free from the lien, operation and effect of the above referenced Security Documents . . . Unit PH-1 of Vista Bella Condominium located in Baldwin County, Alabama, according to that certain Declaration of Condominium . . . [t]ogether with appropriate undivided interest in the common area and facilities declared in said declaration to be appurtenant to the above described unit.

The promissory note, formerly owned by AmSouth/Regions, permitted RBL to release any collateral at any time, without notice, and without affecting or releasing the liability of any party. Further, in the promissory note, the Debtor agreed to "remain bound for the payment of principal, interest, and all other sums payable hereunder or under any of the Loan Documents . . . notwithstanding any change or changes by way of addition, release, surrender, exchange or substitution of any security for this Note." Bo Wilson, on behalf of the Debtor, did not object to the release. The release of PH-1 left fifteen condominium units as collateral for the Debtor's mortgage. The Debtor's loan balance was not credited for the value of PH-1 following the unit's release from the lien. Similarly, no value was credited to the loan balance for the LCEs that were appurtenant to PH-1 at the time of the release.

The Lemoine Company and C. Thurmon Bell also released PH-1 from their liens. Mr. Bell's release was executed on July 23, 2007 and was "given for the purpose of enabling VISTA BELLA, INC., an Alabama Corporation, to make a valid conveyance of [Unit PH-1] free and clear of [his] lien." The Baldwin County Circuit Court determined on January 12, 2010 in an

order in Case No. CV-2009-900861.00 that Mr. Bell's release could not be reformed or rescinded.

C. Sale

In early May of 2009, Bob Shallow sold unit PH-1 to Corey and Theresa Callais, determined by the Circuit Court of Baldwin County to be bona fide purchasers for value, for $912,840.05. The Debtor did not receive any debt reduction or the benefit of the proceeds from the sale of unit PH-1. On or around May 19, 2009, the un-reallocated LCEs appurtenant to unit PH-1 were transferred by Bob Shallow to Vista Bella unit 1001, which was owned by Defendant Ronnie Carr at the time. Shallow testified that the transfer of the LCEs which were appurtenant to PH-1 was necessary because PH-1 had been sold. Shallow also testified that he was not anticipating foreclosure at the time of the transfer. However, he later admitted that he was contemplating foreclosure by May 09, 2009, the first day that the notice of foreclosure was published. The Debtor did not object to RBL, Bob Shallow, and/or Ronnie Carr's disposition of the LCEs. In fact, Bo Wilson testified that he consented to the reallocation of the LCEs to Mr. Carr's unit 1001.

D. LCEs

1. Nature and type of LCEs

The Debtor's Declaration of Condominium identified eight garages and twenty-eight boat slips as limited common elements and described the LCEs as appurtenant to Vista Bella unit PH-1. The Declaration was specifically made subject to the provisions of the Alabama Uniform Condominium Act ("AUCA"), Ala. Code § 35-8A-101, et seq. Under the AUCA, LCEs are "[a] portion of the common elements allocated by the declaration or by operation of section 35-8A-202(2) or (4) for the exclusive use of one or more but fewer than all of the units." *Id.* at § 35-8A-

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document   Page 29 of 88

103(16). "Common elements" are "[a]ll portions of a condominium other than units." Balconies, shutters, storage closets, garages, and boat slips are examples of property that can be LCEs under the AUCA.

The declaration of condominium "must specify to which unit or units each limited common element is allocated." *Id.* at § 35-8A-208(a). The parties stipulate that LCEs can only be owned by condominium owners. They must be appurtenant to a condominium at all times.

### 2. Ownership of LCEs

On July 18, 2007, the Debtor conveyed PH-1 along with all the appurtenant LCEs to the Shallows. Bob Shallow testified that his intention on July 18, 2007 was to purchase unit PH-1 with two garages and one boat slip. The description of the property to be transferred in the vendor's lien is, "Unit PHW-1 of Vista Bella Condominium . . . according to that certain Declaration of Condominium of Vista Bella . . . Together with appropriate undivided interest in the common area and facilities declared in said declaration to be appurtenant to the above described unit." The conveyance included all of the LCEs that had not been previously reallocated to other units which were appurtenant to unit PH-1. Both Wilson and the Shallows testified that while the LCEs were appurtenant to PH-1, they belonged to the Debtor and would be reallocated at the direction of the Debtor as the parties had done with the Legacy Key project. Wilson and the Shallows characterize the arrangement as transferring legal title to the Shallows, but leaving the Debtor with an equitable interest in the un-reallocated LCEs. The vendor's lien deed was recorded and specifically subjected the conveyance to the Debtor's mortgage lien.

Between July of 2008 and March of 2009, some of the LCEs were reallocated from unit PH-1 to other Vista Bella units at Wilson's direction as part of sales of those units to third parties.[8] Wilson testified that the proceeds of these sales went to pay down the bank loan. When

---

[8] A list of the transactions is alleged in the Trustee's Second Amended Complaint at paragraph 18.

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 30 of 88

a particular unit was sold together with an LCE, the Shallows would sign an amendment to the Declaration of Condominium to reallocate the LCE to that unit. Shallow testified that, other than the two garages and boat slips he purchased in 2007, the remaining LCEs were still the property of the Debtor and it was necessary for him to amend the Declaration in order to transfer the LCEs to other units for sale.

On January 22, 2009, the Debtor released PH-1 and all appurtenant LCEs from its $350,000 vendor's lien. On or about January 26, 2009, Bob Shallow, again acting on behalf of RBL, executed a written release of PH-1 from RBL's newly acquired mortgage lien. Shallow testified that RBL only intended to release PH-1, one boat slip, and two garages from the lien. The release stated, in pertinent part:

> RBL, LLC does hereby release . . . free from the lien, operation
> and effect of the above referenced Security Documents . . . Unit
> PH-1 of Vista Bella Condominium located in Baldwin County,
> Alabama, according to that certain Declaration of Condominium . .
> . [t]ogether with appropriate undivided interest in the common area
> and facilities declared in said declaration to be appurtenant to the
> above described unit.

Regardless of RBL's intentions, the January 26, 2009 conveyance legally released all of the LCEs appurtenant to PH-1 from the Debtor's mortgage.

On May 19, 2009 around the time that the Shallows sold PH-1 to the Callaises, the Debtor reallocated the unsold LCEs to Carr's unit 1001. At the time of the conveyance to Carr's unit, RBL had noticed the foreclosure. RBL foreclosed on the project several weeks later.

3. Foreclosure

RBL did not offer any LCEs at the foreclosure sale; none of the fifteen units offered for sale had appurtenant LCEs. All of the unallocated LCEs were appurtenant to Vista Bella unit 1001, which was owned by Defendant Ronnie Carr at the time. Bob Shallow testified that had

the LCEs been appurtenant to foreclosed units, his bidding strategy would have been the same: he would have bid the amount of the debt.

The Shallows both testified that they did not receive any preforeclosure inquiries regarding the availability of LCEs or whether LCEs would be included in the foreclosure sale. No one asked the Shallows to reallocate the LCEs to units that would be foreclosed, to redraft the notice of foreclosure, or to postpone the foreclosure sale.

Gary Malin showed up and bid at the foreclosure sale. Based on the foreclosure notice, he assumed the LCEs would be offered in the sale. According to Malin, he was financially able and would have bid up to $80,000 for a large boat slip or $50,000 for a garage unit if the LCEs had been made available for purchase. The Trustee did not offer evidence to corroborate Mr. Malin's assertion that he was financially capable of making cash purchases at the foreclosure sale, but the Defendants did not controvert his testimony. Mr. Malin bid on units at the sale—units without LCEs.

After the foreclosure sale, RBL sold the LCEs for a profit after the redemption period expired. No requests or attempts to redeem any units or LCEs were made during the redemption period. The Debtor did not receive any economic benefit from these postforeclosure sales.

V. Postforeclosure Activity

A. Interpleader Action

Following the foreclosure, RBL filed an interpleader action in Baldwin County Circuit Court and deposited the surplus resulting from the foreclosure with the court. The Debtor and creditors C. Thurmon Bell, The Lemoine Company, and William P. Condon, among others, were named in the Circuit Court complaint. Mr. Bell accepted the surplus pursuant to a granted motion for partial summary judgment because of the priority of his debt. Even so, Mr. Bell filed

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document   Page 32 of 88

a counterclaim in the state court action against RBL disputing $138,578 as the proper surplus amount. The case was disposed of on June 21, 2012 by a Stipulation of Dismissal with Prejudice. During his 2011 deposition, Mr. Bell stated that he thought the sale had been improperly conducted at the time he accepted the money. He was asked, "When you accepted that money did you believe at the time that the foreclosure had been improperly conducted?" To which he replied, "I think so."

B. Postforeclosure VBCOA meeting

Bob Shallow testified that he had a confrontation with Mr. Haas at a postforeclosure VBCOA meeting. He said that after the election of officers Haas "got heated." Shallow demanded that Haas apologize for "dogcussing" Susan Shallow on the phone months earlier. According to Shallow, Haas then grabbed Shallow's arm and Shallow walked away. This is the only conversation Shallow remembers having with Mr. Haas.

C. Redemption Period

Thurmon Bell testified that during the statutory redemption period following the foreclosure sale he "might have" wanted to redeem a single unit, but he was advised by counsel that he would have to redeem the whole foreclosed property or nothing at all. He could not say which unit, if any, he might have redeemed. During his 2011 deposition, Mr. Bell acknowledged that following the foreclosure sale he was aware of the statutory right of redemption.

> Q. Were you aware by your past experience or maybe by advice from your counsel that after the foreclosure sale you as a former junior lienholder or junior credit holder had a statutory one year right to seek to redeem one or more of those 15 units?
> A. That's correct.

Further, he testified that he could have raised the money to redeem. However, in his deposition, Mr. Bell stated the he did not have the money to redeem.

Q. Did you know you had a right of redemption?
A. Yes.
Q. Why didn't you exercise your right of redemption?
A. I just didn't want to.
Q. Did you not have the money?
A. I didn't have the money.

After considering his deposition testimony at trial, Mr. Bell confirmed that he did not have the money to redeem even one unit.

On July 27, 2010, after the redemption period, Ronnie Carr reallocated the LCEs appurtenant to his unit 1001 to Vista Bella unit 204, owned by RBL by virtue of the foreclosure sale. Shallow acted as Carr's attorney in fact in those transactions. Sometime thereafter, RBL reallocated the LCEs among the fifteen condominium units it purchased at the foreclosure sale. RBL then sold the fifteen condominium units, including the LCEs, to third party purchasers. RBL retained the proceeds from the sales. Bo Wilson did not object on behalf of the Debtor to RBL's reallocation of the LCEs or retention of the proceeds from the sales. RBL sold the fifteen condominium units acquired at the foreclosure sale to third party purchasers at a profit over its basis that exceeded $2,200,000. Those sales occurred over a year after the foreclosure sale. Bob Shallow received a $335,700 commission on those sales. RBL did not sell any units or LCEs during the one year statutory redemption period following the foreclosure. Susan Shallow testified that the LCEs were not advertised during the redemption period because there was a very limited market for the LCEs, potential buyers knew how to contact the Shallows, and no one expressed any interest in the LCEs during that time.

RBL purchased all of the outstanding stock of the Debtor from the Trustee of Bo Wilson's individual bankruptcy on October 12, 2010. Bob Shallow is now the sole director and officer of the Debtor. At no point prior to that purchase were Bob Shallow, Susan Shallow, or Ronnie Carr officers, directors, or shareholders of the Debtor. As the sole director and manager

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 34 of 88

of Vista Bella, Bob Shallow attempted to release all of the Trustee's claims against the Shallows, Carr, and RBL on January 14, 2011. RBL, Bob Shallow, Susan Shallow, and Ronnie Carr were not creditors of the Debtor within one year of the filing of the involuntary petition.

## A. Debtor's Bankruptcy and Adversary Proceeding

On January 14, 2011, Vista Bella was the subject of an involuntary bankruptcy petition that was later converted to a Chapter 7 case. The three creditors who filed the involuntary petition were C. Thurmon Bell, The Lemoine Company, and William P. Condon. The Trustee filed this adversary proceeding on June 4, 2012 seeking to avoid many of the transfers discussed above as fraudulent or preferential.

## V. The Shallow/Wilson relationship

Shallow was closely involved with several of Wilson's condominium developments as an advisor, real estate agent, and investor. Shallow and Wilson both testified that they are close personal friends; that they had a longstanding business relationship; that they trusted each other; and that they shook hands to finalize an agreement rather than putting everything in writing. Shallow was familiar with Wilson's personal financial problems as well as Vista Bella's financial problems. Due to these financial difficulties, Shallow agreed to forgo immediate payment of some commissions. He trusted that Wilson would pay him when he could. Wilson testified that while he listened to Shallow's recommendations about what to build, he did not answer to Shallow regarding Vista Bella's business, and he was not controlled by Shallow. However, he also testified that after RBL purchased the mortgage, he no longer made decisions for and directed the project.

## A. Credibility

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 35 of 88

The Court found Shallow and Wilson to be credible witnesses. Wilson's testimony did not mimic Shallow's, but this is consistent with each man having separate perceptions of events and recalling those events years after the fact. That Wilson and Shallow failed to get their stories perfectly "straight," supports the Court's finding that they were each telling the truth about their business agreements. Bob Shallow was a gruff, no nonsense witness. As a shrewd businessman, he was not always well liked. It is not surprising Bell, Haas, and Malin disliked him. His interests were not always aligned with their interests. Shallow's actions created animosity but the Court concludes he did not operate outside of what was legal. He had money to spend and debts he could call when needed.

## VI. The Shallow/Lienholders/Homeowners Relationship

Bob Shallow, personally or through RE/MAX, engaged in substantial and ongoing negotiations with the Debtor's creditors to obtain lien releases and "clean up the project." Mr. Bell received periodic updates regarding the Debtor's mortgage balance prior to the sale of PH-1 to the Shallows. He testified that he was not monitoring the debt level at the time of the sale, because he was not aware of the sale. The standstill agreement entered by Bell and Wilson on April 23, 2008 acknowledges the sale of PH-1 to the Shallows. Mr. Bell admitted that he was aware of the sale by this time. Bell admitted that while he negotiated to buy the project he was aware that the Shallows had purchased PH-1, but he continued to use Shallow as the exclusive broker for the project because he thought Shallow's services provided him the best chance of success. In fact, Mr. Bell acknowledged that unbeknownst to the Shallows, he was negotiating a deal with Regions to foreclose on Vista Bella wiping out the Shallow's interest in PH-1. According to Bell, Shallow committed fraud against him by 1) purchasing PH-1 for less than the minimum release price and failing to see that the purchase money went to pay down the

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 36 of 88

mortgage; 2) taking the LCEs and leaving them out of the foreclosure; and 3) getting PH-1 released from the mortgage. The Defendants presented evidence that Bell and Wilson had a side agreement in which Bell would receive unit 1201 for $100.

Susan Shallow testified that her relationship with Lennie Lemoine was amicable. After RBL purchased the mortgage, but before The Lemoine Company provided a release for PH-1, Bob Shallow discussed his intentions for the Vista Bella project with Lemoine. These discussions culminated in a Memo of Understanding drafted by Lemoine's counsel, signed by Shallow, and sent from Shallow to Lemoine on March 20, 2009. It reads,

> The following is a brief summary of my previous conversations with Lenny Lemoine and confirmation of my intentions regarding the disposition of units and mortgage debt at Vista Bella:
> 1. I have purchased the mortgage debt along with partners and my intention is to sell units until the mortgage debt is satisfied.
> 2. It is my belief that after satisfaction of mortgage debt that there will be funds remaining which will be shared by Thurman Bell who currently holds the second position behind the mortgage and The Lemoine Company, LLC who is immediately behind Bell.
> 3. In exchange for Lemoine and subcontractors releaseing lien rights on individual units as they are sold, I am committed to update Lemoine and the subcontractors on sale prices of units prior to asking for lien releases as well as asking prices on all remaining units at any given point in time. I will also provide a quarterly statement indicating balance of debt and projected supply/inventory value net of debt.
> Obviously, time will work against us as I am having to incur ongoing cost of interest, condominium dues, taxes, and insurance. So, my statement about funds remaining is under the assumption that all units can be sold within twelve (12) months.

Bob Shallow testified that Lemoine wanted Shallow to execute the Memo of Understanding in exchange for Lemoine's continued execution of lien releases as units were sold. Shallow testified that on March 20, 2009, he believed there was equity in the project and that there would be money for Bell and Lemoine after the mortgage debt was paid. Essentially, he affirmed that

each statement in the Memo of Understanding was true at the time that it was made. The Trustee presented evidence that Lemoine required Shallow to re-execute the Memo of Understanding on May 18, 2009 in exchange for his release of PH-1. Specifically, Lemoine's counsel emailed Shallow's counsel on May 18, 2009 requesting that the Memo of Understanding be signed and redated before Lemoine provided a release for PH-1. Shallow's counsel agreed by email and replied on May 18, 2009 with an attachment that included a signed copy of the Memo of Understanding. The attached copy of the Memo of Understanding was not redated. However, since the signed copy of the Memo was sent in response to Lemoine's request, the Court finds that Shallow re-executed the Memo on May 18, 2009. Shallow did not controvert this. Shallow denied that the main reason Shallow wanted Lemoine's release of PH-1 was to get a release of the Debtor's LCEs. Shallow has settled a state court suit with Lemoine regarding the Memo of Understanding.

Shallow testified that prior to the foreclosure he spoke with Mr. Bell. They discussed RBL's plan to buy the whole project at foreclosure and then let Bell redeem it. Shallow told Bell he planned to bid in the amount of the mortgage.

Shallow also communicated with the VBCOA as real estate agent, unit owner, and eventually as mortgagee. Harry T. Haas, a co-owner of Vista Bella unit 1004[9] and former President of the VBCOA, testified at trial. Mr. Haas attended a VBCOA meeting in early 2009 (before RBL bought the mortgage). Shallow was present at the meeting. According to Haas, Shallow represented to the association that another investor wanted to buy the mortgage and foreclose, thus devaluing all of the units in the project. Haas alleged that Bob Shallow discussed RBL's interest in buying the mortgage, and that Shallow specifically promised that if RBL

---

[9] Mr. Haas admitted that unit 1004 was titled solely in his wife's name until November 8, 2011. That is, at all relevant times, Mr. Haas was not, in fact, an owner or co-owner of any Vista Bella unit.

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document    Page 38 of 88

bought the mortgage it would not foreclose, and it would pay the association dues Vista Bella had accrued. On cross, Mr. Haas admitted that Mr. Shallow's promise not to foreclose was not made in exchange for anything—it was not part of a bargain.

Gary Malin—President of the VBCOA, Board member, and co-owner of unit 504—gave similar testimony. Mr. Malin said that he attended a VBCOA board meeting in early January of 2009 and that Bob Shallow was present at the meeting. According to Malin, at the meeting Shallow said someone else was trying to buy the mortgage and this potential bidder planned to foreclose, thereby lowering the value of all units. Further, Shallow said he was planning to buy the mortgage and that, if he did so, he would not foreclose and he would pay the back dues owed by Vista Bella to the VBCOA.

A. Credibility

According to Susan Shallow, while she had an amicable relationship with Mr. Bell pre-foreclosure, he was "extremely unfriendly" to her after the foreclosure. Bob Shallow testified that following the foreclosure Bell threatened him over the phone. The substance of his alleged threat was that Mr. Shallow could not be the #1 RE/MAX salesman in the world for several years without doing something wrong, and that Mr. Bell would have an attorney "dig up dirt" on him. During his testimony, Mr. Bell was unable to recall many of the details of his personal bankruptcy, his alleged agreement with Wilson to purchase unit 1201, his deposition testimony, and his standstill agreement negotiated with Wilson and Regions bank. Mr. Bell gave contradictory testimony about whether he was aware of the pending foreclosure sale. He also gave conflicting testimony about whether he would have been able to purchase the project if he had bid at the sale. Mr. Bell testified that he was hospitalized around December 1, 2010 and remained in a glycemic coma for seven days. This episode effected his cognitive faculties for at

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document    Page 39 of 88

least eighteen months, during which time his deposition was taken. Based on these facts, the Court finds Mr. Bell to be an unreliable witness. Unfortunately, due perhaps to his health problems, he was largely unable to give credible testimony. The Court finds Susan Shallow and Bob Shallow to be credible in their testimony.

Mr. Malin purchased unit 504 on or about February 10, 2009 for $610,000. Mr. Haas's wife bought unit 1004 in October of 2008 for $675,000 and later conveyed an interest in the unit to Mr. Haas. Shallow sold these units to Mr. Malin and the Haases while the project was in distress. The new condo owners may have been surprised to discover the extent of the problems at Vista Bella. Further, Ms. Shallow testified that the VBCOA was not aware of the Shallows ownership interest in Vista Bella. According to her, members of the association were upset that the realtors had not disclosed their interest preforeclosure.

Susan Shallow testified that she first met Mr. Malin at a VBCOA meeting. According to her, their relationship was amicable at first, but Mr. Malin was very "hot-headed" and communicating with him was difficult. She believes that Mr. Malin no longer likes her and that he likes her husband even less. Mrs. Shallow also testified that her first interaction with Mr. Haas was over the phone. She describes the conversation as the "most unpleasant call of her career." Bob Shallow testified that he had a heated confrontation with Haas due to Hass's verbally abusive treatment of his wife during that phone call.

The Court is convinced that Malin and Haas had reasons to be angry at Bob Shallow. Further, having observed the witnesses on the stand, the Court is convinced that, either leading up to or in the wake of the Vista Bella foreclosure, they were angry at Bob Shallow. While Shallow may have told the VBCOA that he had no plans to foreclose on the project, the Court is not convinced that he *promised* not to do so. Likewise, the Memo of Understanding does not

show a promise not to foreclose, it shows an intention not to foreclose. This is consistent with Shallow's version of events. For these reasons, the Court finds that Malin and Haas's testimony is less credible than the Shallows' testimony. Further, the Shallows' testimony was consistent and credible as stated above.

## ISSUES PRESENTED FOR TRIAL

The Trustee's complaint was amended twice. Subsequently, the Court entered three summary judgment orders which resolved several of the Trustee's claims. In light of these rulings, in their Joint Pretrial Statement, the parties stipulated to four issues for trial:

a) The Trustee's First Cause of Action (11 U.S.C. § 548(a)(1)) alleging actual and/or constructive fraud under federal law regarding the January 22, 2009 release of the Debtor's $350,000.00 vendor's lien from unit PH-1 while owned by Bob and Susan Shallow and the January 22, 2009 cancellation of the Debtor's $350,000.00 promissory note made by the Shallows;

b) The Trustee's First, Second and Third Causes of Action alleging actual and/or constructive fraud under federal and/or Alabama law regarding the transfers of the subject limited common elements from RBL, Carr, Bob and/or Susan Shallow in 2009 forward;

c) The Trustee's First, Second and Third Causes of Action alleging actual and/or constructive fraud under federal and/or Alabama law regarding the January 14, 2011 release of the Debtor's claims against RBL, Carr, Bob and Susan Shallow; and

d) The Trustee's First and Third Causes of Action alleging actual fraud under federal and/or Alabama law regarding the June 1, 2009 foreclosure sale and purchase by RBL.

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document      Page 41 of 88

Claims a, b, and c are treated individually. Claim d is treated as one aspect of the Defendants' alleged scheme to defraud.

## LAW

The Bankruptcy Code contains two different statutes under which fraudulent transfers may be avoided: 11 U.S.C. §§ 548 and 544(b). Under either § 548 or § 544(b), the party alleging a fraudulent conveyance bears the burden of proof by a preponderance of the evidence. *In re Fruehauf Trailer Corp.*, 44 F.3d 203, 211 (3rd Cir. 2006); *In re Earle*, 307 B.R. 276, 288 (Bankr. S.D. Ala. 2002) (explaining that the elements of the state law utilized under § 544(b) must be proven by a preponderance of the evidence).

In pertinent part, § 548 allows a trustee to avoid "any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date such transfer was made . . ., indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .

By its plain language, § 548 delineates two classes of fraudulent transfers. Subsection (A) avoids transfers based upon actual intent to defraud creditors and subsection (B) avoids transfers under circumstances where fraud is presumed—constructively fraudulent transfers. *See* 5 COLLIER ON BANKRUPTCY ¶ 548.01 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

Section 544(b) gives a trustee the ability to avoid any transfer of an interest of the debtor in property that is voidable under applicable nonbankruptcy law by a creditor holding an

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document      Page 42 of 88

unsecured claim that is allowable under the Bankruptcy Code. In this case, the Trustee invokes

the Alabama Uniform Fraudulent Transfer Act ("AUFTA"), Ala. Code § 8-9A-1 et. seq., as her

nonbankruptcy law of choice. The AUFTA is derived from the Uniform Fraudulent Transfer Act

("UFTA"), which has been adopted by 43 states and the District of Columbia. *See* 5 COLLIER ON

BANKRUPTCY ¶ 544.06[2] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.). Therefore, cases

interpreting the UFTA are persuasive authority for the operation of the AUFTA where the

language of the AUFTA mirrors that of the UFTA. *Horton v. Alexander*, 977 So. 2d 462, 465

(Ala. 2007). Like its federal counterpart, the AUFTA concerns both actual fraudulent transfers

and constructive fraudulent transfers.

As to actual fraud, Ala. Code § 8-9A-4(a) states that "[a] transfer made by a debtor is

fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was

made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor

of the debtor." "Actual fraud denotes the actual mental operations of intending to defeat or delay

the rights of the creditor." *In re Earle*, 307 B.R. at 291. Section 8-9A-4(b) provides an

enumerated list of factors to consider when determining the requisite actual intent. Ala. Code

§ 8-9A-5(a) deems transfers constructively fraudulent. It states: "A transfer made by a debtor is

fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the

transfer without receiving a reasonably equivalent value in exchange for the transfer and the

debtor was insolvent at that time or the debtor became insolvent as a result of the transfer."

Fraudulent transfer issues are heavily fact dependent and generally come down to the

credibility of witnesses. *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2nd Cir. 1991).

January 22, 2009 Release of the Debtor's $350,000 Vendor's Lien

1.    § 548 actual and constructive fraud

The Trustee asserts that the Debtor's release of the $350,000 vendor's lien from unit PH-1 while owned by Bob and Susan Shallow and the January 22, 2009 cancellation of the Debtor's $350,000 promissory note made by the Shallows were actually and constructively fraudulent under 11 U.S.C. § 548. The elements necessary to establish a fraudulent transfer for actual fraud under § 548(a)(1)(A) are: (1) a transfer (2) of an interest of the debtor in property (3) that occurred within two years prior to the filing of the petition, (4) where the debtor made the transfer with "actual intent to hinder, delay, or defraud" one of its creditors. Section 548(a)(1)(B), in pertinent part, shares the first three elements with subsection (A), but adds that (1) the Debtor received less than a reasonably equivalent value in exchange for the transfer and (2) the Debtor was insolvent on the date of the transfer.

The parties stipulate that both transfers were transfers under federal law, the Debtor had an interest in the $350,000 vendor's lien and promissory note, and the transfers were made within two years before the date of the filing of the involuntary bankruptcy petition on January 14, 2011. The parties further stipulate that the Debtor was insolvent at the time of the transfers, the Debtor was indebted to multiple parties including Petitioning Creditors Bell, Lemoine, Condon, and WHL, and the Debtor's creditors' claims arose before the January 22, 2009 transfers. Thus, the issues for trial, pursuant to 11 U.S.C. § 548, are (1) whether Wilson, as the sole officer, director and shareholder of the Debtor at the time, along with Bob and Susan

---

[10] Aspects of this claim were treated in the Court's summary judgment opinion, *In re Vista Bella, Inc.*, 2013 WL 2422703 (Bankr. S.D. Ala. 2013). That opinion refers to this claim as "Alleged Fraudulent Transfer 2."

Shallow, released the vendor's lien with actual intent to hinder, delay or defraud the Debtor's creditors; and/or (2) whether the Debtor received reasonably equivalent value in exchange for the January 22, 2009 transfers.

### A.    <u>Actual intent to hinder, delay, defraud</u>

Actual intent to hinder, delay, or defraud creditors is ordinarily established by circumstantial evidence. *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998). That evidence is typically gathered by a court's consideration of certain badges of fraud. *Id.* In *XXZ Options*, the court cited the badges of fraud in Ala. Code § 8-9A-4(b):

1. The transfer was to an insider;

2. The debtor retained possession or control of the property transferred after the transfer;

3. The transfer was disclosed or concealed;

4. Before the transfer was made the debtor had been sued or threatened with suit;

5. The transfer was of substantially all the debtor's assets;

6. The debtor absconded;

7.  The debtor removed or concealed assets;

8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

9. The debtor was insolvent or became insolvent shortly after the transfer was made;

45

10. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*XYZ Options*, 154 F.3d at 1272. Although part of the Alabama Code, they are appropriate to use to determine if there is a fraudulent transfer under federal law.

No specific combination of badges is necessary for a finding of actual intent and the presence of any of the badges of fraud does not compel such a finding. *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 10 n.13 (S.D.N.Y. 2007). The badges merely highlight circumstances that suggest that a transfer was made with fraudulent intent. *Id.* With that being said, it is clear that actual intent to hinder, delay, or defraud is a heavily fact-dependent question. *In re Canyon Systems Corp.*, 343 B.R. 615, 636 (Bankr. S.D. Ohio 2006).

Badge 1: Insider

The Court finds that, at the time of the January 22, 2009 transfer, Shallow was an "insider" within Ala. Code § 8-9A-4(b)(1). Shallow does not fall within the specifically enumerated list of persons and entities deemed "insiders" under § 8-9A-1. However, "the list of 'insiders' in that Code section is not exclusive." *In re Earle*, 307 B.R. 276, 291 (Bankr. S.D. Ala. 2002). "Black's Law Dictionary defines an "insider" in the bankruptcy context as "[a]n entity or person who is so closely related to a debtor that any deal between them will not be considered an arm's length transaction and will be subject to close scrutiny." *Id. See also* Black's Law Dictionary 798 (7th ed. West 1999). After hearing Bob Shallow and Bo Wilson testify about their longstanding relationship and business dealings, the Court is convinced that Shallow was an insider as to Vista Bella even before he bought all of the shares of Vista Bella through Wilson's personal bankruptcy. Mr. Shallow was the real estate agent for Vista Bella; he owned a unit at Vista Bella; all unsold LCEs were appurtenant to Shallow's unit because his close relationship with the Debtor facilitated quick and easy reallocations; he advised Wilson on several real estate developments; he was a close, personal friend of Wilson's; he personally loaned Wilson money when Wilson was in a pinch; and he was poised to purchase the Debtor's mortgage at the time that the Debtor released the $350,000 lien and cancelled the $350,000 promissory note. Thus, this badge of fraud is established.

Badge 4: Threat of Suit

The Trustee also argues that Wilson was under threat of suit at the time that he cancelled the $350,000 lien and promissory note. On January 22, 2009, Wilson had recently been sued on a personal guarantee on the Emerald Tower project and had a deficiency judgment entered against him. Further, Wilson and his wife were liable for another personal guarantee in the Vista Bella project and they did not have the resources to meet this obligation. The Trustee argued that Wilson executed the release in exchange for Shallow's assurance that RBL would not pursue Wilson on the guarantee. The evidence does not directly support this theory.

However, there is enough evidence of Wilson believing Shallow would release his guarantee that the Court concludes it was a partial motivating factor. The Court does believe that Wilson's failure to pay promised commissions to Shallow was a strong factor as well at the time of the release. Wilson knew the work Shallow had done and wanted to compensate him, particularly when Shallow was continuing to sell units. Wilson wanted Shallow to remain motivated to sell the project.

Wilson testified that he knew RBL intended to foreclose, extinguish the mortgage debt, and extinguish the Wilsons' personal guarantees. He was "thankful" for this. He also said that he was "set at ease" when RBL acquired the mortgage since he knew Shallow well and knew that Shallow was trying to sell units and salvage the project. His testimony did not specify precisely when Wilson knew all of this, but it is safe to say that he knew at some point prior to the foreclosure sale. Though the evidence shows that Wilson was aware of Shallow's plans to

cancel his debt, it does not show that Wilson extinguished the lien and promissory note *in exchange for* Shallow's promise to do so. When asked if in 2009 he was concerned that RBL might sue him to recover the $1,000,000 paid by Shallow to him personally for PH-1, Mr. Wilson said that it was "never brought up." However, Wilson did sign an indemnity agreement on November 13, 2007 agreeing to indemnify RE/MAX Paradise for claims arising out of its disbursement of earnest money or escrow funds. Further, Defendants concede, in their Rebuttal Brief at page 11, that Wilson was under threat of suit at the time of the January 22, 2009 release. Therefore, this badge of fraud is established, although weakly so.

Badge 8: Reasonably Equivalent Value

For the reasons discussed below, the Court is convinced that the Debtor received reasonably equivalent value in exchange for the note cancellation and lien release.

For the purposes of proving actual fraudulent intent, what the parties believed they were exchanging is just as important as what they actually had to exchange. In other words, if Shallow thought he was only owed $1,000 in unpaid commissions, this would support the Trustee's allegation of actual fraud, even if it turned out that the Debtor owed Shallow much more than $1,000. *See* 5 COLLIER ON BANKRUPTCY, ¶ 548.04[1][b][iii] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.) (stating "When a transfer is made with the requisite actual intent, for example, the debtor's receipt of reasonably equivalent value is immaterial."). While the Court is finding that the Debtor owed Shallow more than $350,000 at the time of the exchange, it is not convinced that Shallow believed, as he now asserts, that he was owed more than $1,000,000 in unpaid commissions. Shallow has maintained throughout these proceedings that he was owed roughly $156,959.42 in forfeited deposits. The Court does not believe that he thought he was owed significantly more than this on account of forfeited deposits on January 22, 2009. However, the Court is convinced that Shallow thought he was owed somewhere in the neighborhood of $300,000 in unpaid commissions and that is sufficient. As discussed below, REV does not mean mathematical equivalence; it means reasonable equivalence so the badge does not apply in this case.

Badge 9: Insolvency

The parties stipulate to the presence of one badge of fraud: the Debtor was insolvent at the time of the transfer.

Seven of the badges of fraud were not implicated at all. The three established badges of fraud do raise suspicions about Shallow's conduct. The Debtor was insolvent and under threat of suit when it transferred property to Shallow, an insider. However, Wilson and Shallow's rationale for the transfer is convincing. The Court believes that they thought they were exchanging the lien release and promissory note cancellation for forgiveness of roughly equivalent unpaid commissions. Wilson and Shallow were convincing and credible on this point. Shallow did not work for free. That is shown by the success of his real estate business. Wilson valued Shallow's work and expertise. Shallow's release of Wilson's guarantee was a bonus. The monetary grounds alone were sufficient to preclude a finding of fraud. Therefore, the Trustee has not shown by a preponderance of the evidence that Vista Bella through Bo Wilson and/or Bob Shallow actually intended to hinder, delay, or defraud its creditors by cancelling the $350,000 promissory note and releasing the lien on January 22, 2009.

**B.       Reasonably equivalent value**

Reasonably equivalent value ("REV") is not specifically defined in the Bankruptcy Code. However, the purpose of the requirement is well known: "to protect creditors against the depletion of a bankrupt's estate." *In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir. 2012); *In*

*re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990). Therefore, § 548(a)(1)(B) "does not authorize voiding a transfer which confers an economic benefit upon the debtor" because "the debtor's net worth will have been preserved, and the interests of the creditors will not have been injured by the transfer." *Rodriguez*, 895 F.2d at 727.

The pivotal question asks what value a debtor received from a transfer. The Bankruptcy Code defines "value" for § 548 purposes in § 548(d)(2)(A), to include "property, or satisfaction or securing of a present or antecedent debt of the debtor." The Bankruptcy Court for the Northern District of Georgia recently utilized the following three-part test for whether a debtor received REV: "(1) whether the debtor received value; (2) whether the value received was in exchange for the property transferred; and (3) whether the value was reasonably equivalent to the value of the property transferred." *In re Knight*, 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012). It is important to note that strict market equivalence of the transferred property and the received consideration is not required and that "the concept of reasonably equivalent value does not require a dollar-for-dollar transaction." *In re Advanced Telecomm. Network Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007); *see also In re Perry County Foods, Inc.*, 313 B.R. 875, 896 (Bankr. N.D. Ala. 2004) (finding that "paying less than what is the market value price does not demonstrate in isolation from other factors that one paid or received less than reasonably equivalent value for 11 U.S.C. § 548(a)(1)(B)(i)'s purposes"). For purposes of this opinion, it is clear that the Court's inquiry into whether REV was received is largely factual and depends on the circumstances of the case. *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593 (11th Cir. 1990); *TOUSA*, 680 F3d. at 1311.

The Defendants argue that the Debtor owed over $350,000 in real estate commissions to RE/MAX Paradise and that the forgiveness of those outstanding commissions constituted REV to the Debtor. If over $350,000 in earned commissions were forgiven in exchange for satisfaction of the $350,000 lien, then it stands to reason that REV was received by the Debtor. The Trustee argues that the real estate commissions could not be forgiven in order to satisfy the vendor's lien, a personal obligation of Bob and Susan Shallow, because the May 10, 2005 exclusive broker agreement was made between RE/MAX Paradise and the Debtor. The Court does not agree with that conclusion.

The Debtor was owed $350,000 on account of the promissory note. It does not matter who gave value to the Debtor in satisfaction of this obligation. From the Debtor's point of view, the only concern is that value was received from some source in exchange for the release and cancellation. The Debtor was discharged from its debt on several commissions in exchange for the release. This was valuable consideration regardless of who released the debt. Further, Bob and Susan Shallow were the sole owners of RE/MAX Paradise at the time of the release. Under these facts and for the purposes of this transaction, the Court views Shallow and RE/MAX as essentially the same entity/person. Shallow had the authority to forgive a debt owed to RE/MAX Paradise and he did. The Court is not concerned with whether RE/MAX Paradise or the Shallows personally received value for this debt forgiveness. There is no allegation here that any of Bob Shallow's or RE/MAX Paradise's creditors suffered from the exchange. Therefore, the fact that the Debtor received consideration from RE/MAX rather than from the Shallows personally in exchange for the forgiveness of a personal obligation of the Shallows, is not evidence of actual intent to defraud Vista Bella's creditors and it does not bear on whether the Debtor received REV.

The Defendants cite the following transactions as entitling Bob Shallow to commissions:

1. $816,000.00 in commissions derived from 6% of the total amount of forfeited earnest money deposits;[11]
2. $81,000 in commissions equal to 6% of the $1,350,000 gross purchase price of Unit PH-1 to the Shallows;
3. $45,000 in commissions from his brokering of the purchase of the Vista Bella development property from Island Investments II, LLC.; and
4. $105,899.30 in commissions for brokering of a transaction between Stewart Title Guarantee Company which resulted in Stewart Title releasing a second real estate mortgage against the Debtor's property in exchange for Vista Bella unit 303 in February of 2009.

The Trustee argues that the Shallows' failure to report $350,000 as income on their tax returns is evidence that they did not receive the reduction in exchange for commissions owed. The Trustee's argument requires several inferences. Essentially, she asserts that the Shallows are sophisticated real estate agents and that they would not put their personal or professional reputations on the line in order to commit tax fraud.[12] Therefore, the fact that they did not report the $350,000 as income (as the parties agree they should have) is evidence that they did not receive this income. In other words, it is evidence that Wilson and Shallow did not have any deal to exchange commissions. While this is a plausible theory, the Shallows have since determined that their CPA made a mistake on their tax returns and they instructed him to amend their returns to show the $350,000 gain. While failing to initially list the $350,000 gain on their taxes is some evidence that there was no deal, it is weak evidence especially in light of their subsequent tax return amendment. The Court finds Wilson's and Shallow's testimony to the contrary more credible and persuasive. The tax return alone is simply not enough evidence of fraud when balanced against the parties' believable testimony.

---

[11] The Defendants originally calculated the figure at $156,959.42 or 6% of the total forfeited deposits. Upon reexamining the listing agreements, Defendants assert that the Debtor actually owed Shallow the lesser of 6% of the total sales price or ½ of the deposit amount. The Court has reviewed the listing agreement and is convinced that Shallow was owed the lesser of 6% of the total sales price or ½ of the deposit amount.

[12] The irony of this argument is not lost on the Court in light of the Trustee's broader contention that the Debtor, under Shallow's influence, intended to defraud his creditors. On the one hand, Shallow is such an upstanding citizen that he would not cheat on his taxes, but on the other hand, he orchestrated an elaborate fraud to cheat the Debtor and its creditors. To the Court, these theories are irreconcilable.

The Trustee also showed that RE/MAX Paradise did not pay a franchise fee on the unpaid commissions to its RE/MAX franchisor. The Trustee argues that this is further evidence that there was no agreement with Wilson on January 22, 2009. The Defendants contend that under their franchise agreement, no fee is owed on a cashless transaction. While the franchise agreement is in evidence, neither party cited the Court to a specific provision of the agreement or any one of its several appendices to support its position. However, Shallow testified that no franchise fee was owed. Because Shallow, on behalf of RE/MAX is a party to the franchise agreement and has operated under it for years, the Court finds his testimony regarding RE/MAX's duties under the agreement very persuasive. For these reasons, the Court is not convinced that RE/MAX Paradise owed any franchise fee on the transaction. Therefore, its failure to pay a franchise fee is not evidence of a lack of agreement between Wilson and Shallow. For these reasons, the Court finds that Wilson and Shallow did have an oral deal, on January 22, 2009, to exchange commissions for the debt cancellation. The issue now is whether the Debtor received reasonably equivalent value as a result of that deal.

### i. Forfeited Earnest Money Deposits

Bo Wilson testified that he and Shallow had an understanding that Shallow was to receive a 6% commission "on all deals" including on forfeited deposits. Wilson did not specify whether that meant 6% of the sales price or 6% of the forfeited deposit. Wilson further stated that 6% was the arrangement regardless of what he and Shallow said in various settlement statements and listing agreements.

The record shows that, by and large, the parties had an exclusive listing agreement in effect during all the relevant time periods. In her posttrial brief, the Trustee conceded this point. The exclusive listing agreement between Vista Bella and Bob Shallow states that "I/we further

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document    Page 51 of 88

agree that in the event of forfeiture of any earnest money deposits by prospective purchasers of said property during the existence of this agreement, or any extensions thereof, such deposit shall be equally divided between you and me/us with the broker's share not to exceed commission as stated in Paragraph No. 1 above." The commission stated in Paragraph No. 1 on each of the listing agreements and extensions is either 5% or 6%. Thus, under the contract, for each forfeited deposit, Vista Bella owed the lesser of 5% or 6% of the purchase price of the unit or half of the forfeited deposit amount.

The Defendants contend that, under the contract, the Debtor owed 6% of the original sales price of each forfeited unit and cite page 36 of the Loan Agreement between Vista Bella and AmSouth for a statement of each original sales price. Defendants' exhibit 152 only contains 35 pages. Page 35 of the loan agreement lists the "Minimum Unit Sale Prices" negotiated between the Debtor and bank at the outset of the project. The Court will assume that this is the page the Defendants intended to reference.

The Court knows that the Debtor was not able to sell each unit for the minimum sales price. For example, the minimum sales price for PH-1 was $1,820,000, but all parties agree that the Debtor sold PH-1 to the Shallows for $1,350,000. Under the listing agreement, the commission owed is based on the actual sales price, not the minimum sales price listed in the loan agreement. Likewise, Shallow's commission on forfeited earnest money deposits was based on the actual amount of money forfeited. Some buyers negotiated a forfeiture of their earnest money in which less than the full amount of the deposit was actually forfeited. The Court can assume the earnest money deposits were based on the actual sales price negotiated, not on the minimum sales price. At least with regard to the sale of PH-1, the Defendants concede that the commission owed to Bob Shallow is based on the actual sales price, not the

minimum sales price. Eighty-one thousand dollars is 6% of $1,350,000; it is far less than 6% of $1,820,000. Because deposit amounts were based on actual sales prices, and full deposits were not actually forfeited in each case, the loan agreement is not sufficient evidence of the commissions Shallow earned from forfeited deposits.

For evidence of commissions actually earned by Bob Shallow prior to January 22, 2009, the Court turns to the exhibits introduced by the parties. After reviewing over 500 exhibits, the Court has not found the purchase agreements that allegedly gave rise to earned commissions on forfeited earnest money deposits. However, Defendants' exhibit 192, titled "Forfeited earnest money deposits" shows both checks written from Shallow's earnest money account to Regions bank, and settlement agreements resolving disputed earnest money forfeitures. The Court compared the minimum sales prices listed in the loan agreement with the earnest money checks for units 103, 503, 504, 901, 902, and 904. In each case, the Court found that the deposit equaled 20% of the minimum sales price. Therefore, the Court will assume that, at least for these units, the Debtor actually sold the units for the minimum sales price. Based on that assumption, the Court tallied the commissions earned by Shallow on forfeited earnest money deposits for these units.

1.      Unit 103 was sold for $820,000.00. The earnest money deposit on this sale was $164,000.00. (Check #5535, dated 8/13/07.) Six percent of $820,000.00 is $49,200.00. Half the deposit is $82,000. Thus, the lesser of half the deposit or 6% of the sales price is $49,200.00

2.      Unit 503 was sold for $860,000.00. The earnest money deposit on this sale was $172,000.00. (Check # 5549, dated 10/30/07.) Six percent of $860,000.00 is $51,600.

Half the deposit is $86,000.00. Thus, the lesser of half the deposit or 6% of the sales price is $51,600.00.

3.      Unit 504 was sold for $1,080,000.00. The earnest money deposit on this sale was $216,000.00. (Check # 5546, dated 10/17/07.) Six percent of $1,080,000.00 is $64,800.00. Half the deposit is $108,000.00. Thus, the lesser of half the deposit or 6% of the sales price is $64,800.00.

4.      Unit 901 was sold for $1,120,000.00. The earnest money deposit on this sale was $224,000.00. (Check # 5545, dated 10/11/07.) Six percent of $1,120,000.00 is $67,200.00. Half the deposit is $112,000.00. Thus, the lesser of half the deposit or 6% of the sales price is $67,200.00.

5.      Unit 902 was sold for $900,000.00. The earnest money deposit on this sale was $180,000.00. (Check # 5551, dated 11/30/07). Six percent of $900,000.00 is $54,000.00. Half the deposit is $90,000.00. Thus, the lesser of half the deposit or 6% of the sales price is $54,000.00.

6.      Unit 904 was sold for $1,120,000.00. The earnest money deposit was $224,000.00. (Check #5535, dated 8/13/07.) Six percent of $1,120,000.00 is $67,200.00. Half the deposit is $112,000.00. Thus, the lesser of half the deposit or 6% of the sales price is $67,200.00.[13]

Based on the foregoing sales, Shallow earned $354,000.00 in commissions on earnest money deposits prior to January 22, 2009. The Defendants allege and the Court is convinced that Shallow earned commissions from other forfeited earnest money deposits in addition to the commissions referenced above. However, the commissions discussed are sufficient to show that

---

[13]

 Note that the earnest money deposits for units 103 and 904 were paid with one check. RE/MAX's notes state the amount paid for each unit.

Shallow gave reasonably equivalent value in exchange for the release of the $350,000 vendor's lien and concurrent cancellation of the promissory note. Therefore, the Court need not consider other forfeited deposits.[14]

### ii. $81,000 Commission Owed on Purchase of PH-1

The Defendants contend that Vista Bella owed Shallow $81,000 on the July 18, 2007 sale of PH-1 to the Shallows. Wilson confirmed this. Further, the HUD settlement statement from the closing of PH-1 recites the commission owed as "$81,000 to be paid by Seller once vendor's lien has been paid in full." The Trustee argues that because Vista Bella never received any portion of the $1,000,000.00 down payment or cash on the $350,000 promissory note, Vista Bella never owed Shallow a commission on this sale. The Trustee's position is unsupported and incorrect.

The exclusive listing agreement between Vista Bella and Bob Shallow states that "I/we agree to pay you a cash commission of 6 [or 5] percent of the gross amount of any sale, agreement to sale, or exchange, which may be negotiated during the existence of this contract. The term "sale" shall be deemed to include any exchange or trade to which I/we consent." Bo Wilson as principal of Vista Bella clearly consented to sell PH-1 to the Shallows. Shallow's right to a commission arose out of this sale and he did pay $1,000,000.00 to Bo Wilson as consideration for the sale. What Bo Wilson actually did with those funds is immaterial to the question of whether a sale transpired and a commission was earned. The Court finds that there was a sale and that Shallow earned an $81,000.00 commission from it. Further, Wilson and Shallow testified that Vista Bella had not paid this commission to Shallow on January 22, 2009. The Trustee did not present any evidence to rebut this. Therefore, the Court finds that on

---

[14] The analysis would be the same even if Shallow only earned a 5% commission on some unit sales because REV is an approximation; REV does not require mathematical equivalence.

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document   Page 55 of 88

January 22, 2009 Vista Bella owed Shallow an outstanding commission of $81,000 arising from the sale of PH-1.

### iii. $45,000 Commission Owed on Purchase of Vista Bella Development Property

The Defendants argue that on January 22, 2009, Vista Bella owed Bob Shallow $45,000 in commissions on the sale of the Vista Bella development property. The sale occurred on February 10, 2004 from C. Thurmon Bell to Island Investments II, LLC. Bo Wilson purchased the property on behalf of Island Investments II, LLC. The HUD statement recites $100,000 as the commission paid to Mr. Shallow on this sale. Wilson testified that $100,000 was paid. Wilson also testified that despite what was written on the HUD statement, he and Shallow had an oral agreement that entitled Shallow to 6% commission on all transactions. The Defendants allege that $45,000 was the outstanding commission due to Shallow as a result of this oral agreement to pay 6% .

Vista Bella, Inc. was formed on March 10, 2005—over a year after this sale occurred. Wilson testified that despite the fact that Island Investments II, LLC not Vista Bella, Inc. actually owed Shallow the commission, he personally felt he owed Shallow the $45,000. The issue for the Court is, when one person serves as the principal of both the Debtor entity and a separate non-Debtor entity, can a creditor's forgiveness of the non-Debtor entity's debt constitute value given for the Debtor's lien release? If so, was an additional $45,000 owed?

The answer to the first question must be no. "[C]ourts have long recognized that '(t)ransfers made to benefit third parties are clearly not made for a 'fair' consideration,' and, similarly, that 'a conveyance by a corporation for the benefit of an affiliate (should not) be regarded as given for fair consideration as to the creditors of the conveying corporations." *In re Osage Crude Oil Purchasing, Inc.*, 103 B.R. 256, 263 (Bankr. N.D. Okla. 1989) (citing 4

COLLIER ON BANKRUPTCY, ¶ 67.33, at 514.1-514.2 (14th ed. 1978). Inland Investments II, Inc. and Vista Bella, Inc. are not technically "affiliated;" they do not have a parent-subsidiary relationship. However, Wilson's ownership of each entity is an affiliation such that the parent-subsidiary analysis is applicable by analogy. The law does not treat the assets of separate entities as a common pool of assets even when those separate entities are closely affiliated. *See* 5 COLLIER ON BANKRUPTCY, ¶ 548.05[2][c] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

The Defendants argue that Wilson purchased the property through Island Investments II, LLC and held it for over a year before conveying it to Vista Bella, Inc. so that "Wilson could report a substantial amount of gain from the appreciation in value of the property more than one year as capital gain with lower tax rates than ordinary income." *Post-Trial Brief of Defendants* at at 5. Essentially, Wilson only funneled the property through Island Investments II, Inc. for the tax benefits. The Defendants further argue that because the Court must look beyond the form of a transaction to its substance in determining whether a fraudulent conveyance was made, the Court should ignore the fact that Island Investments II, LLC and Vista Bella, Inc. are separate entities.

To support this contention, the Defendants cite this Court's earlier ruling in this case, *In re Vista Bella, Inc.,* 2013 WL 2422703 at *18-19, 25 (Bankr. S.D. Ala. 2013). There, the Court considered "whether RBL's release of Unit PH-1 from the Debtor's mortgage was a transfer" *made by the Debtor* "for purposes of § 548." *In re Vista Bella, Inc.,* 2013 WL 2422703, *18 (Bankr. S.D. Ala. 2013). In concluding that a transfer by RBL could be a transfer made by the Debtor, the Court stated "'a transfer does not have to be made directly by a debtor in order to fall within the ambit of the statute.'" *Id.* at 19 (quoting *In re FBN Food Services, Inc.,* 175 B.R.

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document   Page 57 of 88

671, 683 (Bankr. N.D. Ill. 1994). This is so because, as a court of equity, the bankruptcy court must "look beyond the form of a transaction to determine its substance." *Id.* Specifically, the Court looks beyond the form of a transaction "in order to discern the transfer's effect on creditors." *Id.* (citing *In re Compton Corp.*, 831 F.2d 586, 591-95 (5th Cir. 1987)). The substance over form rule is a shield that protects the estate. It is not intended to protect transfers that diminish the estate. The substance of RBL's release of PH-1 from the Debtor's mortgage was that it potentially deprived the Debtor of property from which its debts could be satisfied. Therefore, the Court looked past the form of the transaction—the fact that the transfer was technically made by RBL, not the Debtor—to consider its substance.

The Court does not agree with the Defendants' analysis here. By accepting Shallow's forgiveness of a debt owed to Island Investments II, LLC in exchange for a lien release and promissory note cancellation, the Debtor received no value either in form or substance. Rather, Island Investments received value since the commission it allegedly owed Shallow was extinguished as a result of the transaction. The effect of the transfer on Vista Bella's creditors was that Vista Bella's asset pool was diminished.

Because the Court finds that the Debtor could not owe Shallow any commission on the purchase of the Vista Bella development property, it will not consider whether $45,000 was still owed to Shallow on that transaction.

Without making a finding about how much money Wilson, on behalf of Island Investments II, owed Shallow from the land purchase, the Court does find that Wilson and Shallow *believed* that Wilson owed Shallow a commission on this sale. Further, the Court believes that the men *thought* it was fair to settle this debt through their January 22, 2009 agreement. In short, while the Court finds that the alleged $45,000 debt could not constitute

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document    Page 58 of 88

REV in exchange for the Debtor's lien release, the Court is persuaded that Wilson and Shallow believed that it could and did. Their mistake does not constitute actual fraud.

### iv. $105,899.30 Commission For Brokering STGC Lien Release in Exchange for Unit 303 in February of 2009.

The Defendants argue that the Debtor owed Shallow a commission for brokering Stewart Title's release of its second mortgage in exchange for unit 303, and that this commission was forgiven in exchange for the lien release. The Trustee contends that any commission earned from this sale could not have been exchanged on January 22, 2009, because the commission was not earned until the sale closed on February 3, 2009. The HUD statement for this transaction was signed on February 3, 2009. The mortgage release was also executed on February 3, 2009. Wilson and Shallow both testified that they orally agreed that Shallow would earn a 6% commission on this sale. Contrary to this, the HUD statement reflects a $0 commission.

"Value" for purposes of § 548 means "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). Value includes "the mere 'opportunity' to receive an economic benefit in the future." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212 (3rd Cir. 2006). Whether value was received at all is a threshold question resolved by the court's determination of whether "based on the circumstances that existed at the time of the transfer, it was legitimate and reasonable to expect some value [to] accru[e] to the debtor." *Id.* Forgiveness of the commission Shallow contemplated earning on the exchange of unit 303 (which closed within two weeks of the January 22nd release) was an economic benefit that was legitimate and reasonable for the Debtor to assume would accrue to it shortly after the January 22nd exchange. Thus, release of the unearned commission could constitute value under

§ 548. However, this does not answer the question of whether it did in fact constitute value given in exchange for the challenged transfer.

To constitute reasonably equivalent value the consideration must be given *in exchange for* the property transferred. A coincidental exchange of value is not sufficient. Wilson testified that he does not remember discussing the transfer of unit 303 to Stewart Title as part of his lien release deal with Shallow. Shallow's testimony about whether he and Wilson contemplated the forgiveness of an unearned commission as part of their agreement was vague. Based on their testimony, the Court is not convinced that Wilson and Shallow contemplated the forgiveness of future commissions as part of their January 22, 2009 agreement.

In sum, the Court finds that, on January 22, 2009, the Debtor owed Shallow over $350,000 from forfeited earnest money deposits as well as $81,000 from the sale of PH-1. The Court also finds that Shallow and Wilson *believed* the Debtor owed Shallow over $350,000 in unpaid commissions. Therefore, Vista Bella's release of its $350,000 lien against the Shallows' unit and its cancellation of their $350,000 promissory note did not constitute actual or constructive fraud under § 548. The evidence does not support such a result.

## 2.    §544 actual and constructive fraud

The Trustee's § 544 claims respecting the January 22, 2009 lien release and promissory note cancellation were disposed of by summary judgment. *In re Vista Bella, Inc.*, 2013 WL 2422703 *17-18 (Bankr. S.D. Ala. 2013) (finding that the lien was not an "asset" capable of being fraudulently transferred under the AUFTA because the lien was fully encumbered by the Debtor's mortgage at the time of the release), and *In re Vista Bella, Inc.*, 2013 WL 4051031 *8 (Bankr. S.D. Ala. 2013) (finding that the promissory note was not an "asset" capable of being fraudulently transferred under the AUFTA because the note was fully encumbered by the

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document    Page 60 of 88

Debtor's mortgage at the time of its cancellation). Because the lien and promissory note were fully encumbered by the Debtor's mortgage on January 22, 2009, they were not "assets" capable of being fraudulently conveyed under the AUFTA. Therefore, the Trustee failed to prove that the January 22, 2009 transfers were fraudulent under Alabama law, and her § 544 claim fails.

For the foregoing reasons, the Court finds that the Trustee failed to prove that the January 22, 2009 transfers were actually or constructively fraudulent under either § 548 or § 544 and the Court awards judgment to the Defendants.

## ISSUE B[15]

### Reallocation of LCEs

The Trustee alleges that the Defendants' various conveyances of unsold LCEs were fraudulent transfers under both 11 U.S.C. § 548(a) and § 544(b) through the AUFTA. Based on a review of the facts, the following transactions encapsulate those involving the LCEs:

1. The LCEs were originally allocated to unit PH-1 in the Declaration of Condominium on May 15, 2007.

2. On July 18, 2007, unit PH-1, which included the appurtenant LCEs, was sold to Bob and Susan Shallow.

3. Between July of 2008 and March of 2009, some of the LCEs were reallocated to various condominium units as part of sales to third party purchasers. The Trustee concedes that the Debtor received the consideration and benefit of those transfers.

4. On May 19, 2009, the remaining un-reallocated LCEs still appurtenant to unit PH-1 were transferred to Ronnie Carr's unit 1001. The foreclosure occurred one month later.

5. On July 27, 2010, Ronnie Carr reallocated the LCEs to Vista Bella unit 204, then owned by RBL by virtue of the foreclosure sale.

---

[15] Referred to as "Alleged Fraudulent Transfer 4" in the Court's summary judgment opinion, *In re Vista Bella, Inc.*, 2013 WL 2422703 (Bankr. S.D. Ala. 2013).

6. Sometime thereafter, RBL reallocated the LCEs among the fifteen condominium units it purchased at the foreclosure sale. RBL then sold the fifteen condominium units, including the LCEs, to third party purchasers. RBL retained the proceeds from the sales.

Only transfers 4-6 are at issue for trial. Because the foreclosure sale changed the nature of the Debtor's interest in the unsold LCEs, the May 19, 2009 disposition is treated separately from all the subsequent dispositions.

## 1. § 548 actual and constructive fraud

It is undisputed that Vista Bella was insolvent when the LCEs were reallocated in 2009 and 2010. It is also undisputed that those reallocations occurred within two years of the filing of the involuntary petition. Beyond that, the parties dispute the application of the elements of § 548(a). Therefore, at issue is whether the reallocations from May 19, 2009 forward constitute (1) transfers made by the Debtor, (2) of an interest of the Debtor in property, and, if so, (2) whether those transfers were made with actual intent to hinder, delay, or defraud creditors and/or (3) whether the Debtor received less than reasonably equivalent value for the transfers.

### a. May 19, 2009 Disposition

#### A. Transfer

The Court has already found that the Debtor's consent to the May 19, 2009 transfer of the LCEs to Carr's unit 1001 was an indirect transfer of the Debtor under § 548(a). *In re Vista Bella, Inc.*, 2013 WL 2422703 *25 (Bankr. S.D. Ala. 2013).[16]

In order for a transfer to be subject to avoidance under § 548(a), it must be a transfer of an interest of the debtor in property. The Bankruptcy Code defines transfers very broadly to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of

---

[16] If the Court is incorrect that the May 19 movement of LCEs was a transfer *of the Debtor's property*—because the Debtor had only an equitable interest in the LCEs after PH-1 was released from the mortgage and it retained its equitable interest in the LCEs after the reallocation to Carr's unit 1001—then there was no transfer *of the Debtor's interest* on May 19, 2009 at all.

disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). A transfer must be either directly or indirectly made by a Debtor in order to qualify for avoidance under § 548. *In re FBN Food Services, Inc.*, 175 B.R. 671, 683 (Bankr. N.D. Ill. 1994) *aff'd by* 185 B.R. 265 (N.D. Ill. 1995).

It is clear that the May 19, 2009 reallocation of the LCEs to unit 1001 disposed of an interest in property. However, the Defendants argue that the reallocation of the LCEs on May 19, 2009, July 27, 2010, and the sales thereafter were not made by the Debtor. It is undisputed that the reallocations were effectuated pursuant to amendments to the Declaration and that those amendments were executed by Bob Shallow, Susan Shallow, and Ronnie Carr (by Bob Shallow as his attorney-in-fact). However, it is also undisputed that Bo Wilson, on behalf of the Debtor, consented to the May 19, 2009 reallocation of the un-reallocated LCEs to Ronnie Carr's unit 1001.

In response to the Debtor's argument, the Trustee argues that the LCEs were the Debtor's property and that the Defendants had no legal right to reallocate them without the Debtor's direction or consent. The Defendants argue in response that following the January 26, 2009 release of unit PH-1 from the Debtor's mortgage the LCEs were released along with the unit. The Defendants are correct because a lien against a common element, like the LCEs, is void if that lien is no longer attached to the unit to which the common element is allocated. Ala. Code § 35-8A-207(e) Commissioners' Commentary 6. It is also true that at the time of the release, the un-reallocated LCEs were appurtenant to unit PH-1 and that a limited common element must be appurtenant to a unit. *Bank of America, N.A. v. Kinslow*, 2012 WL 6062577, at * 4 (Ala. Civ. App. December 7, 2012). Based upon that, the Defendants argue that, upon release from the mortgage lien, the Shallows were free to reallocate the LCEs as they saw fit.

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document    Page 63 of 88

The Court agrees with the Defendants' legal analysis. The Shallows, as unit owners with appurtenant limited common elements allocated to their unit, had the legal right to reallocate the LCEs as long as those reallocations were in line with the Alabama Uniform Condominium Act ("AUCA"), Ala. Code § 35-8A-101 et. seq., and the Declaration of Condominium (the "Declaration") executed by Bo Wilson. ALA. CODE § 35-8A-208 (a) and (b). However, whether the Shallows had the legal right and ability to effectuate a reallocation does not speak to whether the reallocation was an indirect transfer of the Debtor. A transfer under § 548 can be directly or indirectly made by a debtor. *FBN Food Services, Inc.*, 175 B.R. at 683; *Matter of Clover Donut of White Plains Corp.*, 14 B.R. at 210. Many fraudulent transfers are accomplished through legal means but still qualify as fraudulent transfers. Just because the Shallow's could transfer the LCE's does not mean that their transfer was conclusively not fraudulent—or, conclusively not an indirect transfer of the Debtor.

With that being said, it is this Court's conclusion that, given the facts of this case and this Court's duty to consider substance over form with fraudulent transfers, Bo Wilson's consent to the reallocations of the LCEs on May 19, 2009 to Ronnie Carr's unit 1001 qualifies as an indirect transfer of the Debtor under § 548.

**B.      Interest of the debtor in Property**

The Declaration at Article 4.08 initially allocated all of the LCEs to PH-1. The Shallows owned PH-1, and in May of 2009, all of the LCEs that had not been reallocated to other units for sale to third parties remained appurtenant to PH-1. The Trustee asserts that the LCEs were allocated to PH-1 to be held in constructive trust by the Shallows so that they could allocate the LCEs to other units in connection with sales to third parties for the Debtor's benefit. That arrangement makes sense and Bob Shallow's deposition testimony indicates that his

understanding was that he could only reallocate the LCEs at the direction of the Debtor because the LCEs were "assets of the [Debtor]."

Wilson and Shallow both testified to this arrangement. After hearing the witnesses, the Court is persuaded that on May 19, 2009, after the reallocation from PH-1 to 1001, Ronnie Carr held legal title to the unsold LCEs appurtenant to his unit, but the Debtor retained equitable title to the LCEs until each was sold. The Debtor's equitable interest in the unsold LCEs was transferred from PH-1 to 1001. Therefore, the May 19, 2009 transfer of the un-reallocated LCEs from Shallow's unit PH-1 to Carr's unit 1001 was a transfer of an interest of the debtor in property.

### C.  Actual intent to hinder, delay, or defraud creditors

The issue is whether the Defendants, as the alter ego of the Debtor, had actual intent to hinder, delay, or defraud creditors, when they reallocated the unsold LCEs from the Shallows' unit PH-1 to Carr's unit 1001 on May 19, 2009. The Trustee argued that this transfer was made in the weeks preceding the foreclosure for the purpose of shielding the LCEs from the foreclosure and profiting thereby. Though Shallow testified that he did not decide to foreclose until the day of the foreclosure sale, the Court finds that Shallow was at least contemplating foreclosure on May 19th. After all, the foreclosure had already been noticed. Shallow further testified that the reallocation was made because PH-1 had been sold to a third party, the Callaises. As they had in the past, the Debtor and Defendants sought a convenient unit to which to allocate the unsold LCEs since PH-1 was no longer available for this purpose. The Defendants knew that Carr was not planning to sell his unit. Further, Shallow was Carr's attorney-in-fact which made reallocations—which must be signed by the unit owner—particularly easy to come by; Shallow could sign the reallocations on Carr's behalf.

Also undercutting the Trustee's theory is the fact that the May 19th reallocation moved the unsold LCEs from the Shallows' unit PH-1, which was no longer encumbered by the mortgage, to Carr's unit 1001, which was also unencumbered by the mortgage. As discussed above, the LCEs could only be subject to foreclosure if they were appurtenant to a unit that was subject to the mortgage/foreclosure. Because PH-1 was not subject to the mortgage, the unsold LCEs would not have been put through the foreclosure even if the May 19 reallocation had not occurred. For these reasons, the evidence does not support the Trustee's theory that the May 19 reallocation was designed to shield the LCEs from the foreclosure sale.

As the Court has discussed actual fraud can be proven by the confluence of certain badges of fraud. The parties stipulate that the Debtor was insolvent as of May 19, 2009.

Badge 1: Insider

Carr, as an owner of RBL, was an insider. Shallow testified that he was Carr's attorney-in-fact at the time of this transfer and that he had been for at least fifteen years. He and Carr were friends and had done many business transactions together. To the extent that Shallow was an insider, and the Court finds that as of May 19, 2009 he was, Carr was also an insider.

Badge 2: Debtor retained possession or control of the property transferred after the transfer

To the extent that the Debtor controlled the LCEs prior to the May 19, 2009 transfer, the Debtor maintained control over the LCEs after the May 19th transfer until the foreclosure sale. The parties stipulated that the Debtors held an equitable interest and only an equitable interest in the unsold LCEs prior to the May 19th transfer. While the Trustee takes issue with the May 19th transfer, she did not present evidence that the disposition disrupted the legal title/equitable interest arrangement. To the contrary, the Defendants testified that the Debtor retained an

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document      Page 66 of 88

equitable interest in the unsold LCEs until the foreclosure sale. Based on these facts, the Court finds that the second badge of fraud is established.

Badge 4: Threat of suit

On May 19, 2009, the Debtor was not under threat of suit. In theory, RBL could have foreclosed and sought a deficiency judgment against the Wilsons based on their personal guarantees. In reality, Shallow testified that he planned to bid in the debt at the foreclosure sale, thus satisfying the Wilsons' obligation under their personal guarantees. Wilson testified that he knew Shallow planned to bid in the debt if he foreclosed. So, the Debtor did not feel that it was under threat of suit at the time of the May 19, 2009 transfer.

Badge 8: Reasonably Equivalent Value

The Debtor received reasonably equivalent value for the May 19, 2009 transfer. Again, the Court notes that the purpose of the REV requirement is "to protect creditors against the depletion of a bankrupt's estate." *In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir. 2012); *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990). The Debtor's equitable interest in the LCEs was unchanged as a result of the May 19th reallocation. Therefore, the Debtor's estate was not depleted as a result of the transfer.

Despite the confluence of some badges of fraud—the Debtor was insolvent, the Defendants were "insiders," and the Debtor's control of the property was unchanged as a result of the sale—the Court is not convinced that the Debtor, through the Defendants, actually intended to hinder, delay, or defraud its creditors. Most persuasive to the Court's finding is the uncontroverted testimony of Wilson and Shallow respecting their past business practices. Specifically, prior to commencing the Vista Bella project, Wilson acted as developer and

Shallow as exclusive real estate agent, unit owner, and project advisor in the Legacy Key development. Like Vista Bella, Legacy Key is a concrete high-rise with appurtenant boat slips.

As he did at Vista Bella, Bob Shallow purchased a penthouse and boat slip at Legacy Key. Wilson allocated all twenty-four boat slips to Shallow's unit, and then Shallow reallocated them to other units at Wilson's direction as they were sold; the development received all proceeds as a result of these sales. Legacy Key was a successful project; all units were sold. Wilson made roughly $1,200,000 on the Legacy Key project. The Defendants implied and the Trustee did not rebut that Legacy Key's creditors were satisfied with how Shallow and Wilson completed the project.

The Court finds Wilson and Shallow to be credible witnesses. In developing the Vista Bella project, Wilson and Shallow attempted to replicate their Legacy Key success. For the sake of ease, they parked all unsold LCEs at Shallow's unit, as they had at Legacy Key. Until foreclosure, Shallow reallocated LCEs as they were sold to third party purchasers. Vista Bella received the economic benefit of these reallocations. The Court is persuaded that the May 19th reallocation was done to preserve this arrangement following the sale of PH-1 to the Callaises. While the reallocation occurred just a few weeks before the foreclosure, the sale to the Callaises closed at that time too. The Court believes this was coincidental, not part of a scheme to defraud. Had the market continued to rise, this arrangement was likely to produce profits and pay creditors in full. Unfortunately, the housing market crashed and took down Vista Bella and a host of other developments with it.

Because the parties allocated LCEs in the same manner they had during the Legacy Key project and the Debtor's assets were not diminished as a result of the May 19, 2009 transfer, the

Trustee has failed to prove the Defendants actually intended to hinder, delay, or defraud creditors through this transaction despite the presence of some badges of fraud.

### D.    Reasonably equivalent value

While the Debtor did not receive anything in exchange for this transfer, its position vis-à-vis the LCEs did not change as a result of this transfer. The parties agree that the Debtor only had an equitable interest in the LCEs before the May 19th transfer, and the evidence shows that the Debtor retained this equitable interest after the transfer. Therefore, the Debtor received reasonably equivalent value because it maintain the exact same rights with respect to the LCEs that it had before the transfer.

In sum, the Court finds that the May 19, 2009 reallocation of LCEs was not done with actual intent to hinder, delay, or defraud creditors and the Debtor received REV for it. Therefore, the May 19th conveyance was not actually or constructively fraudulent under § 548.

### b. July 27, 2010 Disposition and all subsequent dispositions

### A.    Transfer of an Interest of the Debtor in Property

At issue for trial is whether the July 27, 2010 transfer from Carr's unit to unit 204 and all subsequent reallocations were *transfers* made by the Debtor under § 548(a). Like the May 19, 2009 transfer, the evidence indicates that Shallow, on behalf of RBL, made the contested transfers from July 27, 2010 forward. For the reasons discussed above, Wilson's acquiescence to these transfers can be construed as an indirect transfer of the Debtor.

The evidence indicates that Wilson acquiesced in the foreclosure sale. Wilson testified that, though he had notice of the foreclosure, he did not attend it or object to it. He also did not attempt to redeem any of the foreclosed property. Further, he said that, while he did not explicitly discuss the matter with Shallow, he thought RBL, not Vista Bella, would benefit from

disposition of the LCEs post-foreclosure. Shallow's testimony echoed this idea. Given the facts of this case and this Court's duty to consider substance over form with fraudulent transfers, Bo Wilson's decision not to object to the foreclosure sale, either at the sale or during the redemption period, constitutes acquiescence to the transfers of the LCEs from the time of the foreclosure sale forward. This acquiescence qualifies as an indirect transfer of the Debtor under § 548.

### B.    Interest of the Debtor in property

While the Debtor's acquiescence to Shallow's transfers from the time of the foreclosure forward may constitute an indirect transfer of the Debtor, the issue is really whether the Debtor had anything of value to transfer after the foreclosure sale. The parties stipulate that the Debtor did not have legal title to the LCEs on July 27, 2010 or thereafter. However, the Trustee argues that the Debtor still had an equitable interest in the LCEs because they did not go through the foreclosure sale. The Court must determine whether the foreclosure sale extinguished the Debtor's equitable interest in the unsold LCEs despite the fact that the unsold LCEs did not go through the foreclosure sale. If failing to include the LCEs in the foreclosure sale left the Debtor with less than it would have otherwise had, then its equitable interest was not satisfied. However, if the Debtor received all that it would have, then it was not damaged and it has no grievance in equity. After all, equity regards as done that which should have been done. The Court has found no case law that discusses this issue under the Alabama Uniform Condominium Act or other similar acts.

The Trustee argues that, had the LCEs been included in the foreclosure sale, the Debtor would have received a higher price at the sale leaving a greater surplus for distribution to its creditors. Therefore, by failing to include the LCEs in the sale, the Defendants depleted assets

of the estate for their own benefit. The Trustee's position was supported by the testimony of her expert, Ferrell Anders. According to Mr. Anders, including the LCEs in the foreclosure sale may have encouraged more bidders to show up and place bids. Though only unit owners would be eligible to purchase an LCE, including the LCEs might have compelled current unit owners & prospective owners to bid. This would have produced greater assets for the estate and Vista Bella's other creditors, in particular Thurmon Bell, would have recovered more of his losses. The Court disagrees.

The Trustee's position assumes that a larger pool of bidders would have shown up and bid had the LCEs been included in the sale. The evidence does not support this assumption. The Court has already found that the foreclosure sale was properly noticed. *In re Vista Bella, Inc.*, 2013 WL 2422703 *28 (Bankr. S.D. Ala. 2013). The notice described the property remaining under the mortgage as, "Unit 101, 102, 103, 104, 201, 204, 301, 304, 404, 503, 601, 902, 903, 1201, and PH-2 of Vista Bella Condominium . . . together with the appropriate undivided interests in the common and limited common elements declared in said Declaration to be appurtenant to the above-described units." The Trustee suggested that a more spirited pool of bidders would have been enticed to show up and bid had the notice specifically stated that boat slips and garages would be auctioned at the sale. Hudgens, the Defendants' expert, and Anders agreed both that the law does not require such specific notice and that, in practice, lawyers do not give such specific notice. On the contrary, Mr. Hudgens said that the published notice would be sufficient under the AUCA regardless of whether LCEs were or were not actually auctioned at the foreclosure sale. Mr. Anders testified that based on the published notice, he

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document   Page 71 of 88

would not expect a bidder interested in LCEs to show up at the foreclosure sale without having first called and inquired about whether LCEs would be included in the sale.[17]

Bob and Susan Shallow both testified that neither they nor their office received any inquiries prior to the foreclosure about whether LCEs would be auctioned at the sale. Gary Malin, owner of unit 504, learned of the foreclosure and showed up to bid. He assumed that the LCEs would be auctioned. However, he did not call to inquire about if or how they would be offered. Further, while he was aware that LCEs had to be appurtenant to a unit, he did not investigate to determine whether LCEs were appurtenant to any of the units to be auctioned. So, no potential bidder was dissuaded from showing up to bid on a garage or boat slip after learning from the Shallows that no LCEs would be offered.

The Defendants testified to the extremely depressed nature of the real estate market in Baldwin County in 2009. The Court takes judicial notice of the poor condition of the real estate market in Baldwin County, Alabama during 2009. Based on this and the testimony, the Court finds that the pool of bidders that actually showed up to bid at the sale is the same pool of bidders that would have shown up had the LCEs been included in the sale. This pool included only two people: RBL's counsel and Gary Malin.

The Trustee failed to show that, based on the pool of bidders that showed up, the sale would have produced a higher price if the LCEs had been included. The Trustee also failed to show that any other bidders would have attended had the LCEs been included in the sale. Hudgens and Anders both testified that there were several ways RBL could have included the LCEs in the sale. It could have allocated each LCE to a different unit; or allocated all of the LCEs to any one unit; or it could have sold the LCEs separately to unit owners at some point

---

[17] However, the Court knows from Malin's testimony that at least one bidder showed up without having first called to inquire about the sale, but Malin only bid on units and did not ask about LCEs.

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 72 of 88

during the sale. Mr. Malin testified that he was not interested in bidding on any units below the fifth floor. He said he would not have bid on any unit below the fifth floor even if LCEs had been appurtenant to the unit.

Bob Shallow testified that his plan at the foreclosure was to bid the debt. On advice of counsel, the debt was divided over the units and RBL bid on each unit accordingly. He testified that, if the LCEs had been specifically included in the sale, his strategy would have remained the same. He would have bid in the mortgage debt distributing the debt over the LCEs as well.

Malin's, Shallow's and the experts' testimony reveals scenarios in which the LCEs could have been included in the foreclosure sale without the sale producing a higher bid. The LCEs could have all been made appurtenant to unit 101, 102, 103, 104, 201, 204, 301, 304, or 404 and, because these units are below the fifth floor, Malin would not have bid on them. In which case, RBL would have paid precisely what it did pay for the units. The LCEs also could have been spread amongst these units producing the same result. The LCEs could have been auctioned *en masse* with all of the units and Mr. Malin would not have been financially able to outbid RBL.

Alternatively, the LCEs could have been allocated among units or sold separately in such a way that a larger surplus may have been created. However, under Alabama law, "the duty a mortgagee owes a mortgagor in a foreclosure proceeding is one of good faith and fairness, not a general fiduciary duty. The description of a mortgagee as, 'in a sense, a trustee,' or as a 'quasi-trustee,' should not be taken to mean that a mortgagee owes a mortgagor all the same duties that a trustee owes a trust beneficiary." *In re Sharpe*, 391 B.R. 117, 154 (Bankr. N.D. Ala. 2008) (internal citations omitted). The Trustee's expert testified that the law does not impose a duty on a mortgagee to obtain the highest possible price. He agreed that there is no

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document      Page 73 of 88

duty to take out large advertisements or to personally call potential bidders to drum up interest in a foreclosure sale. While these measures might produce a higher price, they are not required and are not typically done. Rather, the law requires that a mortgagee comply with strict notice and execution procedures. When these procedures are complied with, a presumption arises that the mortgagee has fulfilled its duties of good faith and fairness. This is particularly so when the mortgagee bids in its debt leaving no possibility of a deficiency judgment against the Debtor.

The Trustee bears the burden of proving the Debtor's assets were depleted as a result of RBL's failure to specifically include the LCEs in the foreclosure sale. However, the evidence shows that including the LCEs in the sale may or may not have produced a greater surplus. To the Court, it is not even a close call. It is too speculative to assume that the Defendants would have allocated the LCEs in such a way as to produce a surplus. Because including the LCEs in the sale could have produced the exact same sale prices, the Trustee has failed to prove that the Debtor or its creditors were damaged as a result of the LCEs not going through the foreclosure. In other words, the Trustee has failed to show that the Debtor got less than it should have for its property—including both its legal and equitable interests in the Vista Bella development. This is consistent with the Court's prior rulings.

The Trustee also contends that had the LCEs been included in the foreclosure sale, an interested party would have been more inclined to redeem the project postforeclosure. However, the Trustee did not present evidence that any party was in position to redeem during the statutory period. Mr. Wilson testified that he was not in position to redeem. Mr. Bell testified that he was not personally in position to redeem.

Essentially, Shallow was the only person both willing and able to purchase the project either before or after foreclosure. He was under no duty to pay more than he did, whether the

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document     Page 74 of 88

LCEs were included or not. Because the Debtor received all of the value it would have received had the LCEs been included in the sale, the Debtor's equitable interest in the LCEs was extinguished through the foreclosure sale. Because all of the Debtor's interest in the Vista Bella property was extinguished at the foreclosure sale, the Debtor could not have fraudulently transferred the LCEs after the foreclosure sale.

Also, once all of the units were foreclosed upon by RBL, the LCEs could not be held by Vista Bella on a stand-alone basis. The LCEs only have value and can only be transferred if appurtenant to a unit. Therefore, the value of the LCEs, whether specifically transferred or not, followed the transferred units. The Court finds that the value of the LCEs was $60,000-$80,000, not $600,000-$880,000. The LCEs as stand-alone assets had little or no value because they were nontransferable except by a unit owner or project owner to a unit owner. The title to the LCEs had to pass to RBL after the redemption period (if not at foreclosure) or, Ronnie Carr gained full title to them at the expiration of the redemption period due to the inability of the LCEs to exist as separate properties. The Trustee's LCE valuation did not sufficiently reflect the market in 2009 in the Court's opinion, and assumed a robust market for each and every LCE which the Court does not conclude existed. Further, the Trustee's valuation did not reflect the distressed, bulk nature of the sale. Due to the limited pool of potential buyers for the LCEs, the distressed, wholesale nature of the sale, and the poor conditions of the real estate market during 2009, the Court finds—in part based on the comparable value of the bulk sale of boat slips at Sunset Bay—that the LCEs would have been worth $60,000-$80,000 if they had gone through the foreclosure sale. This amount could have been part of the bid in value. There was no need for a higher bid. Adding this value to the value of the property RBL received through the sale, RBL's bid still does not "shock the conscience." The fact that the LCEs were not included in

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 75 of 88

the foreclosure resulted in no proven damage to the creditors. First, legally, the LCEs were not able to be included in the foreclosure because they were not titled in the Debtor. Second, the same price would have been paid at the foreclosure even if the LCEs were transferred to foreclosed units. No bidders were shown to have been prevented from seeking an LCE.

For the foregoing reasons, the Court finds that the reallocation of LCEs from Carr's unit to unit 204 on July 27, 2010 and all subsequent reallocations were not done with actual intent to hinder, delay, or defraud the Debtor's creditors, and that the Debtor received REV for them. Therefore, the reallocations were not actually or constructively fraudulent under federal or Alabama law.

## 2.   § 544(b) and AUFTA actual and constructive fraud

The elements necessary to establish a fraudulent transfer claim under the AUFTA are substantially similar to the elements necessary to establish a claim under federal law. However, Ala. Code § 8-9A-4(a) states that "[a] transfer *made by a debtor* is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." Because this language differs from the language under § 548, the Court will address it directly.

At issue for trial is whether Bob Shallow controlled the Debtor through Bo Wilson and whether the Debtor was, as a result, a mere alter ego or instrumentality of Shallow. Although Alabama case law has made clear that an essential element of the AUFTA is that the challenged transfer be made by the debtor, *Hart v. Pugh*, 878 So. 2d 1150, 1157 (Ala. 2003), Alabama case law has also made clear that a conveyance made by the alter ego of the Debtor is a transfer made by the Debtor for purposes of the AUFTA. *Thompson Properties v. Birmingham Hide & Tallow Co., Inc.*, 839 So. 2d 629 (Ala. 2002).

It is undisputed that RBL, through Bob Shallow, executed releases of LCEs from the Debtor's mortgage from January 23, 2009 forward. However, whether Bo Wilson was merely an instrumentality or alter ego of Bob Shallow is in dispute. *See Ex Parte AmSouth Bank of America*, 669 So. 2d 154, 156-57 (Ala. 1995) (finding in the piercing the corporate veil context that "separate legal existence will not be recognized when a corporation is 'so organized and controlled and its business conducted in such a manner as to make it merely an instrumentality of another . . . or when it is the 'alter ego' of the person owning and controlling it'").

Several facts lead to the conclusion that Wilson and the Debtor were mere instrumentalities of Bob Shallow including: (1) Shallow's significant involvement with, and first-hand knowledge of, the Debtor since its inception; (2) Wilson's personal guarantee of debt which RBL eventually purchased (3) RBL's partial ownership by Shallow, (4) Shallow's promise not to collect on the Wilsons' guarantees (which may or may not have been true based on testimony at trial), (5) Wilson's inactive stance as to all of the transfers of the Debtor's property, including the release of unit PH-1, and (6) Shallow's ultimate profit from acquiring the Debtor's property. On the other hand, the release of unit PH-1 from the mortgage lien was accomplished by the Shallows and not the Debtor. Further, Wilson testified that Shallow did not control him.

Contrary to this, Wilson testified in his deposition that he was "out" after RBL purchased the mortgage; that he didn't have "any involvement whatsoever" after this. Without finding that the Debtor was an alter ego of Shallow prior to Shallow's purchase of the mortgage, the Court finds that the Debtor was a mere instrumentality of Shallow after the mortgage transfer. By his own admission, Wilson was not making decisions on behalf of the

Debtor after the mortgage purchase. Hence, Shallow's actions and intentions from the time RBL purchased the Debtor's mortgage forward, are imputed to the Debtor.

This conclusion affects the resolution of the Trustee's § 544 claim. However, it does not change the Court's finding that the Trustee failed to prove by a preponderance of the evidence that 1.) the May 19, 2009 and all subsequent LCE transfers were done with actual intent to hinder, delay, or defraud creditors and 2.) the Debtor did not receive REV for these transfers under both Alabama and federal law. For these reasons, the disputed LCE reallocations were not actually or constructively fraudulent under either § 548 or § 544. The Court enters judgment for the Defendants on these claims.

## ISSUE C

### January 14, 2011 Release of the Debtor's Claims Against RBL, Carr, Bob and Susan Shallow

Neither party fleshed out the elements of this claim, but, out of an abundance of caution, the Court makes the following findings.

The Trustee asserts that the Defendants' attempt to release the Trustee's claims against them on behalf of the Debtor was actually and constructively fraudulent under 11 U.S.C. §§ 548 and 544. The elements necessary to establish a fraudulent transfer for actual fraud under § 548(a)(1)(A) are: (1) a transfer (2) of an interest of the debtor in property (3) that occurred within two years prior to the filing of the petition, (4) where the debtor made the transfer with "actual intent to hinder, delay, or defraud" one of its creditors. Section 548(a)(1)(B), in pertinent part, shares the first three elements with subsection (A), but adds that (1) the Debtor received less than a reasonably equivalent value in exchange for the transfer and (2) the Debtor

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document      Page 78 of 88

was insolvent on the date of the transfer.[18] The elements necessary to establish a fraudulent transfer claim under § 544 through the AUFTA are substantively identical to those outlined above and the following analysis covers the Trustee's § 544 claims too.

### A.    Transfer

In order for a transfer to be subject to avoidance under § 548(a), it must be a transfer of an interest of the debtor in property. The Bankruptcy Code defines transfers very broadly to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). A transfer must be either directly or indirectly made by a Debtor in order to qualify for avoidance under § 548. *In re FBN Food Services, Inc.*, 175 B.R. 671, 683 (Bankr. N.D. Ill. 1994) *aff'd by* 185 B.R. 265 (N.D. Ill. 1995). This definition includes releases of causes of action. *In re FBN Food Services, Inc.*, 185 B.R. 265, 272 (N.D. Ill. 1995).

RBL purchased all of the Debtor's outstanding stock from the Trustee of Wilson's personal bankruptcy on October 12, 2010. Following this purchase, Bob Shallow became the sold director and manager of the Debtor. As the sole director and manager of Vista Bella, Shallow attempted to release all of the Trustee's claims against the Shallows, Carr, and RBL on January 14, 2011. This qualifies as a transfer made directly by the Debtor.

### B.    Interest of the Debtor in Property

Typically, "interest of the debtor in property" has been construed to mean property of the estate as defined in section 541(a). *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990). Property of the estate includes "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541 (a)(1). This "includes causes of action belonging

---

[18] As previously discussed, the AUFTA states that a transfer "made by the debtor" is fraudulent . . . . The parties do not dispute that the Debtor made this alleged fraudulent transfer. For this reason, the Court will not parse the § 544 language here.

to the debtor at the time the case is commenced." 5 COLLIER ON BANKRUPTCY ¶ 541.07 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Any cause of action arising from the alleged fraudulent transfers at issue in this suit existed at the time of the Debtor's bankruptcy filing on January 14, 2011.

### C.    Occurred Within Two years Prior to the Filing

The Release was executed the day that the involuntary petition was filed and the Court assumes that the release was made prefiling. Because the Court concludes that there is no fraudulent transfer, it is not significant in any event.

### D.    Actual Intent to Hinder, Delay, or Defraud

Shallow's attempt to release the Trustee's claims does not demonstrate actual intent to hinder, delay or defraud the Debtor's creditors. Shallow believed the Trustee's claims were without merit, and that it was not in Vista Bella's interest to pursue them. In fact, Shallow's analysis of the Trustee's claims has won the day. Therefore, his attempt to release the Trustee's claims does not show intent to defraud because he was correct.

### E.    Reasonably Equivalent Value

The Debtor did not receive any value in exchange for Shallow's attempted release of the Trustee's claims. The Trustee's claims, however, have proven valueless. So, the Debtor received precisely what they were worth. This is reasonably equivalent value.

For these reasons, the Trustee has failed to establish that Shallow's attempted release of her claims was actually or constructively fraudulent under either Alabama or federal law. Therefore, the Trustee's § 548 and § 544 claims fail, and the Court enters judgment for the Defendants on these counts.

### ISSUE D

## June 1, 2009 Foreclosure and the Defendants' Alleged Fraudulent Scheme

The Court has already found that the foreclosure sale was not constructively fraudulent under either § 548 or § 544. *In re Vista Bella, Inc.*, 2013 WL 2422703 *30 (Bankr. S.D. Ala. 2013). However, the Trustee claims that the sale, when viewed in light of all of the Defendants' conduct respecting the Debtor's property, evidences actual intent to hinder, delay, or defraud the Debtor's creditors under these statutes. "A general scheme or plan to strip a debtor of its assets with no regard to the needs of creditors can support a finding of actual fraudulent intent." *In re F & C Services, Inc.*, 44 B.R. 863, 872 (Bankr. S.D. Fla. 1984). Actual intent "may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent." *Id.* (citing 4 COLLIER ON BANKRUPTCY ¶ 548.02[5] at 548-33-34 (15th ed. 1984)).

Specifically, according to the Trustee, the decision to withhold the LCEs from the foreclosure sale was but one part of a fraudulent scheme orchestrated by Mr. Shallow to obtain the Debtor's assets at a discount and profit from its plight. To do so, the Trustee alleges that Bob Shallow asserted control over the Debtor's principal, Bo Wilson, based on Wilson's personal guarantee of the mortgage debt. Moreover, the Trustee asserts that Shallow was close enough to the situation to know the Debtor's finances inside and out, including its insolvency. Based on that knowledge, Shallow was in a position, according to the Trustee, to effectuate transfers of the Debtor's valuable assets to the benefit of the Defendants and at the expense of the Debtor and its creditors.

To support her allegations, the Trustee points to the following facts:

(1) Bob Shallow's purchase of unit PH-1 on July 18, 2007.

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document    Page 81 of 88

Shallow knowingly paid $1,000,000 to Bo Wilson personally in exchange for PH-1 on June 2, 2006. Despite the fact that he was the real estate agent for this transaction (and has claimed that he was due an $81,000 commission on the transaction), he did not hold the money in escrow for the mortgagee. The Trustee alleges that this was a breach of Shallow's duties as a real estate agent under applicable Alabama law. Even if it is true, this is not an issue upon which the Court is going to rule. It is between the Shallows and the Real Estate Board. While the Trustee cites numerous Alabama statutes on real estate agent duties, she does not specify which statutes were violated or what conduct constituted a violation. Based on her argument, the Court is not convinced that Shallow violated any applicable duties by paying Wilson directly for PH-1. Because PH-1 was not released from the Debtor's mortgage on July 18, 2007, the Court concludes that Shallow had no duty to hold the money in escrow. At the very least, the Trustee has not proven that the transaction was a breach of Shallow's duties under applicable Alabama law, or, if it was, how this alone makes all of the transfers fraudulent. If it was a violation of Shallow's duties as a realtor, it was still only one fact to be considered. Overall, other factors counterbalance this one to lead the Court to determine the transfer was not fraudulent.

(2) Shallow's Duties as a Real Estate Agent

The Trustee has not brought claims for breach of applicable real estate agent duties in this case. However, the Court could consider any proven breach as evidence of Shallow's intent. The Trustee alleges that Shallow's acting as the Debtor's real estate agent at the same time that he held the Debtor's mortgage created an irreconcilable conflict of interest. The Trustee cited no law to support this contention. Further, she raised the issue for the first time in her closing argument. Therefore, the matter was not fully litigated. With no authority to rely on,

Case 12-00060    Doc 192    Filed 05/02/14    Entered 05/02/14 13:30:44    Desc Main
Document      Page 82 of 88

the Court is not prepared to find that acting as both mortgagee and real estate agent is a per se violation of the realtor's duty of loyalty. Again, even if true, this factor does not outweigh all factors the Court considered taken as a whole.

The Trustee also argues that Shallow breached his ethical duties by reselling units that no longer belonged to the Debtor when he could have sold units which did belong to the Debtor, thus benefitting the Debtor. Specifically, Shallow resold unit 303 to the Wallaces in March of 2009, and he resold his own unit PH-1 to the Callaises in May of 2009. The Trustee faults Shallow for not selling a unit encumbered by the Debtor's mortgage to the Wallaces and PH-2 to the Callaises. Again, the Trustee does not cite any law to support this claim. It is a fundamental tenet of real property that no two parcels are the same. Based on this presumption, the Court is not inclined to find that it was within Shallow's power to control which units buyers bought. The Wallaces wanted 303. The Callaises wanted PH-1.

The Trustee further argues that Shallow's conduct was a breach of his duties under general agency law principles, and that, under these principles, she need not prove how the breaches damaged the Debtor because general agency law imposes a duty to account for breaches regardless of whether damages are proven. This Court is only concerned with how the Defendants' conduct impacted the Debtor's estate and whether fraudulent transfers occurred. Therefore, damages are an essential element of any claim in this case. The Bankruptcy Code and Alabama Code require it. The Trustee has failed to prove that Shallow breached common law agency principles or that the alleged breaches damaged the Debtor.

(3) January 22, 2009 Release of the Debtor's $350,000 Vendor's Lien

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document      Page 83 of 88

The day before RBL purchased the Debtor's mortgage, Wilson released PH-1 from its vendor's lien. The Trustee argues that this release was without consideration—that Wilson was just helping his friend Bob out vis-á-vis Vista Bella's many creditors as the project deteriorated. The Defendants argued that the release was given in exchange for Shallow's forgiveness of over $800,000 worth of unpaid commissions.

The Court has found that the release was given in exchange for reasonably equivalent value. While this does not preclude a finding of actual fraud, for the reasons stated above, the Court finds that this exchange by itself does not evidence actual intent to defraud. *See* 5 COLLIER ON BANKRUPTCY ¶ 548.04[1][b][iii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (stating "[w]hen a transfer is made with the requisite actual intent . . . the debtor's receipt of reasonably equivalent value is immaterial.")). Further, when viewed in light of the Defendants' other actions, this exchange, while suspicious, just looks like a reasonable exercise of Wilson's and Shallow's business judgment. One suspicious fact does not make a conspiracy or pattern. The Court, as stated elsewhere, has found Shallow and Wilson's testimony to be credible. Their version of these facts is the one the Court believes.

(4) January 26, 2009 Release of Unit PH-1

Days after purchasing the Debtor's mortgage, Shallow released his unit PH-1 from the mortgage. The Court found that this was not a fraudulent transfer under federal or Alabama law. However, the Trustee argues that, when viewed in light of Shallow's other actions, this release shows a pattern of fraudulent intent.

The evidence shows that the Shallows paid fair consideration for PH-1. Their purchase of the Debtor's mortgage was motivated, in part, by an interest in protecting their investment. This interest does not strike the Court as fraudulent.

84

(5) Reallocation of LCEs

As the Court has already discussed, the Debtor's treatment of the LCEs does not show actual intent to hinder, delay, or defraud, nor does it evidence constructive fraud.

The evidence falls short of conclusively answering why Shallow failed to reallocate the LCEs to an unsold unit and put them through the foreclosure sale. It may have been an oversight. Based on the briefs presented and the Court's own research, the LCE issue appears to be a unique one. No case law that directly addresses these facts has been cited. Even if Shallow purposely withheld the LCEs from the sale, the Court is not convinced that he did so with an eye toward depriving the Debtor of their value. He likely did not anticipate competitive bidders at the sale, and in fact, no bidder with the ability to outbid RBL showed up. Keeping the LCEs out of the sale may have simply made for less paperwork and hurdles for what was likely to be a "going through the motions-type" sale. At any rate, the Trustee has not proven that Shallow's and the Debtor's treatment of the LCEs evidences actual intent to defraud or any damages.

(6) June 1, 2009 Foreclosure

While the Court determined that the June 1st foreclosure sale was not constructively fraudulent, the Trustee urges that when considered in light of Shallow's other actions, it shows a "clear pattern of purposeful conduct" to defraud the Debtor's creditors. *See In re F & C Services, Inc.*, 44 B.R. 863, 872 (Bankr. S.D. Fla. 1984). In particular, if Shallow had knowingly made a false promise to creditors that he was not going to foreclose and then proceeded to foreclose, this would be some evidence of actual intent to hinder, delay, or defraud creditors. Malin and Haas both testified that, around the time that RBL bought the mortgage, Shallow promised the VBCOA that he would not foreclose. Shallow firmly denied making any such promise. The VBCOA met several times, and the Trustee did not present clear evidence

about when Shallow's alleged promise occurred. The minutes from the January 31, 2009 meeting of the VBCOA show that Haas attended and that Shallow gave a report on the status of the unsold units. The minutes do not reflect any promise by Shallow to forego foreclosure. While the alleged promise could have occurred at another meeting, the Court does not believe that it did. While Shallow may have told the VBCOA that his intentions were to sell the remaining units, the Court does not believe that he *promised* not to foreclose.

Likewise, the Memo of Understanding (MOU) signed in exchange for Lemoine's lien releases evidences Shallow's intention not to foreclose, but it does not contain a *promise* not to foreclose. Further, even if the MOU had contained a false promise not to foreclose, such a promise would not have been fraudulent as to Lemoine because Lemoine was so far down the priority line that he was never going to get anything out of a foreclosure sale.

The Trustee has also not proven that the estate was damaged by RBL's retention of the LCEs. First, the LCEs cannot be held by the Debtor on a stand-alone basis. Second, the value of the LCEs was $60,000-$80,000 at the time of foreclosure. RBL bid its entire debt and more at the sale. Even with the LCEs included in the bid amount, the bid constituted REV under Alabama and federal. In other words, the price RBL paid at the foreclosure sale would not "shock the conscience" even if, as a percentage of fair market value, the price paid had been lower on account of the value of the LCEs being included in the sale.

The Court does not see a clear pattern of fraud. When taken as a whole, Shallow's conduct with regards to the Debtor and its assets might appear suspect. Vista Bella was under Shallow's control from at least January 26, 2009 onward. Shallow failed to specifically foreclose on all of the Debtor's property and later profited from selling the property he had not clearly foreclosed. But no one attempted to redeem any of the property. No one inquired about

Case 12-00060   Doc 192   Filed 05/02/14   Entered 05/02/14 13:30:44   Desc Main
Document    Page 86 of 88

redemption. Shallow thought RBL owned the LCEs. In retrospect, Shallow and RBL made a lot of money from Vista Bella while the Debtor's creditors all lost. One can agree that the fact pattern could be looked at both ways—that is why this trial occurred. However, the Court concludes that the Trustee did not prove the existence of a fraudulent scheme by a preponderance of the evidence.

The Court finds it very persuasive that Wilson and Shallow engaged in the same conduct with the Legacy Key project: Wilson was the developer. Shallow owned a unit. All the project's LCEs were appurtenant to Shallow's unit and Shallow reallocated them at Wilson's direction. Shallow did not profit from holding the LCEs; it was a mere convenience. Legacy Key was a successful project. Everyone made money; everyone was happy. Wilson and Shallow attempted to replicate their success with Vista Bella.

To this end, Shallow made roughly $50,000,000 in presales of Vista Bella units—a number that came very close to pro forma projections. He bought PH-1 as an investment. Then, in 2008, the housing market, along with the broader economy, tanked. One sale after another failed to close. Some purchasers demanded refunds of their deposits. The Debtor defaulted on its mortgage. Understandably, creditors became increasingly anxious and unwilling to provide lien releases, which further impeded sales efforts. Shallow's own investment in PH-1 was put at risk by these developments—developments which he certainly did not orchestrate.

In 2007 and 2008, Shallow may have thought that the housing market would improve and the Vista Bella project would turn a profit, but he could not have *known* that it would. In buying the Debtor's mortgage, he took a risk—a calculated risk, but a risk nonetheless. Several of the Debtor's creditors were interested in purchasing the mortgage, all with the hope or expectation that things would improve and money would be made. For one reason or another,

these other creditors were not willing or able to buy the project. RBL was. Eventually, the market did improve, and Shallow's risk was rewarded. The Defendants actions are consistent with an effort to make the best business decision at each turn.

These facts together with the Court's view that the testimony of Wilson and the Shallows was credible makes it impossible to find that the Trustee met her burden of proof under either § 548 or § 544. Therefore, it is ordered and adjudged that all of the counts of the complaint of Lynn Harwell Andrews against the defendants RBL, L.L.C., Robert W. Shallow, Susan Shallow, and Ronald H. Carr are DENIED and judgment is awarded to the Defendants.

Dated:   May 2, 2014

MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE